**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | : : : | |
| | : | Civil Action No. 4:20-cv-1099-LPR |
| **Plaintiff,** | : : | |
| v. | : : | **KROGER'S STATEMENT OF** |
| | : | **MATERIAL FACTS IN SUPPORT OF** |
| KROGER LIMITED PARTNERSHIP I d/b/a | : | **ITS MOTION FOR SUMMARY** |
| KROGER STORE NO. 625. | : | **JUDGMENT** |
| | : | |
| **Defendant.** | : | |

Pursuant to Local Rule 56.1, Defendant Kroger Limited Partnership I provides the following Statement of Material Facts in Support of Its Motion for Summary Judgment:

## I.   Kroger Background & Corporate Structure

1.   The Kroger Co. is a holding company that owns dozens of subsidiary companies, across the United States, including numerous supermarket divisions, jewelry stores, fuel stores, a meal-kit delivery service, manufacturing companies, logistics operations, data processing companies, financial institutions, healthcare clinics, retail pharmacies, and specialty pharmacies. **Exhibit 1** - Declaration of Kevin Lindsey ("Lindsey Decl."), ¶ 6.

2.   The Kroger Co.'s holdings include multiple grocery and supermarket divisions that operate under different banners, including Baker's, City Market, Dillons, Food 4 Less, Fred Meyer, Fry's, Jay C Food Store, Gerbes, King Sooper, Kroger, Mariano's, Metro Market, Pay-Less Super Markets, Pick'n Save, QFC, Ralphs, Ruler, and Smith's Food and Drug. *Id*. at ¶ 7.

3.      Operations for the Kroger Co. grocery and supermarkets brands are managed by regional divisions, who are responsible for operations and all have their own policies and leadership. *Id.* at ¶ 8.

4.      Kroger Store 625 is operated by the Delta Division, and follows Delta Division policies. *Id.* at ¶ 9; **Exhibit 2 -** Lindsey 30(b)(6) Dep. 19:14-22.

## II.      Kroger Inclusion and Diversity Initiatives

5.      Kroger Delta Division is an Equal Employment Opportunity (EEO) employer and prohibits discrimination on the basis of age, color, disability, gender, national origin, race, religion, sexual orientation or gender identity. Lindsey Decl. ¶ 11. Additionally, Kroger Delta Division policy requires maintaining an inclusive business culture. *Id.* at ¶ 12.

6.      Kroger grants reasonable accommodations for religious beliefs or practices that conflict with an employment requirement, if they do not create an undue hardship. *Id.* at ¶ 13.

7.       If an associate requires a religious accommodation, they should first raise the request with their Store Leader. *Id.* at ¶14; Lindsey 30(b)(6) Dep. 22:3-18, 28:1-23. Alternatively, associates can make a request to the Ethics Hotline. *Id.* Either way, the accommodation request is routed to the District Human Resources ("HR") team to determine if the request can be accommodated. *Id.* When necessary, HR will consult with legal counsel for guidance on assessing accommodation requests. *Id.*

8.      The Kroger Co. has been recognized by various diversity and inclusion awards, including being recognized as a Best Place to Work for Disability Inclusion by the DEI Disability Equality Index, America's Top Corporations for Women's Business Enterprises by the Women's Business Enterprise National Counsel, and Top 20 Company for Diversity & Inclusion by the Wall Street Journal. Lindsey Decl. ¶ 17.

9.      In 2019, the Kroger Co. announced that the Human Rights Campaign Foundation's Corporate Equality Index as a Best Place to Work for LGBTQ Equality ("HRC Award"). **Exhibit 3 -** Nieman Dep. 38:14-39:7. The Corporate Equality Index assesses "non-discrimination workplace protections, domestic partnership benefits, transgender-inclusive health care, competency programs and public engagement with the LBGTQ community," and the Human Rights Campaign Foundation determined that the Kroger Co. met or exceeded all the of index criteria. Lindsey Decl. ¶18; **Exhibit 4 –** Declaration of Karl Nieman. ¶ 24.  The award was not promoted or advertised in Store 625. **Exhibit 5 –** Declaration of Sean Maxwell ¶ 9; **Exhibit 6 -** Lawson Dep. 16:15-21.

10.     After Kroger corporate announced that it won the HRC Award, several employees at Store 625 saw the announcement online and complained to store management that they did not think that Kroger should have LGTBQ initiatives or support LGBTQ associates because they felt participation in the LGBTQ community was sinful. Maxwell Decl. ¶¶8-10. The associates also complained that they did not think the Kroger Co. should have published the award or highlight its participation in LGBTQ initiatives. *Id.*

### III.      Development of the Our Promise Symbol

11.     The origin of the Our Promise symbol dates back to Kroger's Customer First Promise, which launched around 2004. Nieman Dep. 8:18-9:8; Nieman Decl. ¶6.

12.     In 2012, Kroger began contracting with marketing firm Boston Consulting Group ("BCG") and Brighthouse ("BH"), who conducted customer and associate research and determined Kroger lacked a strong emotional connection to its customers. Nieman Dep. 9:9-10:25; Nieman Decl. ¶7. Based on that research, Kroger attempted to strengthen the emotional connection

with customers by putting "[their] the heart in the shopping cart." Nieman Dep. 9:20-10:5; 10:19-22; Nieman Decl. ¶¶7-8.

13.     Kroger began to develop the Feed the Human Spirit campaign, where Kroger aimed to address the unmet needs in helping customers, associates, and their communities. Nieman Dep. 10:7-25; 33:15-34:6; Nieman Decl. ¶¶8-9. The Kroger Co. created a Feed the Human Spirit symbol that was a blue heart with the words "Feed the Human Spirit" in white, which was finalized and published in early 2016. Nieman Decl. ¶ 9.

14.     In 2016, Kroger had various company initiatives articulating the company's values, goals, mottos, leadership models, and commitments that were somewhat disjointed and worked independently. Nieman Decl. ¶ 10; Nieman Dep. 26:14-27:24. Kroger wanted to combine these company initiatives into a cohesive and easily understandable framework. Nieman Dep. 11:5-10; 15:13-16:7; Nieman Decl. ¶ 10. So, in 2016, Kroger partnered with the Disney Company, the experts in service-based model and associate communication. *Id.* Disney helped Kroger to create a new, clear, and easy to embrace framework that simplified Kroger's various company initiatives into an understandable message. *Id.*

15.     With assistance from Disney, BCG, and BH, Kroger developed the unifying framework, which summarized Kroger's Purpose, Leadership Model, Value, and Promise. Nieman Decl. ¶ 20.

16.     During this transformation, Kroger's Customer First Promise evolved into Kroger's Our Promise, which represents Kroger's four service-based commitments: (1) everyone friendly and caring; (2) everything fresh; (3) uplift every way; and (4) improve every day. Nieman Dep. 11:9-24; Nieman Decl. ¶ 12.

17.     The Our Promise symbol is comprised of four layered hearts, which represent the four promises. Lawson Dep. 10:16-11:7; Nieman Decl. ¶13. In the center is a blue heart surrounded by a yellow heart, surrounded by a red heart, surrounded by a light blue heart. *Id.*

18.     When developing the Our Promise symbol, Kroger selected a heart to show that Kroger cared about its customers, associates, and communities. Nieman Decl ¶ 14. Additionally, the heart symbolized Kroger's commitment to put the "heart back in the cart" and to "Feed the Human Spirit," which were already a part of Kroger's branding initiatives. Nieman Dep. 20:6-13; Nieman Decl ¶ 15.

19.     Kroger's signature blue color was selected as the base layer of the heart because it was an already established color in Kroger's brand.  Nieman Dep. 20:14-21; Nieman Decl ¶ 15.

20.     Red was selected for one of the hearts to be inclusive of the color's well-known presence in the company banners on the West Coast. Nieman Dep. 20:22-21:4; Nieman Decl ¶ 16.

21.     After selecting blue and red, the Kroger Co. selected yellow as the remaining color because they wanted another lighter color and liked the eye-grabbing look of the primary colors. Nieman Dep. 20:22-21:9; Nieman Decl ¶ 17.

22.     The light blue color was selected because it complemented the Kroger blue. Nieman Decl. ¶ 18.

23.     Prior to release, the Our Promise symbol was market tested and received positive reviews. Nieman Decl. ¶ 19.

24.     Kroger continued to work with Disney, BCG and BH to develop a training and communication plan to roll out the new framework to associates, which would integrate the plan into Kroger's internal culture and external brand. Nieman Dep. 12:6-19; 14:5-17:24; Nieman Decl. ¶21.

25.     In total, Kroger paid Disney, BCG and BH over tens of millions of dollars to assist in creating, testing, and implementing the Our Purpose and Our Promise campaign and create a positive company culture and brand identity. Nieman Decl. ¶ 22.

26.     The Kroger Co. began to rollout the Our Purpose and Our Promise campaign in June 2018, when it was published to associates and trainings were conducted on the Our Promise meaning. Nieman Dep. 29:21-22; Nieman Decl. ¶23. Information on the Our Purpose and Our Promise campaign was also posted on the employee intranet site in 2018. Nieman Decl. ¶ 23.

27.     LGBTQ initiatives were not discussed or considered while designing any part of the unifying framework or the Our Promise symbol. Nieman Decl. ¶ 25. There was no intention to reference or support the LGBTQ community. Nieman Decl. ¶ 25.

28.     Kroger has a specific PRIDE logo that is used when Kroger is promoting or supporting LGBTQ initiatives. Nieman Decl. ¶ 26. The Our Promise symbol has not been used to promote or support any LGBTQ initiative. Nieman Decl. ¶ 26.

29.     Kroger never requested that Lawson or Rickerd wear the PRIDE logo or participate in any LGBTQ initiatives. Ricked Dep. 27:9-17; Lawson Dep. 16:22-17:4.

### IV.     Creation of the Uniform

30.     In 2018, the Kroger Co. began rethinking its uniform branding. Nieman Dep. 28:1-32:8. At the time, Kroger Co.'s grocery banners had over 200 different uniform components, and the Kroger Co. was considering how they could simplify the uniform while honoring each grocery banner and creating a consistent brand. Nieman Dep. 29:16-20; 30:1-14; Nieman Decl. ¶27. The Kroger Co. also wanted to find a way to save money on uniform costs, while making associates easily identifiable to customers and improving associate satisfaction. Nieman Decl. ¶ 27.

31.     The decision to create Kroger's new uniform was inspired by the models of other successful companies:

   a.   Around 2018, Kroger executives visited the Home Depot headquarters. Nieman Dep. 28:12-29:1; Nieman Decl. ¶28. While in the lobby, the Kroger executives saw Home Depot's hall of aprons, which displayed Home Depot's trademark orange aprons. *Id.* The Kroger executive team was inspired by the equality of the apron. *Id.* Specifically, Kroger was moved by a story that whenever the Home Depot CEO visits a store, he wears the apron. *Id.* The Kroger executives thought this showed humility and Home Depot's commitment to putting the customer first. *Id.*

   b.    Also around 2018, Starbucks' CEO sent Kroger's CEO a Starbucks apron. Nieman Dep. 29:2-10; Nieman Decl. ¶29. The Starbucks apron had the Starbucks' logo in the center and had the Starbucks' Barista Promise inscribed in the inside to remind Starbucks associates of the commitments. *Id.*

   c.   In June 2018, Walmart announced a new uniform policy that allowed associates to wear their own clothes with the messaging of be yourself and be unique. Nieman Dep. 29:11-17; Nieman Decl. ¶30. The Kroger Co. team liked the Walmart messaging and liked the idea of allowing associates to express themselves by wearing their own clothes. *Id.* Kroger also took note that the new Walmart policy included a vest that had the Walmart spark logo on the back. *Id.*

32.     By drawing on the examples of others, the Kroger Co. decided to create a new uniform apron for associates under the Kroger Co. banner. Nieman Decl. ¶31. Kroger Co.'s uniform supplier created two versions of the apron; a black apron for the West Coast banners, who

were accustomed to black uniform components, and a blue apron for the East Coast banners, who were more accustomed to the Kroger blue uniform components. *Id.*; Nieman Dep. 30:6-21.

33.     The aprons had the company name for each banner in the center and the Our Promise symbol on the left over the employee's heart. Nieman Decl. ¶ 32. The apron also had two eyelets on the right side for employees to display their name tag. *Id.*; **Exhibit 7 -** Riddley Dep. 30:16-31:3.

34.     Kroger embroidered Kroger's Our Purpose & Our Promise meaning on the inside of the apron, which stated Because Our Purpose is to Feed the Human Spirit, We Promise Everyone Friendly & Caring, Everything Fresh, Uplift Every Way, and Improve Every Day. Nieman Decl. ¶33; Nieman Dep. 30:22-31:16. The Kroger Co. placed the Our Purpose & Our Promise meaning on the inside of the apron to make sure that associates saw it every day as they put on their apron over their heads. Nieman Decl. ¶34; Nieman Dep. 32:13-33:3; **Exhibit 8 -** Maxwell Dep. 41:20-42:16.

35.      The decision to accept the new uniform was left to each Kroger Co. division, who set their own uniform policy, and set their own schedule for rollout. Lindsey 30(b)(6) Dep. 19:14-21:23. The first Kroger Co. Division to rollout the new uniform apron and policy was the Nashville Division, who launched the new uniform in late 2018. Nieman Dep. 32:1-8; Nieman Decl. ¶35.

### V.    Delta Division's Adoption of the Uniform

36.     The Delta Division has adopted a uniform policy because Kroger has a business interest in the benefits that uniforms provide, including: (a) ensuring an attractive and professional business image; (b) making employees easily recognizable to customers; (c) promoting Kroger's brand; (d) providing clear advertising; (e) encouraging teamwork and reminding employees to work as a team; (f) reminding employees of Kroger's value and promise to its customers; (g)

promoting company pride; (h) assisting with customer relations; and (i) improving security for employee-only areas. Lindsey Decl. ¶ 19.

37.     The Delta Division decided to adopt the new uniform because they wanted to be more competitive in hiring and retention based on feedback from associates that they would like a more relaxed uniform and to wear their own clothes. Lindsey Decl. ¶22; Lindsey 30(b)(6) Dep. 22:24-24:4, 24:14-25:9; 25:9-26:3. Additionally, Delta Division decided to adopt the apron to share Kroger's Purpose and Promise with associates and customers. *Id.*

38.     The Delta Division adopted the new associate dress code policy in April 2019, and provided Store Leaders guidance on how to launch the program and communicate the new dress code to associates. Lindsey Decl. ¶ 23; Maxwell Dep. 39:7-16; Lawson Dep. 32:21-34:8.

> a.  Guidance provided to the Store Leaders stated "beginning April 22, associates will receive new Kroger-blue apron designed around Our Promise messaging and colors. These new aprons have the four Our Promise statement sewn into the bib. This will help associates to remember our commitment to our customers. The aprons also have the Our Promise heart sewn over the left side. This is intended to serve as a reminder of what we stand for – to "Feed the Human Spirit." Lindsey Decl. ¶ 24; Maxwell Dep. 107:10-16.

> b.  The Delta Division Dress Code policy indicated that "professional appearance is essential to our Everything Fresh promise to customers. An associate's appearance can impact how customers view friendliness, freshness and cleanliness. . . Associates are encouraged to express their style in a manner that is professional and approachable." Lindsey Decl. ¶ 21.

39.     Starbucks associates and Murray's Cheese Associates were not required to wear the new uniform apron due to branding agreements. Lindsey Decl. ¶ 25. **Exhibit 9 -** Lindsey Fact Dep. 27:18-24. Instead, Starbucks associates wore the Starbucks aprons and Murray's Cheese Shop employees wore the Murray's cheese uniform. Lindsey Decl. ¶25; Lindsey Fact Dep. 27:18-28:3.

40.     The pharmacy associates wore scrubs and/or traditional pharmacy white coats. Lindsey Decl. ¶26; Maxwell Dep. 52:1-3.

41.     Under the terms of the collective bargaining agreement, Kroger is required to provide uniforms to associates at Kroger's expense. Lindsey Decl. ¶ 31. As a result, Kroger spent millions of dollars on purchasing new uniform aprons for its associates. Lindsey Decl. ¶ 31.

42.     Delta Division maintains an employee handbook, which states that the following behaviors may result in disciplinary action including discharge: violation of established Company policies and insubordination or willful refusal to follow the instructions of a supervisor. Lindsey Decl. ¶¶ 32-33.

43.     In regard to dress code compliance, the Store 625 generally followed a progressive disciplinary policy with dress code violations. Maxwell Dep. 70:22-23; Maxwell Decl. ¶ 15. First, if a manager notices the employee is out of uniform and is available to assist, the manager will pull the employee aside, explain the policy to the employee, provide the employee a verbal warning and ask the employee to fix the issue. Maxwell Decl. ¶ 16. If the issue can be fixed immediately, the manager will ask the employee to do so. Maxwell Dep. 68:23-69:8. If the issue cannot be fixed immediately, the manager may ask the employee to fix the issue while on a break or the next day. Maxwell Decl. ¶ 16. Second, if the employee does not comply, the manager will issue the employee a Serious Incident Reminder ("SIR"). *Id.* at ¶ 16. Third, if the employee continues to refuse to comply, the manager will issue a Constructive Advice Record ("CAR"). *Id.* Fourth, if non-

compliance continues, the manager will proceed to a 1-3 day suspension. Finally, if non-compliance persists, Kroger will terminate the employee. *Id*. At each stage of the process, employees are warned that further non-compliance may result in disciplinary action. *Id.*

## VI.   Store 625 Background

44.    Plaintiffs Brenda Lawson and Trudy Ricked were employed at Kroger Store 625. Maxwell Decl. ¶6.

45.    A copy of the new dress code policy was posted in the employee breakroom, and both Lawson and Rickerd reviewed the policy. Lawson Dep. 53:15-17; **Exhibit 10 -** Rickerd Dep. 35: 4-22; **Exhibit 11 -** Brockman Dep. 13:13-9.

46.    The new uniform aprons were distributed on or around April 22, 2019, and continued to be distributed as employees returned to work. Maxwell Decl ¶ 13.

## VII.   Our Promise Symbol is not a Rainbow or LGBTQ Symbol

47.    Lawson admits that a rainbow is normally seven colors and in the shape of an arc or bow. Lawson Dep. 3:16-17, 13:2-17.

48.    Lawson and Ricked agree that the Our Promise symbol is red, yellow, blue, and light blue. Lawson Dep. 10:22-11:7; Rickerd Dep. 188:12-21.

49.    Lawson and Rickerd admitted that the Our Promise symbol was not actually a full rainbow. Rickerd Dep. 188: 22-24; Lawson Dep. 13:13-15.

50.    Lawson and Rickerd agree that the Our Promise symbol was in the shape of a heart. Lawson Dep. 10:16-24; Rickerd Dep. 11:19-24.

51.    Lawson and Rickerd believe that rainbows are a symbol of God's promise. Lawson Dep. 79:3-21; Rickerd Dep. 17:11-13.

52.     Rickerd and Lawson admit that the Our Promise meaning ascribed on the inside of the uniform did not mention or relate to LGBTQ. Rickerd Dep. 21:22-22:13, 36:6-18; 78:1-80:19; Lawson Dep. 28:2-4.

53.     Lawson and Rickerd admit that Kroger told them on multiple occasions that the Our Promise symbol represented everyone friendly and caring, everything fresh, improve every day, and uplift every way. Lawson Dep. 26:2-27:14; Lawson. Dep. Exh. N- Lawson EEOC Interview Notes ("Lawson EEOC Notes") p. EEOC-000083; Rickerd Dep. 39:7-11, 60:13-15.

54.     Lawson admits that the Kroger Our Promise symbol is clearly different from the Pride flag. Lawson Dep. 23:8-24.

55.     Rickerd and Lawson admit that no one at Kroger ever told them that the apron or heart emblem had anything do with LGBTQ rights. Ricked Dep. 16:4-7; 92:1-6; Lawson Dep. 25:24-26:1.

56.     Lawson admits that she had no involvement in developing the Our Promise symbol and did not know why it was developed, why the colors were selected, or why the shape was selected. Lawson Dep. 29:4-19.

57.     Rickerd admits that she was not involved with developing the Our Promise symbol, did not know when it was developed, did not know why it was developed and did not know how it was developed. Rickerd Dep. 24:13-25.

## VIII.     Rickerd's Beliefs

58.     Rickerd alleges that she has a religious belief that homosexuality is a sin and an "abomination," and that she cannot support LGBTQ rights. Rickerd Dep. 9:21-10:16; Rickerd Dep. Exh. L – Rickerd EEOC Interview Notes ("Rickerd EEOC Notes"), p. EEOC-0001028.

59.     Rickerd admits that she has no religious objection to wearing the color light blue, blue, red or yellow together. Rickerd Dep. 14:9-11.

60.     Rickerd stated that her belief that the Our Promise symbol represented LGBTQ rights had nothing to do with it being multi-colored. Rickerd Dep. 16:15-18

61.     Rickerd does not have any religious objection to the shape of a heart. Rickerd Dep. 74:2-75:2. In fact, Rickerd admitted that she frequently uses heart emojis. Rickerd Dep. 167:5-7.

62.     Rickerd stated in her deposition that she did not know that rainbows were a symbol of the LGBTQ movement and claims that rainbows are a symbol of God's promise. Rickerd Dep. 17:8-13; Rickerd EEOC Notes, p. EEOC-0001029.

63.     Rickerd claims that she first heard about the new dress code at the end of April 2019 from Steve Brewer, an associate in the Dairy Department. Rickerd Dep. 14:9-11, 62:19-23, 64:6-21; Rickerd EEOC Notes, p. EEOC-001028. Rickerd alleges Brewer told her it was a blue apron, with a rainbow heart on it, and if they didn't wear it, they would be fired. Rickerd Dep. *Id.*

64.     The same day that Rickerd saw the apron, Rickerd first learned that Kroger Co. was involved in LGBTQ initiatives after another associate told her that Kroger Co. participated in an LGBTQ parade. Rickerd Dep. 14:9-11, 25:3-12, 65:8-66:24, 68:12-19; Rickerd EEOC Notes, p. EEOC-0001028.

65.     Rickerd claims that the day before she learned about the uniform, God "laid on [her] heart: Be not conformed to this world, be ye separate." Rickerd Dep. 63:24-64:5, 165:17-166:14. At the time, Rickerd stated that she did not know what it meant. *Id.* However, after learning about the new uniform, she assumed that it was referring to wearing the new apron. *Id.*

13

66.     Rickerd admitted that God never specifically told her that she could not wear a uniform, the apron, or a rainbow symbol. Rickerd Dep. 63:24-64:5, 70:7-71:6, 72:10-12, 75:3-24, 76:19-77:15, 165:17-166:14.

67.     Rickerd also claims that she would not wear the following logos because they support the LGBTQ community: the Olympic rings, NBC, Google, Microsoft, Apple, Skittles, Southwest, Burger King, Superman, Ebay, Play Station, Crayola, or Billboard. Rickerd Dep. 189:12-190:10; Rickerd Dep. Exh. M - Company Logos.

## IX.     Lawson's Beliefs

68.     Lawson believes that homosexuality is a sin and that she cannot support LGBTQ rights. Lawson Dep. 9:21-10:16.

69.     Lawson told Kroger that she thought the Our Promise Symbol was an LGBTQ symbol because it was a "rainbow heart" and she knew Kroger supported LGBTQ initiatives. Lawson Dep. 23:25-24:14; **Exhibit 12 -** Declaration of Sheryl Riddley ¶ 18; Maxwell Decl. ¶ 22.

70.     When District HR Leader Sheryl Riddley asked Lawson to explain why she believed the Our Promise symbol was an LGBTQ symbol, Lawson stated that the "rainbow heart" was against her religious beliefs and that she had nothing else to say. Lawson Dep. 51:18-52:11; Riddley Dep. 72:4-12.

71.     Lawson admitted that she does not have any religious objection to wearing hearts. Lawson Dep. 11:8-10.

72.     Lawson admitted that she does not have a religious objection to wearing the colors yellow, blue, or red. Lawson Dep. 11:11-22.

73.     Lawson admitted that she does not believe that using multiple colors necessarily represents LGBT. Lawson Dep. 84:22-25.

74.     Lawson admitted that she had many multi-colored garments. Lawson Dep. 14:15-16.

75.     Lawson appeared at her deposition wearing a sweater with horizontal striped blocks of the following colors: red, blue, white, tan, green, and yellow. Lawson Dep. 12:18-13:1.

76.     Lawson admitted that she was wearing a multi-color cardigan that displayed more colors on it than the Our Promise symbol. Lawson Dep. 85:9-12.

77.     When asked why Lawson objected to wearing the red, blue and yellow in the Our Promise symbol while she was wearing a sweater at her deposition that was red, blue, white, tan, green, and yellow, Lawson responded "When I look at this, I don't think of a rainbow. That is a rainbow." Lawson Dep. 12:18-13:1.

78.     When asked to define her definition of a rainbow, Lawson stated "That's hard to say. A rainbow is a rainbow. It's just layers of rainbow colors." Lawson Dep. 13:25-14:2.

79.     When asked when using multiple colors represented LGBTQ, Lawson stated "I recognize a gay flag when I see it." Lawson Dep. 85:1-2.

80.     Lawson admitted that she learned of Kroger's support of the LGBTQ community months before the new uniform was released. Lawson Dep. 15:5-22.

81.     Lawson claimed that the Our Promise symbol was a "subliminal symbol of a rainbow." Lawson Dep. 15:2-4.

82.     When asked why Lawson thought the Our Promise symbol was a rainbow, Lawson stated "It's just - - because that had been planted in my mind for one thing… [t]hat Kroger support LGBTQ, and they were the number one workplace - - voted number on work place for LGBTQ… That was all over the store when – before the apron was issued. It was employees showing pictures

of the parade, and that was just in our minds when the new dress code was issued." Lawson Dep. 14:8-25.

83.     Lawson admitted that multiple Kroger managers explained to her what the Our Promise symbol stood for, but she did not believe Kroger's explanation because "after the rumors and the pictures of the gay pride parade and being on my mind – when I saw that, that's the first thing that I thought of; that they were trying to get the message across in a – in a simple way. And they were approving of LGBTQ in that way." Lawson Dep. 39:5-14.

84.     Lawson admitted that the reason she thought Kroger's Our Promise symbol represented LGBTQ was because she had heard about the pride parade participation and Kroger's award for LGBTQ. Lawson dep. 85:24-86:3; Lawson EEOC Notes, p. EEOC-0000083.

85.     Lawson has posted photos of rainbows on her Facebook page. Lawson Dep. 80:14-8; Lawson Dep. Exh. K.

86.     Lawson claims that a picture of a rainbow coming out of a leprechaun hat is an LGBTQ symbol because it is the same colors as the LGBTQ flag. Lawson Dep. 82:12-4; Lawson Dep. Exh. L.

87.     Lawson believes that when a company asks associates to wear a logo, they are asking associates to promote their social causes. Lawson Dep. 76:12-24.

88.     Lawson stated that she felt that the following logos also represented LGBTQ: the Olympic rings, NBC, Google, Microsoft, Apple, Southwest, Superman, Ebay, Playstation, and Billboard. Lawson Dep. 29:25-31:8, 78:17-24; Lawson Dep. Exh. E.

89.     Lawson does not believe that the Crayola, Skittles, or the Burger King logos represent the LGBTQ. Lawson Dep. 30:22-31:14; Lawson Dep. Exh. E.

## X.        Rickerd's & Lawson's Refusal to Wear the Uniform

90.        Rickerd and Lawson admit that they understood that failure to follow policy, insubordination or refusal to follow instructions could lead to discipline. Rickerd Dep. 41:7-42:5, 43:12-44:16, 47:13-16; Lawson Dep. 43:21-23, 44:5-11, 47:8-16.

91.        Lawson and Rickerd initially refused to accept the uniform apron and stated they would not wear it because it had a "rainbow heart" on it. Lawson Dep. 35:10-14; Lawson EEOC Notes; Rickerd Dep. 47:17-48:8, 134:23-135:19. When a Co-Manager tried to hand Rickerd an apron, she told the Co-Manager "I don't want it," but the Co-Manager said he had to give it to her. Rickerd handed the apron to an employee, who she was training, and stated "you're going to need these because I'm not wearing them." Rickerd 47:17-48:8, 134:23-135:19; Rickerd EEOC Notes.

92.        Prior to issuing any discipline, Store Manager Maxwell explained the meaning of the Our Promise symbol to Plaintiffs several times and indicated that it did not support LGBTQ. Maxwell Decl. ¶22, Lawson Dep. 35:10-14, 50:12-18. EEOC Notes.

93.        Before Kroger issued any discipline, several managers and associates warned Plaintiffs that they would be disciplined, up to termination, if they refused to wear the uniform properly. Rickerd Dep. 36:19-39:21; 62:15-24; Lawson Dep. 35:10-14, 36:16-37:9; Maxwell Dep. 70:24-71:22; Maxwell Decl. ¶¶26-27.

94.        Lawson began to wear the apron with her nametag over the Our Promise symbol. Lawson Dep. 36:11-13. Kroger managers instructed Lawson several times that she could not cover up the Our Promise symbol with her nametag before it violated the dress code. Lawson Dep. 75:8-16; Maxwell Dep. 61:6-10; Maxwell Decl. ¶ 51; Lawson EEOC Notes 84; Rickerd EEOC Notes. Lawson refused to move her nametag and told Maxwell "to do what he had to do." Lawson Dep. 37:6-9; Maxwell Decl. ¶27.

95.     Rickerd refused to wear the Kroger uniform apron. Rickerd Dep. 20:2-8. Rickerd admitted that she had conversations with managers prior to being issued discipline where the manager instructed her that she needed to wear the uniform apron and that she refused. Rickerd Dep. 38:1-39:21, 43:25-11, 46:24-47:20. Rickerd told Maxwell that "he would have to do what he needed to do." Rickerd Dep. 20:1-15; Maxwell Decl. ¶27.

96.     On May 1, 2019, Maxwell issued Rickerd an SIR for failure to follow the dress code. Rickerd Dep. 43:25-18; Rickerd Dep. Exh. E – Rickerd's Disciplinary Documents ("Rickerd Discipline").

97.     On May 3, 2019, Assistant Store Leader Kaleb Dickey issued Rickerd a CAR for disregarding an established rule and failure to follow instructions when Rickerd refused to follow the dress code. Rickerd Dep. 49:2-51:24; Rickerd Discipline. The CAR also warned that further instances would result in progressive discipline up to and including termination. Rickerd Dep. 50:12-23; Rickerd Discipline; Rickerd EEOC Notes.

98.     During her disciplinary meeting on May 3, 2019, Rickerd presented her first request for accommodation to Dickey. Rickerd Dep. 48:23-49:1; 52:5-53:3; Rickerd Dep. Exh. F- Rickerd's Request for Accommodation ("Rickerd's RFA"). Rickerd's note stated "I have a sincerely held religious belief that I cannot wear a symbol that promotes or endorses something that is a violation of my religious faith. I am requesting a religious accommodation to have a uniform apron that does not have a rainbow symbol." Rickerd's RFA.

99.     On May 4, 2019, Maxwell issued Lawson an SIR, which stated "Brenda refuses to follow the dress code." Lawson Dep. 37:25-38:9; Lawson Dep. Exh. G – Lawson's Disciplinary Documents ("Lawson Discipline").

100.     In response to receiving the May 4th SIR, Lawson gave Maxwell her first request for an accommodation. Lawson Dep. Exh. H – Lawson's Requests for Accommodation ("Lawson RFA"); Lawson Dep. 48:10-49:19; Lawson EEOC Notes EEOC-000085-86. The request stated, "I am requesting reasonable accommodation of the dress code, with regard to any religious belief causing me great discomfort and [sic] anguish, if I am required to wear the rainbow heart logo." Lawson Dep. 48:8-24; Lawson RFA.

101.     On May 4, 2019 at 1:19 pm, Maxwell forwarded Rickerd's request for an accommodation and CAR to HR Leader Sheryl Riddley and explained Lawson's request. Maxwell Dep. 87:22-24; Maxwell Decl. ¶¶ 31-32.

102.     On May 5, 2019, Assistant Store Leader Kaela Goodnight issued Lawson a CAR for "disregard of established rule well known to the employee and failure to follow instructions," which stated "[o]n 5/5/2019, Brenda refused to follow the dress code. Further instances will result in progressive discipline up to and including discharge." Lawson Dep. 46:13-48:1; Lawson Discipline.

103.     Then, Kroger stayed any additional discipline while Human Resources determined if an accommodation would be granted. Maxwell Dep. 74:11-75:6.

104.     On May 21, 2019, HR Leader Sheryl Riddley met with Rickerd, Maxwell, and union steward Noah Judy regarding Rickerd's request for an accommodation. Riddley Decl. ¶ 17. Riddley asked Rickerd to explain why she would not wear the apron. *Id.* Rickerd stated that she believed the "rainbow heart" signified Kroger's support of LGBTQ, which she refused to do. *Id.* ; Rickerd Dep. 59:12-60:12; Rickerd EEOC Notes.

105.     On May 21, 2019, Lawson had a separate meeting with HR Manager Sheryl Riddley and Maxwell. Lawson Dep. 51:18-20; Riddley Decl. ¶ 19.  During the May 21st meeting,

Riddley explained the meaning of the Our Promise symbol. Lawson Dep. 51:21-24; Riddley Decl. ¶ 19. In the May 21st meeting, Rickerd asked Lawson why she objected to the uniform and Lawson told Riddley that she had "[n]othing more to say." Lawson Dep. 52:9-11; Riddley Dep. 41:16-20; Riddley Decl. ¶ 17.

106.    During the May 21st meetings, Riddley explained to Plaintiffs the meaning of the Our Promise symbol and that it did not represent support for LGBTQ. Rickerd Dep. 60:13-23; Riddley Decl. ¶ 19.

107.    On May 21, 2019, Riddley told Plaintiffs that Kroger was going to withdraw their previous discipline, but that they needed to follow the dress code moving forward. Rickerd Dep. 86:19-87:9; Maxwell Dep. 75:3-13; Lawson Dep. 53:7-14; Riddley Decl. ¶ 19.

108.    On May 22, 2019, Rickerd received an SIR for "failure to follow the dress code." Rickerd Dep. 59:12-60:12; Rickerd Discipline.

109.    On May 23, 2019, Rickerd received a CAR, which stated "[o]n 5/23/2019, Trudy refused to follow the dress code. Further instances will result in progressive discipline up to and including termination." Rickerd Dep. 81:6-83:1; Rickerd Discipline.

110.    On May 24, 2019, Kroger issued Lawson another SIR for failure to follow the dress code. Lawson Dep. 53:22-55:9; Lawson Discipline.

111.    In response to her write-up on May 24, 2019, Lawson gave Maxwell another request for an accommodation. Lawson Dep. 60:4-61:23; Maxwell Decl. ¶42; Lawson RFA. The request stated "I am requesting reasonable accommodation of this dress code, with regard to my religious belief causing me great discomfort and aguish, if I am required to wear it (the apron with the heart logo… I am simply asking to wear my name badge over the heart logo." Lawson Dep. 48:8-24; Lawson RFA.

112.    On May 27, 2019, Rickerd received a CAR that stated "on 5/27/2019, Trudy refused to follow the dress code. Further instances will result in progressive discipline up to and including termination." Rickerd Dep. 83-84:2, 94:2-23; Rickerd Discipline.

113.    On May 27, 2019, Lawson received a CAR, which stated that "Brenda refused to follow the dress code. Further instances will result in progressive discipline up to and including discharge." Lawson Dep. 55:10-56:25; Lawson Discipline.

114.    On May 28, 2019, Lawson received another CAR and was suspended for one (1) day because "Brenda refused to follow the dress code." Lawson Dep. 56:3-59:2; Lawson Discipline. Maxwell told Lawson to go home and think about things and that she hoped that she changed her mind. Lawson Dep. 58:19-25.

115.    On May 28, 2019, Rickerd received another CAR, which stated "[o]n 5/28/2019, Trudy refused to follow the dress code. Trudy will be suspended for 1 day. Further instances will result in progressive discipline up to and including discharge." Rickerd Dep. 100:2-20; Rickerd Discipline.

116.    On May 29, 2019, Rickerd received another CAR terminating her employment, which stated "[o]n 5/29/2019, Trudy refused to follow the dress code. Trudy will be terminated." Rickerd Dep. 102:17-7; Maxwell Dep. 78:20-24; Rickerd Discipline.

117.    On June 1, 2019, Kroger terminated Lawson for refusing to follow the dress code. Lawson Dep. 59:11-13, 100:2-3; Lawson Discipline.  Maxwell told Lawson that he did not want to terminate her, and that Lawson should think about things and come back. EEOC Notes 88.

118.    During the grievance process, Kroger offered to rescind Plaintiffs' terminations and reinstate Plaintiffs if they agreed to wear the uniform properly, but they denied the offer. Lawson

Dep. 70:3-17; Rickerd Dep. 112:1-113:23, 113:7-114:8, 179:16-180:11; Lawson Dep. Exh. J – Lawson's Grievance; Rickerd Dep. Exh. I – Rickerd's Grievance.

119.    Rickerd admits that she received the offer of reinstatement but that she turned it down because she did not want her job back. Rickerd Dep. 113:7-114:8, 179:16-180:11.

120.    Other than her request for an accommodation on May 3, 2019, Rickerd never provided another request for accommodation to anyone in management or Human Resources. Rickerd Dep. 86:10-14.

121.    Rickerd admitted that the first time she told the company that she thought they were being discriminatory was during the grievance after she filed after her termination. Rickerd Dep. 110:8-111:1.

122.    Lawson admitted she never filed a complaint of discrimination while employed with Kroger. Lawson Dep. 110:23-111:2

123.    Before each discipline, Rickerd and Lawson were given an opportunity to comply with the dress code and avoid additional discipline, but refused to do so. Rickerd Dep. 43:25-18, Maxwell Dep. 101:20-102:4; Lawson Dep. 53:12-14; Maxwell Decl. ¶¶ 26-27.

124.    Lawson and Rickerd both admit that management told them repeatedly that they did not want to discipline or terminate them and asked them to just comply with the dress code. Rickerd Dep. 86:19-87:7; Lawson Dep. 487:22-48:4, 50:6-11; Lawson EEOC Notes 85, 87; Maxwell Decl. ¶¶26-27; **Exhibit 13 -** Declaration of Kaela Goodnight ¶ 9.

125.    Lawson and Rickerd both admit that they understood throughout the disciplinary process that further refusal to comply with the dress code would result in termination. Rickerd Dep. 50:17-51:1, 50:12-23; Lawson Dep. 44:17-46:4. 43:12-44:16; 47:13-16; Brockman Dep. 48:5-8.

126.     Plaintiffs admitted that they were terminated for failing to comply with the dress code. Lawson Dep. 59:11-13; 100:2-3; Rickerd Dep. 105:15-18.

127.     When managers noticed other employees were violating the dress code, they asked other employees to comply with the uniform policy and indicated that non-compliance would result in discipline. Maxwell Dep. 65:3-6, 65:11-23,67:4-16; Maxwell Decl. ¶ 51; Kaela Goodnight Decl. ¶ 7; Brockman Dep. 37:3-38:1; **Exhibit 14 -** Uekman Dep. 31:22-32:8.

128.     Except Rickerd and Lawson, no other employee refused to comply with the dress code after being instructed by a manager to do so. Maxwell Dep. 65:7-10, 65:11-23, 68:23-69:8, 69:9-14, 99:18:-20; **Exhibit 15 -** Judy Dep. 22:3-9, 28:12-22; Uekman Dep. 31:22-32:8; Maxwell Decl. ¶50; Goodnight Decl. ¶ 17. As a result, no other employee at Store 625 was disciplined or terminated for refusal to follow the dress code. *Id.*

129.     Other employees requested religious accommodations and complained to management that they did not want to wear the Our Promise symbol because they had a religious belief against homosexuality. Brockman Dep. 43:3-10; Judy Dep. 18:32-2; Uekman Dep. 38:2-3; Maxwell Dep. 65:11-23, 67:4-16, 67:17-68:1, 68:8-16, 99:7-17; Brockman Dep. 19:13-20:10; Uekman Dep. 28:9-25; Maxwell Decl. ¶ 33.

## XI.          Human Resources Involvement

130.     In late April, Maxwell informed District HR Leader Sheryl Riddley that Lawson and Rickerd were refusing to wear the uniform because they thought the Our Promise symbol was an LGBTQ symbol. Maxwell Decl. ¶ 53; Riddley Decl. ¶ 8. Riddley provided Maxwell information regarding the Our Promise Symbol and directed him to explain the symbol's meaning to Plaintiffs. *Id.*

131.    On May 4, 2019, Maxwell notified Riddley of Plaintiffs' request for an accommodation. Maxwell Decl. ¶ 31; Riddley Decl. ¶ 9.

132.    On May 4, 2019, Maxwell received a letter from attorney David Hogue requesting an accommodation for Store 625 employees Jared (Noah) Judy, Cynthia Bailey, Trudy Rickerd, Brenda Lawson, Carol Maxwell, Jeanetta Brockman, Paula Uekman, Steve Brewer, and Wesley Boyce because they felt it was an LGBTQ symbol. Maxwell Dep. 61:13-68:7; Maxwell Dep. Exh. 13 - Hogue Letter; Maxwell Decl. ¶ 33.

133.    Maxwell forwarded Hogue's letter to Riddley and inquired about next steps while Human Resources reviewed the requests for accommodation. Maxwell Decl. ¶ 33. Riddley elevated the requests for accommodation to Total Reward and Associate Relations Manager Andrea Wilson, who reviewed the request for accommodation with Delta Division HR Leader Kevin Lindsey and in-house counsel. Riddley Decl. ¶ 9.

134.    Kroger did not question the sincerity of Plaintiffs' religious beliefs that homosexuality was a sin. Lindsey Decl. ¶ 37.

135.    Neither Lawson nor Rickerd could give a clear explanation of how the symbol impacted their religious beliefs or why they believed it was an LGBTQ symbol. Lindsey Dep. 33:1-10; Lindsey Decl. ¶ 38; Riddley Decl. ¶¶ 17-18.

136.    Wilson and Lindsey both agreed that the Our Promise symbol was not a rainbow and did not resemble a rainbow. Lindsey Dep. 31:17-33:10; Lindsey Decl. ¶ 39.

137.    Wilson and Lindsey both agreed that the Our Promise symbol did not support or promote the LGBTQ community. Lindsey Dep. 31:17-33:10; Lindsey Decl. ¶ 39.

138.    Wilson and Lindsey determined that there was nothing to accommodate because there was no conflict between the uniform and Plaintiffs' alleged religious belief. Lindsey Dep. 31:17-33:10; Lindsey Decl. ¶ 41.

139.    Human Resources directed Maxwell to resume enforcing the uniform policy. Maxwell Decl. ¶ 25.

140.    Lindsey had previously granted religious accommodation requests from employees who were Seventh Day Adventist who could not work on Saturdays. Lindsey Fact Dep. 7:8-8:1; Riddley 26:9-23. Lindsey had previously granted religious accommodation requests for employees who needed to wear head wraps due to their religious beliefs. *Id.*

## XII.      Controversy in the Store

141.     Plaintiffs and their colleagues discussed with other associates in the store that they objected to wearing the Our Promise symbol because they believed homosexuality and the LGBTQ community was a sin. Brockman Dep. 27:12-28:23, 29:23-25, 30:1-9; 37:24-39:19.; Uekman Dep. 37:13-23.

142.    Other employees in the store were offended by the assertion that homosexuality and participation in the LGBTQ community was a sin. Brockman Dep. 35:8-14; Goodnight Decl. ¶ 11.

143.    The conflict created polarization in the workplace, which witnesses described as "divisive," "a major issue," "an uproar," and causing "a split" in the store." Judy Dep. 31:9-13; Brockman Dep. 28:17-29:2; 34:21-25, 37:24-39:19; Maxwell Decl. ¶¶ 52-56; Goodnight Decl. ¶¶ 11-15.

144.    Judy admitted that it impacted employee comfort in the store. Judy Dep. 32:14-17; Goodnight Decl. ¶¶ 11-12.

145.    As a result, employees on both sides began to complain to management and human resources. Goodnight Decl. ¶¶ 12-13; Riddley Decl. ¶ 13.

146.    An employee filed a Hotline complaint alleging that anti-LGBTQ employees, including Rickerd, were discriminating against LGBTQ employees and creating a hostile work environment. Riddley Decl. ¶ 13.

147.    Rebecca Harper from the PickUp Department protested the Our Promise symbol by coloring in the symbol with a red marker. Lindsey Fact Dep. 21:9-15; Maxwell 95:22-96:15, 98:25-99:1; Riddley Decl. ¶ 16; Maxwell Decl. ¶ 55. Kroger management instructed Harper that she could not alter the uniform apron and needed to obtain a new apron. *Id.*

148.    In reaction, other employees in the PickUP Department brought in rainbow-colored duct-tape and began wearing it on their uniform aprons to show support for the LGBTQ employees. Maxwell 95:24-96:15; Maxwell Decl. ¶ 55. Kroger management also instructed the PickUp employees to remove the tape from their uniform.  *Id.*

149.    Harper also reported to Riddley that employees were going "berserk," that it was impacting her relationship with her co-workers, and that PickUp was not able to get its work done. Riddley Dep. 65:22; Riddley Decl. ¶ 16.

150.    Additionally, other employees began violating the dress code to see what they could get away with. Goodnight Decl. ¶ 15. Goodnight claims enforcing the dress code became a battle until employees realized that managers were going to hold everyone accountable. Goodnight Decl. ¶ 15.

151.    Kroger customers also heard about the controversy and began to complain to managers. Goodnight Decl. ¶ 14; Maxwell Decl. ¶ 57.

Respectfully submitted,

Faith C. Whittaker, Admitted Pro Hac Vice
Hayley L. Geiler, Admitted Pro Hac Vice
Attorneys For Defendant
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
T:  (513) 977-8200
F: (513) 977-8141
Faith.whittaker@dinsmore.com
Hayley.geiler@dinsmore.com

Cynthia W. Kolb, AB#2000156
Cross, Gunter, Witherspoon & Galchus, P.C.
Attorneys For Defendant
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
T: (501) 371-9999
F:  (501)371-0035
Ckolb@cgwg.com