**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

EQUAL EMPLOYMENT OPPORTUNITY : 
COMMISSION, 
: 
: Civil Action No. 4:20-cv-1099-LPR
**Plaintiff,** :
:
v. :
: **KROGER'S MEMORANDUM IN**
: **SUPPORT OF ITS MOTION FOR**
: **SUMMARY JUDGMENT**
KROGER LIMITED PARTNERSHIP I :
d/b/a KROGER STORE NO. 625. :
:
:
**Defendant.** :

Defendant Kroger Limited Partnership I ("Kroger" or "Defendant"), by and through

its counsel, files this Memorandum of Law in Support of Its Motion for Summary Judgment.

## I.        INTRODUCTION:

This case is not about religious freedom or discrimination. The EEOC is using

Plaintiffs' claims to expand Title VII far beyond its intended scope.  It is a clear and

expansive overreach over the agency's authority that threatens a private business's Freedom

of Speech, specifically a business's right to establish and maintain a brand and a religiously

neutral uniform policy. As the Supreme Court has held, businesses, like individuals, have a

protected right to free speech under the First Amendment, including the right to support

certain causes. *Citizens United v. FEC*, 558 U.S. 310, 392, 130 S. Ct. 876, 928 (2010).

Employers also have the right to establish a reasonable dress code for employees, which is

exactly what Kroger did in this case.

Vitally, Title VII grants employees a right to religious accommodations; it does not give an employee a right to opt out of a dress code requiring an employee to wear the Company's neutral symbol simply because the employee does not agree with the business's stance or support in other areas. For example, employees cannot refuse to wear the Chik-Fil-A or Hobby Lobby logo simply because they disagree with the organization's religious stance, nor could an employee refuse to wear the Nike or Marriott logo because those companies donate to social justice charities or a certain political party.  Likewise, Title VII does not extend its protections to employees who wrongly believe that a business's neutral symbol supports causes that conflict with a sincerely held religious belief.

As the facts will show, Kroger did not discriminate or retaliate against Plaintiffs Brenda Lawson ("Lawson") or Trudy Rickerd ("Rickerd"). All Kroger did was establish a neutral dress code policy that required its store clerks to wear a blue company apron displaying the Kroger Our Promise symbol, which indisputably stands for Kroger's promise to be friendly and caring, provide everything fresh, to uplift every way and to improve every day. SOF ¶¶16-17.

While Kroger does not attempt to hide the fact that The Kroger Co. maintains corporate policies and practices supporting employees of every demographic, including LGBTQ employees, the Our Promise symbol on the apron has no relation to the LGBTQ community.[1] SOF ¶ 27. Nor could any reasonable person assume that the Our Promise symbol is a rainbow - it is a blue heart, surrounded by a yellow heart, surrounded by a red heart, surrounded by a light blue heart. SOF ¶¶ 19–22.

---

[1] LGBTQ is a term referring lesbian, gay, bisexual, transgender and questioning or queer. This term commonly also refers to individuals who self-identify as non-heterosexual or non-cisgender.

Plaintiffs Lawson and Rickerd irrationally assumed that Kroger's Our Promise symbol was an endorsement of the LGBTQ community because they thought the Our Promise symbol looked like a rainbow, despite the fact it only contains three colors of the rainbow and is in a heart shape,[2] and because they heard Kroger had been designated as one of the Best Places to Work for LGBTQ equality. SOF ¶ 85. Despite Kroger's best efforts to explain that the Our Promise symbol had no relation to the LGBTQ community, Plaintiffs Lawson and Rickerd continually refused to follow the dress code leading to their eventual termination. SOF ¶¶ 117–18.

Kroger does not dispute that Plaintiffs have a sincerely held religious belief that homosexuality is a sin.  However, the Our Promise Symbol does not conflict with their religious beliefs.  Even the Plaintiffs cannot rationally explain their obtuse assumption that the Our Promise symbol is an LGBTQ rainbow. Both Plaintiffs admitted the Our Promise symbol only contains three of the seven colors of the rainbow and is in a heart shape. SOF ¶ 21. At best, Plaintiff Lawson attempted to articulate an "I know it when I see it" subjective approach, which no company should be required to accept. SOF ¶ 80. Even Lawson admitted she would not object to the heart if it contained the color combination of red, white, and blue, but could not explain why adding the color yellow made the symbol an LGBTQ symbol other than her own irrational assumption. Lawson Dep. 115:12-116:1.

Thus, the issue before the Court is whether Kroger has to categorically accept an employee's incorrect and objectively unreasonable conjecture that the Our Promise symbol was secretly designed to support the LGBTQ community and permit them to opt out of the

---

[2] As noted above, the Our Promise symbol contains red, yellow, and two shades of blue. SOF ¶¶ 19–22.

uniform branding. For businesses to have any true ability to exercise freedom of speech, control over their branding, or control over their uniform policies, the answer must be "No."

As Kroger will explain below, because they failed to articulate any reasonable basis to conclude that the Our Promise symbol violated a religious belief and the proposed accommodation created an undue burden, Plaintiffs Lawson and Rickerd were not entitled to a religious accommodation and were properly terminated for refusal to comply with the uniform policy.

## II.   <u>SUMMARY OF THE MATERIAL FACTS:</u>

Like many companies, the Kroger Co. has devoted a significant amount of time and millions of dollars into creating a positive company culture and brand identity. SOF ¶ 25. Based on consumer research, in or around 2012, the Kroger Co.'s marketing team began looking for a way to strengthen the Kroger Co.'s connection to its customers. SOF ¶ 12. With assistance from outside marketing firms, the Kroger Co. developed the Kroger Our Promise symbol and launched the Our Promise campaign in June 2018. SOF ¶ 26.

Kroger did not design any part of the unifying framework or the Our Promise symbol to reference or support the LGBTQ community, nor has the Our Promise symbol been used to promote or support any LGBTQ initiative. SOF ¶ 27. In fact, Kroger Co. has a specific PRIDE logo that it uses when the Kroger Co. is promoting or supporting LGBTQ initiatives. SOF ¶ 28.

In 2018, the Kroger Co. was considering how it could simplify and refresh its grocery banners'[3] uniforms, which had 200 different uniform components across two dozen

---

[3] Kroger Co.'s owns numerous grocery and supermarket divisions that operate under 18 separate company banners, including Baker's, City Market, Dillons, Food 4 Less, Fred Meyer, Fry's, Jay C Food Store, Gerbes, King Sooper, Kroger, Mariano's, Metro Market, Pay-Less Super Markets, Pick'n Save, QFC, Ralphs, Ruler, and Smith's Food and Drug. SOF ¶ 2.

banners. SOF ¶ 30.  The Kroger Co. wanted to create a consistent brand while honoring each banner, save money on uniform costs, and improve customer and employee satisfaction. SOF ¶ 30. After taking inspiration from Home Depot's and Starbucks' signature aprons and Walmart's new dress code that allowed associates to wear their own clothes, the Kroger Co. decided to create a new dress code that permitted associates to wear their own clothes and issue a new uniform apron for all associates under all the Kroger Co. grocery banners. SOF ¶ 31. The Kroger Nashville division rolled out the new dress code first in late 2018. SOF ¶ 35.

Plaintiffs Lawson and Rickerd worked at Kroger store 625, which is in the Kroger Delta Division. SOF ¶ 25. The Delta Division launched the new dress code policy in April 2019. SOF ¶ 38.  The new Kroger Delta Division apron was a blue apron that had the Kroger scripted logo in the center of the chest, the Kroger Our Promise symbol on the left side of the chest, and two eyelets on the right side of the chest for employees to wear their name tag. SOF ¶ 33.

Following Starbucks' example, Kroger had the Our Purpose & Our Promise meaning embroidered on the inside of the apron, so that associates saw it every day as they put on their apron over their head. SOF ¶ 34. The dress code required grocery clerks to wear the Kroger apron over their clothes and display their nametag on the right side of the apron.[4] SOF ¶ 34. The dress code was displayed in the Store 625 breakroom for all associates to review, and Plaintiffs Lawson and Rickerd both saw the new uniform. SOF ¶ 45.

---

[4] Per branding agreements, the Starbucks' associates and Murray's cheese associates were not required to wear the Kroger apron, and instead wore Starbucks' or Murray's cheese branded aprons. Additionally, the pharmacy associates wore traditional pharmacy scrubs and/or pharmacy white coats to identify themselves as pharmacy employees.

Store 625 generally used a progressive discipline program when enforcing the dress code. SOF ¶ 43.  If a manager observed non-compliance, the manager would first explain the policy to the employee, provide the employee a verbal warning, and ask the employee to get into uniform. SOF ¶ 43.  If the employee did not comply, the next action would be to issue a Serious Incident Reminder ("SIR"). SOF ¶ 43. If the employee still did not comply, the next action would be to issue a Constructive Advice Record ("CAR"). SOF ¶ 43. If non-compliance continued, the manager would proceed to a suspension before termination. SOF ¶ 34. At each stage, the employee is warned that further non-compliance will result in further discipline including termination. SOF ¶ 34.

In March 2019, the Kroger Co. published an announcement on its website that it had been named by the Human Rights Campaign Foundation's Corporate Equality Index as a Best Place to Work for LGBTQ Equality, based on its workplace protections, domestic partner benefits, transgender inclusive health care, and public engagement with the LGBTQ community. SOF ¶ 9. The award was not promoted in Store 625, and Store 625 did not participate in any LGBTQ initiatives. SOF ¶ 9. However, several employees at Store 625 saw the award online and complained to store management that: (i) they did not think Kroger should have LGBTQ inclusion initiatives because they felt that the LGBTQ community was sinful; (ii) Kroger should not be supporting LGBTQ associates; and (iii) they did not think the Kroger Co. should have published it won the award. SOF ¶ 10.

Under the terms of the CBA, Kroger was required to provide uniforms to employees at Kroger's expense, which necessitated Kroger spending millions of dollars on the new uniforms. SOF ¶ 41. When the aprons were being handed out, both Lawson and Rickerd initially refused to accept the apron and claimed that they would not wear the aprons because

the aprons had a "rainbow heart," that they believed supported the LGBTQ community. SOF ¶ 63. Lawson eventually wore the apron but covered up the Our Promise symbol with her name tag, and Rickerd refused to wear the apron entirely. SOF ¶¶ 95–96.

Store Leader Sean Maxwell raised the issue to District HR Leader Sheryl Riddley, who provided information on the meaning of the Our Promise symbol and directed Maxwell to explain the meaning of the symbol. SOF ¶ 131. Store management had several conversations with both Lawson and Rickerd, during which they explained what the Our Promise symbol meant and that it did not support the LGBTQ community. SOF ¶ 93. Before issuing any discipline, store management instructed Lawson and Rickerd several times that they needed to wear the uniform apron properly or they would be disciplined up to termination. SOF ¶ 94. However, they outright refused to follow the uniform policy and told Store Leader Maxwell to do what he needed to do. SOF ¶ 96.

On May 1, 2019, Maxwell issued Rickerd an SIR for failure to follow the dress code. SOF ¶ 97. Then, on May 3, 2019, Assistant Store Leader Kaleb Dickey issued Rickerd a CAR for refusal to follow the dress code. SOF ¶ 98. In response, Rickerd handed Dickey a note that stated she was requesting an accommodation to wear a uniform apron "that does not have a rainbow symbol." SOF ¶ 99.

On May 4, 2019, Maxwell issued Lawson an SIR for refusal to follow the dress code. SOF ¶ 100. In response, Lawson gave Maxwell her first request for an accommodation stating that she was requesting an accommodation not to wear the "rainbow heart logo" because it was against her religious beliefs. SOF ¶ 101. On May 4, 2019, Maxwell forwarded Rickerd's request for an accommodation to HR Leader Sheryl Riddley and informed her of Lawson's request. SOF ¶ 102.

Later that afternoon, Maxwell received a letter from attorney David Hogue stating that Store 625 employees Jared (Noah) Judy, Cynthia Bailey, Trudy Rickerd, Brenda Lawson, Carol Maxwell, Jeanetta Brockman, Paula Uekman, Steve Brewer, and Wesley Boyce all requested an accommodation based on their religious beliefs to wearing the Our Promise symbol because they felt it was an LGBTQ symbol. SOF ¶ 133.

On May 5, 2019, Assistant Store Leader Kaela Goodnight issued Lawson a CAR for failure to follow the dress code. SOF ¶ 103. On May 6, 2019, Maxwell sent Riddley an email that stated that Judy, Bailey, Maxwell, Brockman, Uekman, Brewer and Boyce were all following the dress code currently. SOF ¶ 134. Maxwell consulted Riddley about next steps and stayed any additional discipline while Human Resources determined the accommodation. SOF ¶ 134. Riddley elevated the requests for accommodation to Total Reward and Associate Relations Manager Andrea Wilson, who reviewed the request for accommodation with Delta Division HR Leader Kevin Lindsey and in-house counsel. SOF ¶ 134.

Neither Lindsey nor Wilson challenged the sincerity of Plaintiffs' religious belief against homosexuality. SOF ¶ 135. But Lindsey and Wilson determined that neither Plaintiff could give a clear explanation of how the Our Promise symbol conflicted with their religious beliefs or why they believed it was an LGBTQ symbol. SOF ¶ 136. Lindsey and Wilson both agreed that the Our Promise symbol was not a "rainbow," nor was it an LGBTQ symbol, so no accommodation was needed because there was no conflict between the uniform and the employees' religious belief. SOF ¶ 137.

On May 21, 2019, Riddley visited Store 625 to meet with Rickerd and Lawson and discuss their concerns. SOF ¶ 105. During the May 21st meetings, Riddley explained the

meaning of the Our Promise symbol again and that it did not represent support for the LGBTQ symbol. SOF ¶ 107. Riddley and Maxwell informed Rickerd and Lawson that they were going to rescind their previous discipline, but that Rickerd and Lawson needed to follow the dress code going forward or they would resume discipline. SOF ¶ 108.

However, Plaintiffs continued to refuse to follow the dress code. On May 22, 2019, Rickerd received another SIR for failure to follow the dress code. SOF ¶ 119. On May 23, 2019, Rickerd received another CAR for refusal to follow the dress code. SOF ¶ 110. On May 24, 2019, Lawson received another SIR for failure to follow the dress code. SOF ¶ 111. In response, Lawson gave Maxwell another note requesting an accommodation. SOF ¶ 112. On May 27, 2019, Rickerd and Lawson received an additional CAR for refusal to follow the dress code. SOF ¶ 113.

On May 28, 2019, Rickerd and Lawson received another CAR with a one day suspension for refusal to follow the dress code. SOF ¶ 115. On May 29, 2019, Kroger terminated Rickerd for refusal to follow the dress code. SOF ¶ 117. On June 1, 2019, Kroger terminated Lawson for refusal to follow the dress code. SOF ¶ 118.

Before each discipline, Plaintiffs were given an opportunity to comply and refused to do so. SOF ¶¶ 105–18. Additionally, it is undisputed that management told both Plaintiffs that they did not want to terminate them and asked them to comply. SOF ¶ 108.  Neither Lawson nor Rickerd filed a complaint of discrimination until they filed a grievance following their termination. SOF ¶ 122.  During the grievance process, Kroger offered to rescind Rickerd's and Lawson's terminations and reinstate them if they agreed to wear the uniform properly, but both refused the offer of reinstatement. SOF ¶ 119.

Kroger enforced the dress code policy against all employees during this time. When managers noticed a violation, they asked other employees to comply with the uniform policy and indicated that non-compliance would result in discipline. SOF ¶ 128. Except Rickerd and Lawson, no other employee refused to comply with the dress code after being instructed by a manager to do so, let alone repeatedly. SOF ¶ 129. As a result, no other employee at Store 625 was disciplined or terminated for refusal to follow the dress code. SOF ¶ 129.

Plaintiffs and their supporters openly discussed with their co-workers that their refusal to follow the dress code was based on their belief that homosexuality and participation in the LGBTQ community was a sin, which naturally offended LGBTQ employees and their allies. SOF ¶ 143. As a result, employees filed complaints alleging that anti-LGBTQ employees, including Rickerd, were discriminatory against LGBTQ employees and creating a hostile work environment. SOF ¶ 146. This fracture resulted in protests of the uniform policy from both sides of the debate, including one employee coloring in the heart and other employees wearing rainbow-colored duct tape on their apron. SOF ¶ 148–49.

Additionally, employees reported that the polarization of the workplace led to deteriorated relationships with their co-workers and caused employees to be unable to complete their assignments. SOF ¶ 150. The issue also raised complaints from customers who heard about the internal debate and Plaintiffs' claims. SOF ¶ 152. As a result, Kroger had to clarify again that the Our Promise symbol had no relations to LGBTQ initiatives and insist that all employees follow the dress code and treat each other with respect. SOF ¶ 27.

### III.        LAW & ARGUMENT:

#### a.  Kroger Did Not Fail to Offer Lawson and Rickerd a Reasonable Accommodation.

##### i.  Lawson and Rickerd Were Not Entitled to a Religious Accommodation.[5]

Plaintiffs were not entitled to a religious accommodation because they did not have a *bona fide* religious belief that conflicted with an employment requirement. To establish a *prima facie* case of religious discrimination for failure to accommodate, an employee must show that she (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of this belief, and (3) was disciplined for failing to comply with the conflicting requirement. *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383 (8th Cir. 1984).

This is not the traditional dress code accommodation case in which an employee would object to wearing an inherently religious symbol, such as a cross or crescent moon, or have a religious requirement to wear or not wear a certain item of clothing, such as wearing a head scarf or requesting to wear skirts instead of pants. Plaintiffs admit that their religious beliefs do not prohibit them from wearing aprons, hearts, multi-colors, or rainbows. SOF ¶ 72. Thus, their "conduct is [not] mandated by religious belief," but by their

---

[5] Neither the EEOC's Complaint nor the Intervenor's Complaint plead a disparate treatment claim. *See generally* EEOC Compl. & Intervenor Compl. While the Complaints address Kroger's alleged denial of the accommodations and the resulting discipline, they do not plead that employees outside the protected class received more favorable treatment. *Id.*; *Mann v. Frank*, 7 F.3d 1365, 1370 (8th Cir. 1993) (A disparate treatment case based on religion requires a plaintiff to show that she is, or was, treated less favorably than others because of her religious beliefs."). Even if Plaintiffs pled a claim of disparate treatment, it fails as a matter of law because there is no evidence to support that employees with religious beliefs outside Plaintiffs' protected class received more favorable treatment.

interpretation of a neutral symbol. *Brown v. Polk Cty.*, 61 F.3d 650, 656 (8th Cir. 1995)

(quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

In this case, Plaintiffs' alleged religious belief is that homosexuality is a sin and that

they cannot support or promote the LBGTQ community. SOF ¶ 142. The alleged conflict

with the dress code is based on their wrongful assumption that the Our Promise symbol

supported or promoted the LGBTQ community. Despite Kroger clearly explaining to

Lawson and Rickerd that the Our Promise symbol has nothing to do with LGBTQ rights,

Plaintiffs requested an accommodation not to wear the "rainbow heart" because it was a

symbol of the LGBTQ community. But Plaintiffs never provided Kroger with a clear

explanation for why they believed the Our Promise symbol supported the LGBTQ

community.

Kroger does not deny that Plaintiffs Brenda Lawson and Trudy Rickerd expressed

that they had a religious belief against homosexuality, nor does Kroger challenge the

sincerity of that belief. However, Kroger fervently denies that its uniform policy created any

conflict with Plaintiffs' religious beliefs because Kroger's uniform did not reference or

show any support for homosexuality or the LGBTQ community. Moreover, Kroger did not

actually deny the requested accommodation and it would have caused Kroger an undue

burden to allow Plaintiffs to refuse to wear the Our Promise symbol.

1. **Lawson Was Not Entitled To An Accommodation Because She Failed To Articulate A Reasonable Basis That There Was A Conflict Between A Sincerely Held Religious Belief And The Dress Code.**

Lawson told Kroger that she refused to wear the Our Promise symbol as she thought

it was an LGBTQ symbol because it was a "rainbow heart" and she knew Kroger supported

LGBTQ initiatives. When Riddley met with Lawson to ask for clarity on Lawson's belief

on the symbol, Lawson stated that the "rainbow heart" was against her religious beliefs and that she had nothing else to say. Lawson Dep. 51:18-52:11; Riddley Dep. 72:4-12. Thus, Lawson refused to engage in the interactive process and never provided any clarity on why she thought the Our Promise symbol was a rainbow or an LGBTQ symbol, which alone is grounds for denying an accommodation. *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir. 1977) (holding employee can waive right to accommodate by refusing to explain to his religious needs) ("An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts.").

Notably, the Our Promise symbol is not a rainbow. A rainbow is generally defined as an arc that exhibits concentric bands of the color spectrum: red, orange, yellow, green, blue, indigo, and violet.[6] The well-known acronym "ROYGBIV" lists the colors in the recognized order. The Our Promise symbol does not come close to meeting the established definition because: (1) it does not include all seven colors as it is missing orange, green, indigo, and violet; (2) it is not an arc, it is a heart; and (3) the colors are not in the appropriate order for a rainbow. Even if one compared the colors in the Our Promise symbol to the six colors in the widely recognized LGBTQ Pride Flag, the Our Promise symbol is still missing half of the colors and is in a completely different shape.

---

[6]  *Anton Int'l v. Chunhong Zhang*, No. 5:21-cv-00120-JWH-KKx, 2021 U.S. Dist. LEXIS 79709, at *9 n.23 (C.D. Cal. Apr. 26, 2021); Merriam-Webster defines "rainbow" as "an arc or circle that exhibits in concentric bands the colors of the spectrum and that is formed opposite the sun by refraction and reflection of the sun's rays in raindrops, spray, or mist."' *Rainbow*, MERRIAM-WEBSTER.COM, https://www.merriamwebster.com/dictionary/rainbow (last visited January 14, 2022). 'The Encyclopaedia Britannica explains that this order is "violet, indigo, blue, green, yellow, orange, and red."' *Rainbow*, BRITANNICA.COM, https://www.britannica.com/science/rainbow-atmospheric-phenomenon (last visited January 14, 2022).

Lawson also admits that a rainbow is normally seven colors and in the shape of an arc or bow, and that the Our Promise symbol was only three colors of the rainbow and not in the shape of an arc or bow. Lawson Dep. 3:16-17, 13:2-15. It is simply unreasonable to expect Kroger to accept Plaintiffs' claim that the Our Promise symbol is a rainbow when it does not share even half of the characteristics of a rainbow. Under the same reasoning, a company with a triangle logo would necessarily have to permit objections based on the logo's resemblance to the Star of David and a company with a horizontal line logo would have to permit objections based on the logo's resemblance to a cross.

Even more confounding, Lawson does not object to rainbows generally. She only objects to rainbows when she personally feels they are an LGBTQ rainbow. In fact, Lawson believes that rainbows are a symbol of God's promise and has posted several images of rainbows on her Facebook page, which she did not believe supported the LGBTQ community. SOF ¶ 86.  Yet, she felt a picture of a rainbow coming out of a St. Patrick's Day hat was an LGBTQ symbol. SOF ¶ 87.

Notably, Lawson's determination of when something is an LGBTQ rainbow or symbol varies greatly based on her subjective, personal feeling without any consistent criteria and no religious guidance. Lawson claims she does not believe that using multiple colors necessarily represents LGBTQ. Lawson Dep. 84:22-25. To the contrary, she admitted that she owns many multi-colored garments. SOF ¶ 75. For example, at her deposition, Lawson wore a sweater with horizontal striped blocks of red, blue, white, tan, green, and yellow, which she admitted had more rainbow colors than the Our Promise symbol. SOF ¶ 76. When Lawson was asked why she objected to the colors in the Our Promise symbol, but was comfortable wearing a multi-color sweater, Lawson stated "When I look at this, I don't

think of a rainbow. That [referencing the Our Promise symbol] is a rainbow." Lawson Dep. 12:18-13:1; SOF ¶78

When asked at what point using multiple colors represents the LBGTQ community, she stated "I recognize a gay flag when I see it." Lawson Dep. 85:1-2. Curiously, Lawson stated that she felt the following logos all represented LGBTQ and that she would refuse to wear them: the Olympic rings, NBC, Google, Microsoft, Apple, Southwest, Superman, Ebay, PlayStation, and Billboard. Lawson Dep. 29:25-31:8, 78:17-24. On the other hand, Lawson testified that she did not believe that the Crayola or Skittles logos, which have actual rainbows on them, represent the LGBTQ community.[7] Lawson Dep. 30:22-31:14.

Consequently, Lawson's belief is that the Southwest and Superman logos that are red, yellow, and blue are LGBTQ symbols, but the Skittles logo, which is a bow with purple, blue, green, yellow, orange and red stripes is not. Critically, Lawson also stated that she did not believe that the Burger King logo, which is yellow, red, and blue was an LGBTQ symbol, but the Southwest symbol and the Our Promise symbol, which are also yellow, red, and blue were LGBTQ symbols. SOF ¶ 89.

Title VII does not accommodate this level of personal preference and inconsistency of practice. *See Vetter v. Farmland Indus., Inc.*, 120 F.3d 749, 751 (8th Cir. 1997) (holding Title VII does not require accommodations of "purely personal preference"); *Sidelinger v. Harbor Creek Sch. Dist.*, 2006 U.S. Dist. LEXIS 86703, at *33 (W.D. Pa. 2006) (holding beliefs were not sincerely held based on numerous inconsistencies in testimony regarding his beliefs); *Hussein v. Waldorf Astoria*, 134 F. Supp. 2d 591, 594 (S.D.N.Y. 2001).

---

[7]   Notably, the Skittles' trademarked slogan is "Taste the Rainbow." https://trademarks.justia.com/870/69/taste-the-87069704.html

Moreover, Lawson admits that her personal belief that the Our Promise symbol was an LGBTQ symbol was a result of Kroger's participation in LGBTQ initiatives. SOF ¶ 85. Lawson testified repeatedly that she thought that the Our Promise symbol was a rainbow because it had "been plant[ed] in her mind . . . that Kroger supported LGBTQ" after they won the award for being a good workplace for LGBTQ employees and she saw pictures of Kroger participating in a pride parade. Lawson Dep. 14:8-25, 38:10-40:19, 85:24-86:3; EEOC Notes, p. 83. However, the Our Promise symbol was not used for the award announcement and did not appear in a pride parade.  There is absolutely no legitimate connection between the Our Promise symbol and the LGBTQ community.

A company's support of LGBTQ initiatives does not transform an otherwise neutral corporate symbol or logo into an LGBTQ symbol. Hundreds of companies support LGBTQ initiatives and PRIDE events. In fact, the Human Rights Campaign found that 14 of the Top 20 Fortune-Ranked Companies Received 100% ratings, including retailers Walmart, Amazon, Costco., Walgreens Co., and The Kroger Co. *See* Human Rights Campaign Foundation, Corporate Equality Index 2021, https://hrc-prod-requests.s3-us-west-2.amazonaws.com/CEI-2021-revised-030121.pdf (last accessed Jan. 12, 2022).

Lawson's belief that the Our Promise Symbol is an LGBTQ symbol is even more incredulous given that the symbol has a clearly defined meaning with no relation to Kroger's support of the LGBTQ community and Kroger never used the Our Promise symbol to promote LGBTQ causes.[8] SOF ¶ 27. In fact, like many companies, Kroger has a separate PRIDE logo it uses when supporting LGBTQ initiatives. SOF ¶ 28. Kroger never requested that Lawson wear the PRIDE logo or participate in any LGBTQ initiatives. SOF ¶ 29.

---

[8] The Kroger Our Promise symbol stands for Kroger's promise to be friendly and caring, provide everything fresh, to uplift every way and to improve every day. SOF ¶ 16.

Kroger only requested that Lawson wear the neutral symbol, which in no way conflicted with her religious beliefs. SOF ¶ 29.

In sum, there is no reasonable basis to believe that the Our Promise symbol is an LGBTQ symbol. Because Lawson failed to articulate how the Our Promise symbol conflicted with her religious belief, her claims fails as a matter of law.

**2.** **Rickerd Was Not Entitled To An Accommodation Because She Failed To Articulate A Reasonable Basis That There Was A Conflict Between A Sincerely Held Religious Belief And The Dress Code.**

Likewise, Rickerd failed to articulate to Kroger a reasonable justification for how wearing the Our Promise symbol conflicted with her religious beliefs. Even now, Rickerd cannot clearly identify her religious objection to the Our Promise symbol. At her deposition, Rickerd's testimony was often contradictory and senseless.[9]

Rickerd's request for an accommodation specifically asked "to have a uniform apron that does not have a rainbow symbol." SOF ¶ 99. Yet, Rickerd admitted that the Our Promise symbol is not actually a rainbow and also claimed that her belief that the Our Promise symbol represented LGBTQ rights had nothing to do with it being multi-colored. SOF ¶ 60.

---

[9] For example, at first Rickerd stated that she had a religious objection to hearts, then later she stated that she had no objection.

    Q: But specifically just a heart symbol in general, do you have an objection to that based on your religion?
    A: Yes, I do.
    . . .
    Q: So wearing a heart is against your religion?
    A: No.
    . . .
    Q: Do you use hearts when you're texting, like an emoji heart?
    A: Yes.
    Q: So you don't object to hearts in general?
    A: No.
*Compare* Rickerd Dep. 12:10-21; *with* Rickerd Dep. 13:8-9, 74:2-76:2, 167:2-9.

Rickerd also stated that she had no religious objection to wearing the colors red, yellow, and blue together. Rickerd Dep. 14:9-11; SOF ¶59.

However, later, Rickerd indicated that certain colors on the Our Promise symbol indicated it was an LBGTQ symbol.

> Q: As far as your belief that the heart emblem represented LGBTQ rights, did it have anything to do with the multiple colors?
> A: No.
> . . .
> A: . . . And when I seen that apron, I wasn't going to wear it; because even though you – all don't think that's a rainbow on there, the certain colors, it's a representation that they supported the LGBTQ. . .
> Q: You said "certain colors." What colors were representing the LGBTQ?
> A: The heart itself. It looks like – it has different colors in it. No, it's not the complete rainbow, but that is a support sign that they support LGBTQ.
> . . .
> Q: Ms. Rickerd, looking at the Our Promise symbol again, what about these colors symbolize LGBTQ to you?
> A: It's the whole thing. It's a ra – rainbow without all the colors. It's the symbol of it. That's God's symbol, not their symbol.

*Compare* Rickerd Dep. 16:15-21; *with* Rickerd Dep. 18:21-19:8, 189:12-17. Confusingly, Rickerd testified that she knew that she would not wear the apron as soon as she saw it. But she also testified that she did not believe that rainbows were a symbol of the LGBTQ movement and that she never knew the LBGTQ community had adopted a rainbow as a symbol of their cause. Rickerd Dep. 17:8-18:3, 64:1-65:1, 182:12-17; EEOC Notes.

> Q: Do you believe that rainbows in general represent the LGBTQ movement?
> A: They do not represent that.
> . . .
> Q: Were you aware, before you saw the new apron, that the LGBTQ community had adopted the rainbow as a symbol of their cause, so to speak?
> A: No.
> Q: You never knew that a rainbow flag referred to LGBT?
> A: Yes.
> . . .
> Q: So you did see it to form your belief that you were not going to wear it; is that fair and accurate?
> A: To form it? As soon as I seen it, I knew it was wrong.

*Id.* As such, it's unclear why Rickerd felt a rainbow was an LGBTQ symbol in the first place, let alone the Our Promise symbol, which only contained 3 of the colors of a rainbow in a heart shape.

Rickerd also claims that the day before she saw the apron, God told her "b[e] not conformed to this world, be ye separate." Rickerd Dep. 63:24-64:5; 70:7-71:6, 72:10-12, 75:3-24; 76:19-77:15, 165:17-166:14. But, Rickerd did not know what it meant at the time. *Id.* Then the following day when she saw the apron, she "kind of drew [her] own conclusion that that's what God was talking about." *Id.* Critically, Rickerd admits that God did not specifically tell her that she should not wear the apron, the uniform, or a heart or rainbow symbol, that is just how she interpreted the verse. *Id.*

Like Lawson, Rickerd's objection to the Our Promise symbol is based on her own subjective and nonsensical personal opinions.  When asked about other company logos with similar color schemes, Rickerd stated that she believes companies should not require employees to wear their symbol or logo and that employees should have a choice. Rickerd Dep. 170:25-171:2. Rickerd also claimed that she would not wear the following logos because they support the LGBTQ community: the Olympic rings, NBC, Google, Microsoft, Apple, Skittles, Southwest, Burger King, Superman, Ebay, Play Station, Crayola, or Billboard. Rickerd Dep. 189:12-190:10.

Rickerd cannot articulate how the Our Promise Symbol conflicts with her religious belief.  Nor has she identified how a religious belief or practice reasonably led her to believe that the Our Promise symbol was a rainbow, an LGBTQ symbol or showed support for the LGBTQ community. Even if Rickerd could clearly explain the connection, her argument fails for the same reason Lawson's fails; the Our Promise symbol is not a rainbow or an

LGBTQ symbol, nor could it reasonably be interpreted as one. Because the Our Promise symbol is not a rainbow, Kroger did not deny Lawson's and Rickerd's request for an accommodation because it never required them to wear a "rainbow symbol" or "rainbow heart logo" and certainly not an LGBTQ symbol.

### ii. Plaintiffs' Requested Accommodation Caused Kroger an Undue Burden.

Even if Plaintiffs had a religious belief that conflicted with an employment requirement, Kroger was not required to accommodate it because it created an undue burden. Employers are not required to accommodate any belief that creates an "undue burden" on the employer's business. 42 U.S.C. § 2000e(j); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n.1 (1986). Under Title VII, anything "more than a de minimis cost [or burden] . . . is an undue hardship." *TWA v. Hardison*, 432 U.S. 63, 84 (1977). As the EEOC notes, the undue hardship standard under Title VII is a far "lower standard" than under the Americans with Disabilities Act. EEOC Compliance Manual 915.003, Section 12: Religious Discrimination, July 22, 2008.

In monetary terms, *Hardison* suggests that just $150 can exceed *de minimis* costs. *See Hardison*, 432 U.S. at 92 n.6 (Marshall, J., dissenting). Furthermore, *"[d]e minimis* cost . . . 'entails not only monetary concerns, but also the employer's burden in conducting its business.'" *Brown.*, 61 at 655(quoting *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995)). Courts have recognized that non-economic costs such as damage to employee morale and unequal treatment can constitute an undue hardship. *See e.g. Brennan v. Deluxe Corp.*, 2021 U.S. Dist. LEXIS 100006, at *35–36 (D. Md. May 26, 2021); *Sides v. NYS Div. of State Police*, 2005 U.S. Dist. LEXIS 12635, at *12 (N.D.N.Y. June 28, 2005) (recognizing that *de minimis* costs include the burdens employers bear in conducting their

businesses, such as scheduling difficulties, loss of efficiency, disruption of work routines, and general employment discontent).

An "actual imposition on co-workers or disruption of the work routine" can establish an undue burden. *Brown*, 61 F.3d at 655 (internal citations omitted); *see also Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011). The Eight Circuit held that when an employee's requested accommodation created a substantial disruption at work, the accommodation created an undue burden. *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1339 (8th Cir. 1995) (finding permitting an employee to wear a pro-life button was an undue burden when it created strong objections from her co-workers and resulted in complaints); *Cook v. Chrysler Corp.*, 779 F. Supp. 1016, 1023 (E.D. Mo. 1991) ("Granting Cook a preference in the seniority structure … would create very hard feelings among Cook's fellow employees…. The Court can only imagine the degree of animosity and hostility such a move would create."), aff'd, 981 F.2d 336 (8th Cir. 1992). Critically, Title VII does not require an employer to allow an employee to impose their religious beliefs on others. *Id.*

Additionally, the First Circuit has noted that a company's loss of its ability to mandate uniform policies, and thus loss of control over its public image, created an undue hardship. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 137–38 (1st Cir. 2004) (finding accommodation violating company's dress code policy against piercings created an undue hardship).

Furthermore, an undue hardship can be created when an accommodation would create significant safety or legal risks, result in discrimination against co-workers, or deprive co-workers of contractual or other statutory rights. *Wilson v. U.S. W. Commc'ns*, 860 F. Supp. 665, 675–76 (D. Neb. 1994), aff'd 58 F.3d 1337, 1342 (8th Cir. 1995); *Chalmers v.*

21

*Tulon Co.*, 101 F.3d 1012, 1021 (4th Cir. 1996) (finding an undue burden when an employees' religious need causes them to criticize the personal lives of their co-workers, putting the employer between a rock and a hard place).[10]

Kroger has a legitimate business interest in requiring an employee uniform: (i) it ensures an attractive and professional business image;[11] (ii) it makes employees easily recognizable to customers; (iii) it promotes Kroger's brand and acts as free advertising for the company; (iv) it encourages teamwork and reminds employees to work as a team;[12] (v) it reminds employees of Kroger's value and promise to its customers; (vi) it promotes company pride and customer relations; and (vii) it improves security for employee-only areas. SOF ¶ 36.

### 1. The Requested Accommodation Compromised Kroger's Commitment to Customer Service and Deprived Kroger of Free Branding.

Like many businesses, the Kroger Co. has spent tens of millions of dollars on creating and establishing a company brand and business image, including establishing the

---

[10] *See also Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 830 (9th Cir. 1999); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) (also holding that employee's proposed accommodation of either allowing him to post religiously motivated messages intended to demean and harass co-workers, or the company deleting sexual orientation from its voluntarily adopted diversity and non-discrimination policy, would have posed an undue hardship on the employer); *Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 517–18 (6th Cir. 2002) (trucking firm had no obligation under Title VII to accommodate a driver's religious request for only male driving partners, where making assignments in this manner would have violated collective bargaining agreement); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000); *United States v. Bd. of Educ.*, 911 F.2d 882, 887 (3d Cir. 1990).

[11] Numerous Courts have held that businesses have a legitimate interest in setting attractive and professional business images through uniforms. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135 (1st Cir. 2004); *Fagan v. Nat'l Cash Register Co.* 157 U.S. App. D.C. 15, 481 F.2d 1115, 1124–25 (D.C. Cir. 1973); *Woods v. Safeway Stores, Inc.*, 420 F. Supp. 35, 43 (E.D. Va. 1976), *aff'd*, 579 F.2d 43 (4th Cir. 1978); *EEOC v. Sambo's of Georgia, Inc.*, 530 F. Supp. 86 (N.D. Ga. 1981).

[12] As other Courts have held, "standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission." *Kelly v. Johnson*, 475 U.S. 503, 508 (1986).

Our Promise symbol. SOF ¶ 25. Based on guidance from experts and feedback from associates, Kroger chose to create an attractive and professional business image by instituting a uniform policy that permitted employees to express themselves and be more comfortable by wearing their personal clothing and to create a consistent uniform by wearing Kroger's new branded apron. SOF ¶ 31. Kroger felt so strongly about reminding employees to live by Kroger's Our Promise that it displayed the Our Promise symbol on the front of the apron, over the associate's heart, and inscribed the Our Promise meaning on the inside of the apron, so associates saw it every time they put on the apron.  SOF ¶ 34.

The Our Promise symbol is a reminder to customers and associates that Kroger is committed to its associates being friendly and caring, uplifting in every way, improving every day, and providing everything fresh. SOF ¶ 16. These neutral values are key to creating and executing Kroger's consistent customer experience. SOF ¶ 30. Requiring Kroger to permit the employees to opt out of wearing the Our Promise symbol is unreasonable because it undermines Kroger's commitment to customer relations and deprives Kroger of free branding. SOF ¶ 30.

## 2. The Requested Accommodation Required Kroger to Intentionally Undermine their Branding and Infringed on Kroger's Right to Free Speech.

Critically, the Our Promise symbol was an entirely neutral symbol until the Plaintiffs proscribed a pro-LGBTQ meaning to it. If Kroger granted Plaintiffs' request, it would have served as an acknowledgement that Plaintiffs' interpretation of the meaning of the Our Promise symbol as an LGBTQ promotion was accurate. This would have undermined the real meaning of the Our Promise symbol and the millions of dollars that Kroger spent on

branding. Kroger has a right to protect the meaning of its branding and not allow employees to incorrectly alter its meaning. SOF ¶ 16.

Additionally, as explained above, Companies have a right to freedom of speech to support causes they feel are worthwhile. If the Court held that a company's participation in a social cause that an employee disagrees with requires an accommodation from a neutral dress code, it would completely undermine the business' right to free speech and ability to set a uniform. This ruling would not just impact Kroger's ability to support LGBTQ employees, it would affect any business that takes a political or social stance—thus causing a massive chilling effect on corporate speech.

For example, Plaintiff Lawson noted in her deposition that she would also refuse to wear NBC's logo if she worked for NBC because NBC supports LGBTQ. Lawson Dep. 29:20-31:14. But this reasoning would also apply to any businesses that donate to political candidates or other social causes that an employee disfavors. Employees have no right to refuse to wear a neutral company-logo or symbol because they disagree with a decision of the company to support a certain cause. To hold otherwise would completely undermine the business's right to free speech.

### 3. The Requested Accommodation Required Kroger to Sacrifice the Consistency of Their Uniform and Incur Additional Financial Cost.

Kroger spent several million dollars purchasing the new aprons for its hundreds of thousands of employees, so employees would have a consistent look no matter which store a customer visited. SOF ¶ 41. By requesting that Kroger exempt Plaintiffs from the uniform policy, Plaintiffs were demanding that Kroger sacrifice its commitment to a consistent business image. SOF ¶ 30.

Likewise, granting Plaintiffs' request would have undermined the uniform policy at the store because it would have had to grant the religious accommodation requests from the eight other employees asking not to wear the uniform due to religious objections to the LGBTQ community. SOF ¶ 24. This is indeed a slippery slope because if Kroger legitimized Plaintiffs' claims that the Our Promise symbol was an LGBTQ symbol by granting their accommodation, many other employees would have also objected, which would entirely undermine the uniform of not only this store, but also other stores who learned of the situation. This is not simply conjecture as a total of 8 employees at Store 625 were requesting an accommodation from wearing the uniform because they assumed it supported LGBTQ.

Moreover, Kroger would have incurred the financial cost of this non-compliance, not only from compromising their business image and the millions of dollars invested in branding and uniforms, but also due to the requirements of the collective bargaining agreement that governs the terms of employment for employees at Store 625 and other stores. SOF ¶ 41. The collective bargaining agreement requires that Kroger bear the cost in providing employees the uniform apron, which Kroger did. SOF ¶ 41. Under the terms of the collective bargaining agreement, Kroger would have had to purchase new aprons for the associates who refused to wear the Our Promise symbol. SOF ¶ 41. This would have resulted in increased costs for Kroger, especially considering that there were numerous employees at the store who were requesting not to wear the apron based on Plaintiffs' beliefs that it was an LGBTQ symbol. SOF ¶ 41.

### 4. **Plaintiffs' Request Caused a Substantial Disruption to Kroger's Business Operations and Subjected Kroger to Potential Liability.**

Finally, Plaintiffs' campaign not to wear the uniform caused a substantial disruption in Kroger's workplace and created potential liability for Kroger against harassment suits from LGBTQ employees. Plaintiffs and their supporters' discussions with their co-workers led to most employees in the store knowing that Plaintiffs refused to wear the uniform because they regarded homosexuality and participation in the LGBTQ community as a sin. SOF ¶ 142. As could be predicted, members of the LBGTQ community and their allies were offended by Plaintiffs' assertion that a non-heterosexual sexual orientation and gender nonconforming identity was inherently immoral or sinful. SOF ¶ 143.

This led to polarization within the workplace, which witnesses described as "pretty divisive" and causing "some controversy," "a major issue," "an uproar," "a split," and impacting employee comfort. SOF ¶ 144. Pro-LGBTQ employees objected to the anti-LGBTQ sentiment, including complaints to management and human resources. SOF ¶ 146. One employee even filed a complaint via Kroger's complaint hotline alleging that Plaintiffs and their colleagues were creating a hostile work environment for LGBTQ employees. SOF ¶ 147.

Meanwhile, another employee in the PickUp department protested the Our Promise symbol by coloring it in with a red marker so no one would see it was multi-colored.[13] SOF ¶ 148.  In reaction, other employees from the PickUp department brought in rainbow colored

---

[13] Kroger informed the employee who colored in the heart to obtain a new, unaltered uniform.

duct-tape and began wearing it on their uniform aprons to show support for LGBTQ employees.[14] SOF ¶ 149.

Rebecca Harper reported to Human Resources that the issue caused employees to go "berserk," affected her relationships with her co-workers, and resulted in employees not completing their work because of the controversy. SOF ¶ 150. ASL Kaela Goodnight explained that the debate was "very disruptive" to operations because employees were not accomplishing their tasks and other employees began challenging the uniform attempting to see what they could get away with. SOF ¶ 151. Goodnight described the situation as a "battle" until employees realized that management was going to hold all employees accountable for uniform violations. SOF ¶ 151. Unfortunately, customers began to learn of the controversy and began to come in to express their complaints or feelings on the situation. SOF ¶ 152.

As a result of Plaintiffs' objections, Kroger's neutral Our Promise symbol, which has no relation to the LGBTQ community in the first place, was transformed into a battle ground between pro-LGBTQ and anti-LGBTQ demonstrations. This not only significantly negatively impacted employee morale, customer relationships, and business operations, it created potential legal liability for Kroger on both sides.

Thus, for all the reasons above, permitting the proposed accommodation would have been an undue burden because it would have resulted in Kroger conceding that the Our Promise symbol was an LGBTQ symbol and permitting those who opposed LGBTQ to advertise their beliefs to co-workers and customers by not wearing the symbol. The store was already being plagued by the polarizing effects of pro-LGBTQ and anti-LBGTQ

---

[14] Kroger instructed all employees with the rainbow tape to remove the tape from their uniforms.

demonstrations and such activity would have only increased had Kroger not taken the actions that it did— sending a clear message reiterating the that Our Promise symbol is a neutral symbol that does not indicate support for LBGTQ community, clearly instructing both sides to wear the uniform properly, and reminding all employees to treat each other with respect.

### b.      Kroger did not Retaliate Against Plaintiffs.[15]

The EEOC's retaliation claim fails as a matter of law because there is no evidence to support that Kroger retaliated against Plaintiffs. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she was engaged in a protected activity (opposition or participation); (2) she suffered an adverse employment action; and (3) the adverse action occurred because she was engaged in the protected activity. *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (citing *Coffman v. Tracker Marine*, 141 F.3d 1241, 1245 (8th Cir. 1998)). Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defense to produce a nondiscriminatory reason for the adverse employment action. *Id.* Then, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Id.*

Here, Plaintiffs' claims fail as a matter of law because Plaintiffs fail to establish that they engaged in any protected activity or that the adverse action was a result of a protected activity. Additionally, Kroger has a legitimate non-discriminatory reason for their terminations and there is no evidence that Kroger's proffered reason was pretextual.

---

[15] Intervenor's Complaint only identified a claim of failure to accommodate under 42 U.S.C. 2000e-2(a). *See generally* Inter. Compl. They did not plead a separate retaliation claim.

i. **Plaintiffs Fail to Establish That They Engaged in a Protected Activity.**

Plaintiffs fail to identify that they engaged in any legally-protected activity. Plaintiffs claim that Kroger retaliated against them because they requested a religious accommodation. EEOC Amend. Compl. ¶¶24-25, 35-36; EEOC's Resp. IROGS ¶7. However, under Eighth Circuit law, requesting an accommodation is not a protected activity. *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1101–04 (8th Cir. 2018). Like in *N. Mem'l Health Care,* the EEOC is attempting to shoehorn a failure to accommodate claim into a retaliation claim by claiming that the termination, which resulted from Plaintiffs' failure to comply with instructions to follow the uniform policy, was retaliation for requesting an accommodation to be exempt from the uniform policy. *Id.* If the EEOC were correct, then every plaintiff with a failure to accommodate claim would also have a retaliation claim based on any discipline that resulted from denial of their accommodation request. *Id.*[16]

To the contrary, the Eighth Circuit found the exclusive remedy for such situations is a failure to accommodate claim. *Id.* Plaintiffs do not identify any other oppositional activity and admit that they never filed a complaint of discrimination with Kroger until filing a grievance following their termination. SOF ¶ 122. As a result, Plaintiffs' retaliation claim fails for failure to engage in a protected activity.

---

[16] *See also e.g. EEOC v. Walmart Stores E., LP*, No. 18-cv-804-bbc, 2020 U.S. Dist. LEXIS 8596, at *18 (W.D. Wis. Jan. 16, 2020) (dismissing a retaliation claim as simply repackaging a failure to accommodate claim); *Koty v. Zaruba*, 2017 U.S. Dist. LEXIS 152207, at *18 (N.D. Ill. Sep. 19, 2017); *Allen-Smith v. Vilsack*, 2014 U.S. Dist. LEXIS 14567, at *21–22 (E.D. Mo. Feb. 5, 2014) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (finding that a retaliation claim based on the defendant's alleged failure to accommodate "merely reclothes" the plaintiff's discrimination claim).

ii. **There is No Evidence That Kroger Terminated Plaintiffs for Their Alleged Protected Activity and Kroger Had a Legitimate Non-retaliatory Reason for Termination.**

There is no evidence that Kroger retaliated against the Plaintiffs. In order to establish a causal connection between the alleged protected activity and the adverse employment action, the protected activity must have occurred before the decision to take the adverse action. *Brower v. Runyon,* 178 F.3d 1002, 1006–07 (8th Cir. 1999); *Culton v. Mo. Dep't of Corr.*, 515 F.3d 828, 831 (8th Cir. 2008) (finding action was not retaliatory when decision was made prior to learning of protected activity). "Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action." *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008).

Prior to requesting an accommodation, Kroger directed both Plaintiffs to comply with the uniform policy and informed them that failure to comply would lead to progressive discipline ending in termination. SOF ¶ 43. In fact, Plaintiff Lawson admits that Store Leader Maxwell informed her that if she continued to refuse to wear the uniform properly, she would be issued progressive discipline, including and SIR, CAR, suspension and termination. SOF ¶¶ 90, 93.

Only after Plaintiffs received their first disciplinary action did they request an accommodation. SOF ¶ 99. As such, the evidence clearly shows that Kroger determined and explained to Plaintiffs the disciplinary steps that would occur if Plaintiffs continued to refuse to follow the dress code prior to receiving their request for accommodation, thus undermining Plaintiffs' belief that the discipline was in response to the request. *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had

been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.").

### iii. **Kroger Had a Legitimate Non-retaliatory Reason for Termination.**

Kroger had a legitimate non-retaliatory reason for terminating Plaintiffs who consistently refused to comply with directions from management that they needed to comply with the uniform policy. The Eighth Circuit has repeatedly recognized that insubordination and failure to follow policy are legitimate reasons for termination. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011); *see also e.g., Hill v. Walker*, 918 F. Supp. 2d 819, 834 (E.D. Ark. 2013).

Kroger had clear, written policies that stated that failure to follow the uniform policy and insubordination could lead to disciplinary action up to and including termination. SOF ¶ 43. Plaintiffs do not dispute that they refused to wear the uniform properly and refused orders from management to comply with the uniform policy, despite numerous warnings from management, including suspensions. SOF ¶ 103. Kroger properly followed its progressive disciplinary policy against Plaintiffs for failure to comply with the uniform policy.   SOF ¶¶ 97–118.

### iv. **There is No Evidence That Kroger's Reason for Termination was Pretext for Retaliation.**

Plaintiffs provide no evidence that Kroger's reason for termination was pretext for retaliation. To the contrary, the evidence clearly shows that Kroger did not retaliate against Plaintiffs for filing a complaint. To establish pretext in a retaliation case, a plaintiff must both discredit defendant's asserted reasons for termination and show circumstances that

permit drawing a reasonable inference that the real reason for the termination was retaliation. *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 506 (8th Cir. 2021).

Here, there is undisputed evidence to show that Kroger terminated Plaintiffs for refusing to follow the uniform policy. First, the employees received multiple disciplinary warnings regarding uniform violations, which clearly state the reason for discipline was failure to follow the uniform policy. SOF ¶¶ 97–116. Second, before issuing discipline, Plaintiffs were provided the opportunity to avoid the discipline if they complied with the uniform policy. SOF ¶ 119. Third, the disciplining managers stated that they did not want to issue discipline and asked Plaintiffs to comply with the policy. SOF ¶ 119. Fourth, Kroger has never wavered in its explanation that Plaintiffs were terminated for refusing to comply with the uniform policy. Most significant, **Plaintiffs admit that they were terminated for refusing to comply with the uniform policy.** SOF ¶ 126.

Moreover, mid-way through the first set of progressive discipline, Kroger stopped issuing discipline to allow HR Manager Sheryl Riddley to meet with Plaintiffs and explain that the uniform policy did not support LGBTQ. SOF ¶¶ 105–06. Then, Riddley even rescinded all previous discipline, restarting the progressive discipline process, and asked Plaintiffs to comply with the policy going forward. SOF ¶ 108. After Plaintiffs still refused to follow the policy, they were permitted to go through all of the steps of the progressive disciplinary process prior to termination. SOF ¶ 109–18. Even after they were terminated, Kroger offered to reinstate their employment if they just agreed to comply with the uniform policy. SOF ¶ 119. This evidence shows that Kroger had no ill will toward the Plaintiffs, it just wanted them to comply with its policy.

Additionally, there is no evidence that similarly situated individuals who did not allegedly engage in protected activity were treated more favorably. In fact, the evidence clearly shows that: (i) Kroger repeatedly asked other employees to comply with the uniform policy; (ii) Kroger management told other employees who did not comply with the uniform policy that they would be disciplined for non-compliance, and (iii) no other employee refused to comply with the policy after being asked to do so by management. SOF ¶128-129

Finally, there were numerous other employees who also requested a religious accommodation for the same reasons proffered by Plaintiffs, and not a single one was terminated or even disciplined because they complied with the policy when asked to do so by management SOF ¶129-130. Thus, there is no evidence to support that requesting the accommodation was the reason for their terminations.

### IV.      CONCLUSION

For the reasons explained above, Plaintiffs' claims are without merit and fail as a matter of law. Accordingly, Kroger respectfully requests that the Court grant Defendant's Motion for Summary Judgment and dismiss all claims with prejudice.

Respectfully submitted,

Faith C. Whittaker, Admitted Pro Hac Vice
Hayley L. Geiler, Admitted Pro Hac Vice
Attorneys For Defendant
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
T:  (513) 977-8200
F: (513) 977-8141
Faith.whittaker@dinsmore.com
Hayley.geiler@dinsmore.com

Cynthia W. Kolb, AB#2000156
Cross, Gunter, Witherspoon & Galchus, P.C.
Attorneys For Defendant

500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
T: (501) 371-9999
F:  (501)371-0035
Ckolb@cgwg.com