**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | : | |
| | : | |
| | : | Civil Action No. 4:20-cv-1099-LPR |
| **Plaintiff,** | : | |
| v. | : | **KROGER'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| | : | |
| KROGER LIMITED PARTNERSHIP I d/b/a KROGER STORE NO. 625. | : | |
| | : | |
| **Defendant.** | : | |

Defendant Kroger Limited Partnership I ("Kroger" or "Defendant"), by and through its counsel, files this Reply in Support of its Motion for Summary Judgment.

**I.   INTRODUCTION**

Despite the EEOC's attempt to grossly expand the scope of Title VII, Plaintiffs[1] have failed to establish a failure to accommodate claim because there was no conflict between their religious belief and Kroger's dress code. Plaintiffs do not have a religious belief that Kroger's Our Promise symbol is an LBGTQ symbol; Plaintiffs have a religious belief against homosexuality.

Plaintiffs wrongfully and unreasonably presumed that Kroger intended to support LGBTQ rights when it created the Our Promise symbol because: (1) the Our Promise symbol contained multiple colors and, (2) based on rumors circulating in the store about Kroger's intentions because

---

[1] The term Plaintiffs refers to Plaintiff EEOC and Plaintiff Interveners Lawson and Rickerd, who the EEOC is prosecuting on behalf.

the Human Rights Commission had named Kroger as One of the Best Places to Work for LGBTQ Equality ("Equality Award") approximately a month before the dress code rolled out.  Even after Kroger provided numerous explanations about the meaning of the Our Promise symbol and assured Plaintiffs that the symbol had no relation to the LGBTQ community, Plaintiffs refused to reconsider and assumed that they knew Kroger's intentions better than Kroger did.

Essentially, the EEOC is arguing that Plaintiffs have unlimited discretion to ascribe any meaning to Kroger's branding, even if it has no rational relation to a religious belief or the LGBTQ community, and that Kroger is required to accept Plaintiffs' incorrect presumption about the intention of its own branding. As explained in Kroger's opening brief, the EEOC's argument that Plaintiffs may determine that Kroger's neutral uniform is an LGBTQ symbol simply based on Kroger's support for LGBTQ initiatives is a direct attack on businesses' rights to Free Speech and to establish policies and branding. It is also greatly outside the scope of Title VII.

If Plaintiffs have a problem with Kroger's participation in or support of LGBTQ equality initiatives, their remedy is to complain to the company; they do not have the right to refuse to comply with Kroger's neutral uniform requirements. If they did, any employee who claimed that a company took a position contrary to their religious beliefs (e.g. diversity initiatives, merchandise, contributions to social causes, etc.), could opt out wearing of the company's uniform. Requiring employers to provide "accommodations" every time an employee disagrees with a social position undeniably undermines a company's right to speech and its ability to set neutral workplace policies. Protesting employer social positions is not the purpose of Title VII; the purpose of Title VII is to prevent discrimination against employees who maintain certain religious beliefs.

Instead of proving an actual conflict between Plaintiffs' religious beliefs and a job requirement, the EEOC attempts to amend the case law to claim that Plaintiffs do not need to prove

an actual conflict, but only need to prove that they believed in good faith that there was a conflict. This is absurd --- it would fundamentally undermine employers' abilities to set policies and force them to grant accommodations without actual conflicts and accommodations for any conflict that an employee "believes" is true, regardless of whether it is actually true.

Moreover, even if Plaintiffs did have a legitimate conflict between their religious belief and the dress code, Kroger was not required to accommodate the request to opt out of the dress code because it created an undue hardship on Kroger. As established, Plaintiffs' incorrect assumption about the Our Promise symbol already spread to 7 other employees in the store who also sought accommodations. As such, Plaintiffs' discrimination claims fail as a matter of law.

Likewise, Plaintiffs fail to establish a cognizable claim of retaliation. Plaintiffs did not raise any claims of discrimination until after they were legitimately terminated from Kroger for repeatedly refusing to comply with the uniform policy. Plaintiffs attempt to establish pretext by pointing to other allegedly non-compliant employees, which fails as a matter of law because: (a) Kroger showed that it directed the other employees to comply with the policy on multiple occasions; and (b) when asked to do so by management, all the other employees complied with the policy.

Plaintiffs fail to identify any example of when Kroger was aware another employee was not complying with the policy, the employee refused to comply after being asked to do so by management, and Kroger failed to act. Moreover, all of the alleged comparators who supposedly received preferential treatment also requested religious accommodations and objected to the Our Promise symbol.

Additionally, Kroger presented significant evidence that it provided Plaintiffs the opportunity to avoid discipline and even offered to reinstate Plaintiffs, so long as they agreed to comply with the policy. In sum, there is no evidence that Kroger retaliated against the Plaintiffs.

Contrary to the EEOC's assertion, there is no dispute of material fact, which is evidenced by the EEOC's own belief that they are entitled to Summary Judgment.[2] Regardless, Plaintiffs failed to respond to Kroger's Statement of Material Facts, which means that the facts are automatically admitted. *See* L.R. 56.1 (c).

For the reasons explained below, Kroger is entitled to Summary Judgment and respectfully requests that the Court dismiss all claims with prejudice.

## II.   LEGAL ARGUMENT

### 1)   Plaintiffs have not Established a Conflict Between a *Bona Fide* Religious Belief and an Employment Requirement.

Despite the EEOC's attempts to obfuscate its argument, the EEOC is arguing that employees are entitled to unlimited deference regarding their alleged beliefs, regardless of actual religious conflict or impact. This is an unprecedented expansion of Title VII.

---

[2] In the EEOC's Response to Kroger's Material Statement of Facts, the EEOC denies several statements of fact claiming that it is not reflected in the page numbers cited. However, the EEOC does not deny the allegations included. Regardless, the facts alleged are reflected in the record. *Compare* EEOC's Response to Kroger's SOF ¶53, *with* 38:3-39:9, 61:4-17, 165:1-8; *compare* EEOC's Response to Kroger's SOF ¶63, *with* Ricked Dep. 14:20-15:5; c*ompare* EEOC's Response to Kroger's SOF ¶83, *with* Lawson Dep. 27:9-12, 50:6-18, 51:21-25; *compare* EEOC's Response to Kroger's SOF ¶103, *with* Riddley Decl. ¶11; *compare* EEOC's Response to Kroger's SOF ¶123, *with* Rickerd Dep. 43:25-18, Maxwell Dep. 101:20-102:4, Lawson Dep. 53:12-14, Maxwell Decl. ¶¶ 26-27; *compare* EEOC's Response to Kroger's SOF ¶124, *with* Rickerd Dep. 86:19-87:7, Lawson Dep. 487:22-48:4, 50:6-11, Lawson EEOC Notes 85, 87, Maxwell Decl. ¶¶26-27; Goodnight Decl. ¶ 9; *compare* EEOC's Response to Kroger's SOF ¶133, *with* Lindsey Decl. ¶¶14, 35-41; *compare* EEOC's Response to Kroger's SOF ¶136, *with* Lindsey Decl. ¶¶36-39; *compare* EEOC's Response to Kroger's SOF ¶145, *with* Goodnight Decl. ¶¶12-13.

To establish a *prima facie* case of religious discrimination under Title VII, an employee must show that they have "a *bona fide* religious belief that conflicts with an employment requirement." *Jones v. TEK Indus.*, 319 F.3d 355, 359 (8th Cir. 2003). As explained below, the Plaintiffs have a sincerely held religious belief against homosexuality and refuse to promote homosexuality. However, they do not have a religious belief that the Our Promise symbol is an LGBTQ symbol or a religious belief that conflict with an employment requirement.

### i. Plaintiffs do not have a religious belief that prevents them from wearing the Our Promise symbol.

Contrary to the EEOC's argument, Kroger does not challenge the legitimacy or reasonableness of Plaintiffs' religious beliefs or practices. *See* Pl.'s Reply, p. 9-10 (citing *Burwell*, U.S. at 725.) The only sincerely held religious belief established by Plaintiffs is their religious belief that homosexuality is a sin. It is undisputed that Kroger never requested or required that Plaintiffs support the LGBTQ community. Kroger's SOF ¶29. Kroger also agrees that it is not the Court's place to challenge whether a religious belief is plausible or correct. Title VII protects religious beliefs that are considered unpopular or obscure as much as Christianity, Islam, Judaism or Buddhism. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 451 (7th Cir. 2013) ("the protections of Title VII are not limited to familiar religions.")

However, Plaintiffs do not have a sincerely held **religious** belief or practice which supports their unreasonable[3] assumption that the Our Promise symbol supported the LGBTQ community. [4]

---

[3] Plaintiff Interveners allege that Kroger is mocking their beliefs by pointing out that they are subjective and nonsensical. Pl. Interven. Br., p. 4. As indicated in its brief, Kroger does not challenge the legitimacy of Plaintiffs' religious beliefs. Kroger only highlights that Plaintiffs' belief about the meaning of the Our Promise symbol is non-religious, highly subjective, and lacks factual support.

[4] Their religion did not prevent them from wearing hearts, red, blue, or yellow, nor any combination of the three. Kroger's SOF ¶72.

Kroger does not argue that companies have the sole right to interpret the meaning of their symbols. To the contrary, Kroger recognizes that symbols may have different meanings to different individuals in different contexts. But, the burden is on the employee requesting the accommodation to articulate a religious basis for his/her objection to the symbol.[5]

According to the EEOC itself, protected religious practices necessarily involve "moral or ethical *beliefs as to what is right and wrong* which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1 (emphasis added). That definition includes Plaintiffs' belief that homosexuality is a sin, but it does not include their interpretation of the meaning of Kroger's Our Promise symbol.

As the EEOC so candidly admits, Lawson and Rickerd believed that the Kroger Our Promise symbol "represented Kroger's support for LGBTQ[] rights." EEOC's Resp., p 9.

As the EEOC admits, Plaintiffs' belief that the Our Promise symbol was an LGBTQ symbol is based solely on the fact that the Our Promise symbol was multi-colored and they knew that Kroger Co. had LGBTQ initiatives. Kroger **repeatedly** asked Plaintiffs to explain why they thought the Our Promise symbol was an LGBTQ symbol, and they never identified any aspect of scripture, religious belief or practice to support their determination regarding the meaning of the Our Promise symbol.[6]

---

[5] There are various examples of when an individual may have a religious basis for objecting to a symbol: (1) a Jewish employee refusing to wear a cross necklace, which is a universally accepted symbol for Christianity; (2) a Christian employee refusing to wear an inverted Pentecost because his/her church teaches that an inverted Pentecost is the sign of Satan; and (3) a Hindu employee refusing to wear a hamburger logo because their faith teaches that cows are sacred and prohibits eating beef.

[6] Contrary to the EEOC's assertion, **God never told Rickerd that the Our Promise logo was an LGBTQ symbol.** EEOC MSJ, p. 6, 13. According to Rickerd, "the Lord talked to [her] heart and said, Do not be conformed to this world, be ye separate." Rickerd Dep. 70. That was before she had even seen the Kroger apron featuring the Our Promise logo. Rickerd Dep. 70-71. Later, when she saw the logo, she "kind of drew [her] own conclusion that's what God was talking about."

While Plaintiffs incorrectly and unreasonably believed that the Our Promise symbol supported LGBTQ rights, this was not a religious belief. To this day, Plaintiffs cannot provide any religious basis for objecting to the Our Promise symbol – they have only ever claimed that they have a religious objection to homosexuality and that they personally interpreted the Our Promise symbol to be an LGBTQ symbol.[7] As such, the Plaintiffs' personal interpretation of the meaning of the Our Promise symbol is not a religious belief.

> ii. **The EEOC attempts to impermissibly conflate the *bona fide* religious belief and the conflict.**

To succeed on a failure to accommodate claim, an employee must also demonstrate an actual conflict between the *bona fide* religious belief and the uniform requirement. *Jones v. TEK Indus.*, 319 F.3d 355, 359 (8th Cir. 2003). This is where Plaintiffs' argument has always failed. Plaintiffs have never been able to show an actual conflict between their religious belief (that they cannot promote homosexuality) and Kroger's dress code.

---

Rickerd Dep. 70. There was no additional instruction from God. Rickerd Dep. at 77. Rickerd can't argue now that her "own conclusion" was a divine command. Similar attempts have failed. In *Wilson v. U.S. W. Commc'ns*—a case the EEOC relies upon—the plaintiff "made a religious vow that she would wear an anti-abortion button" at virtually all times. 58 F.3d 1337, 1339 (8th Cir. 1995). It was undisputed that the button she chose, which depicted a fetus, "caused a great deal of disruption" at work. *Id.* To accommodate the button, the employer suggested that she continue wearing it, but covered. *Id.* Only thereafter did the employee claim that her vow including a requirement to be an outward "living witness." *Id.* at 1341. The Eighth Circuit found that her vow compelled her only to wear the button—not to wear it openly as a living witness, even if that was her desire. *Id.* at 1340–41. Likewise, in this case, wearing Kroger's Our Promise logo as instructed wouldn't have infringed the Plaintiffs' belief that homosexuality is a sin. Rickerd's claimed religious practice is to "not be conformed to this world." Rickerd Dep. at 70. Her "own conclusion" (Rickerd Dep. at 70) to balk at the Our Promise logo was not "conduct mandated by religious belief." *Brown v. Polk Cty.*, 61 F.3d 650, 655 (8th Cir. 1995) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

[7] For example, if Plaintiffs had asserted that their religion does not permit employees to wear heart symbols or the color red, that would have articulated a religious conflict with the Our Promise symbol.

Without citing to any case law, the EEOC argues that Plaintiffs do not need to show an actual conflict, they just need to show that Plaintiffs "believed in good faith that a work requirement conflicted with their religious beliefs." EEOC's Resp., p. 14. To the contrary, numerous cases have found that an employer's duty to accommodate does not arise until there is "an actual conflict" between a religious belief and a job-related requirement. *See e.g. Raskind v. Res. for Human Dev., Inc.*, No. 16-0629, 2017 U.S. Dist. LEXIS 182261, at *25 (E.D. Pa. Nov. 3, 2017) ((citing Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 319-20 (3d Cir. 2008)); *Goines v. BPL Plasma, Inc.*, No. 8:18-cv-2545-T-02AEP, 2018 U.S. Dist. LEXIS 211009, at *6-7 (M.D. Fla. Dec. 14, 2018); *Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1089 (7th Cir. 1991) (holding that a company is not required to grant an accommodation "unless there is some actual conflict with religion").

If the EEOC was correct, an employee would be entitled to an accommodation regardless of whether there was an actual conflict, so long as the employee honestly "believed" there was a conflict even if the employee was clearly mistaken. Under the EEOC's theory, a store clerk who was unable to work on Sundays from 9:00 a.m. to 10:30 a.m. to attend mass, would be entitled to a religious accommodation not to work Saturday nights even though their shift would end by 6:00 a.m. on Sunday, so long as the employee believed they may have to work until 9:00 a.m. even if they were never actually required to do so.  Alternatively, a professional taste tester who was unable to eat meat due to his/her religious beliefs, would be entitled to a religious accommodation not to test a veggie burger, so long as the employee honestly believed it contained meat. This is opposite to both the intention of Title VII and the relevant case law. Employees must show an actual conflict entitling them to accommodation, not a perceived conflict.

Whether there is a conflict between a religious belief and an employment requirement is an objective assessment. *Summers v. Whitis*, No. 4:15-cv-00093-RLY-DML, 2016 U.S. Dist. LEXIS 173222, at *12-13 (S.D. Ind. Dec. 15, 2016) ("[I]f this element was purely subjective, there would be simply no reason to have it as part of the *prima facie* case.") (citing *Bush v. Regis Corp.*, 257 F. App'x 219, 221 (11th Cir. 2007) ("Bush argues that the Sunday shift prevented her from doing field service with her family, which constituted a bona fide religious belief. The record, however, indicates that field service was not required to be performed on Sundays; rather, that was the day Bush and her family wished to perform field service."); *Tiano v. Dillard Dep't Stores*, 139 F.3d 679, 683 (9th Cir. 1998) (holding that the employee's religious belief—that she "had a calling from God" to take a pilgrimage to Medjugorje, Yugoslavia in October—was not in conflict with Dillard's "no leave policy" for October through December because "the timing of the trip was a personal preference and not part of her calling").

As the EEOC so candidly admits, Lawson and Rickerd believed that the Kroger Our Promise symbol "represented Kroger's support for LGBTQ[] rights." EEOC's Resp., p 9. Plaintiffs unilaterally decided that Kroger intended the Our Promise symbol to support LGBTQ rights because the Our Promise symbol contained: (1) multiple colors (which they believed represented a rainbow)[8] and; (2) employees in the store were discussing Kroger's participation in LGBTQ rights initiatives due to Kroger's receipt of the Human Rights Commission's One of the Best Places to Work for LGBTQ Equality ("Equality Award"). However, the evidence clearly shows that Plaintiffs' assumption about the meaning of the symbol was unreasonable.

---

[8] Plaintiffs claim that Kroger Co. never used the colors in the Our Promise symbol before, which is inaccurate. The blue color is well-known Kroger blue, which has been an established part of Kroger's brand for years. Kroger's SOF ¶19. Likewise, Red was selected because it was a part of Kroger Co.'s West Coast company banners. Kroger's SOF ¶20.

First, any objective observer must agree that the Our Promise symbol is clearly not a rainbow: (1) it is not in the shape of a bow or arc; (2) the symbol lacks over half of the colors in a rainbow;[9] and (3) the colors that are included are not even in the right order for a rainbow.[10] Kroger's SOF ¶¶47-50. In fact, Lawson and Rickerd admitted that the Our Promise symbol was not an actual rainbow. Kroger's SOF ¶49. Nor does the Our Promise symbol resemble a rainbow any more than thousands of other businesses who utilize the primary colors or three colors in their logos.

Even if the Our Promise symbol was an actual rainbow, Lawson admits that she does not believe that using multiple colors necessarily represents LGBTQ, and Rickerd and Lawson admit that they do not believe that rainbows are always a symbol of LGBTQ. Kroger's SOF ¶¶51, 73. Plaintiff Interveners state "[t]he similarity between the "Our Promise" symbol and the various LGBTQ+ symbols cannot be denied," "it closely resembles existing symbols (LGBTQ+)," and "it doesn't particularly bring to mind anything EXCEPT LGBTQ+," yet the Plaintiffs **still** fail to explain how the Our Promise symbol resembles an LGBTQ symbol or even identify which LGBTQ symbols it allegedly resembles. Pl. Inter. Br., p. 3. Thus, Plaintiffs' determination that Kroger's intention regarding the Our Promise symbol was based primarily on their knowledge that Kroger Co. maintained LGBTQ initiatives.

---

[9] Notably, as Plaintiffs Lawson and Ricked admit, the colors are only two shades of blue, yellow and red. Kroger's SOF ¶48. It is missing violet, orange, and green, which are prominent colors in both a rainbow in nature and the LGBTQ flag. Contrary to the EEOC's assertion, the color orange is not present in the heart, the color is yellow and only appears orange due to tone of the printer. EEOC Resp. to Kroger's SOF ¶48; Kroger's SOF ¶48.

[10] As indicated by ROYGBIV, rainbows are recognized for their prism-like characteristics and the colors appear in a recognized order: red, orange, yellow, green, blue, indigo, then violet. The Our Promise symbol has a light blue heart, surrounding a red heart, surrounding a yellow heart, surrounding a blue heart.

Second, Plaintiffs provide no explanation for why they believed that the Our Promise symbol was related to Kroger's LGBTQ initiatives, except that they found out through rumors that were circulating the store around the same time that Kroger Co. maintained LGBTQ initiatives. However, there is not a shred of evidence to support that there was any relationship between the Our Promise symbol and the Kroger LGBTQ initiatives. To the contrary, all evidence shows that Kroger had no intention to promote LGBTQ initiatives when it developed the Our Promise symbol, and that the symbol was developed as a part of overall rebranding efforts.[11]

The undisputed evidence from Kroger Vice President of Human Resources Karl Nieman, who was on the team responsible for developing and rolling out the Our Promise logo, shows that the colors and shape of the Our Promise symbol were pulled from existing components of Kroger Co.'s business. Nieman Decl. ¶¶1-23. Significantly, the undisputed evidence shows the symbol had no relation to the LGBTQ community and Kroger did not intend to promote or even reference the LGBTQ community when developing the logo. Nieman Decl. ¶25.

In addition, the evidence clearly shows that Kroger Co. designed and rolled out the Our Promise logo in 2018, many months before it won the LGTBQ award. Nieman Decl. ¶23. Further, Kroger already had a logo that it used when promoting its sponsorship of the LGBTQ community and it did not ever use the Our Promise logo while promoting its LGBTQ initiatives. Nieman Decl. ¶26.

Contrary to the EEOC's assertion, the Our Promise symbol was never mentioned or referenced in Kroger's March Press release about the Equality Award. EEOC's Resp., p. 16. The

---

[11] The EEOC provides no evidence to support that Kroger did not intend to reference or support the LGBTQ community when it created the Our Promise symbol. EEOC's Resp. to Kroger's SOF ¶ 27. The EEOC impermissibly engages in speculation that Kroger must have intended to support LGBTQ because it issued a press release in March. *Id.*

March press release about the Equality Award included a branding statement at the bottom of the press release that referenced the Kroger Feed the Human Spirit Campaign, which has been at the bottom of all Kroger's press releases as early as 2018 to current, and also includes Kroger's New York Stock Exchange identifier, a short description of the company, and Kroger's #ZeroHungerZeroWaste initiative.[12] ECF No. 31-6.

Notably, the Feed the Human Spirit Campaign has its own symbol, which is a blue heart with the words "Feed the Human Spirit" in white. Kroger's SOF ¶13.  While the base layer of the Unifying Framework represents Kroger's Purpose to Feed the Human Spirit, the Our Promise symbol and the Feed the Human Spirit symbol are two different symbols. Kroger's SOF ¶¶13-18. As has already been explained, the Feed the Human Spirit campaign, including its heart logo, was published in early 2016 and predated the LGBTQ initiatives by several years. Kroger's SOF ¶13. Critically, despite being asked repeatedly why they felt the Our Promise symbol was an LGBTQ symbol, neither Plaintiff ever claimed that they associated the statement referencing Kroger's Feed the Human Spirit campaign with the Our Promise symbol. *See generally* Lawson Dep.; Rickerd Dep.

Plaintiffs also admit that the Kroger Delta Division never participated in any LGBTQ initiatives or pride parades. Lindsey Decl. ¶16. The Pride Parade that Plaintiffs refer to

---

[12] *See e.g.* Kroger's Top Food Trends for Summer 2018, published 6/4/2018, available at https://ir.kroger.com/CorporateProfile/press-releases/press-release/2018/Krogers-Top-Food-Trends-for-Summer-2018/default.aspx; Kroger and Instacart Expand Same-day Grocery Delivery, published 8/30/2018, available at https://ir.kroger.com/CorporateProfile/press-releases/press-release/2018/Kroger-and-Instacart-Expand-Convenient-Same-day-Grocery-Delivery/default.aspx;  Kroger Announces New Senior Vice President of Supply Chain, published on 9/29/2020, available at https://ir.kroger.com/CorporateProfile/press-releases/press-release/2020/Kroger-Announces-New-Senior-Vice-President-of-Supply-Chain/default.aspx; Kroger to Host 2022 Business Update, published on 2/18/2022, available at https://ir.kroger.com/CorporateProfile/press-releases/press-release/2022/Kroger-to-Host-2022-Business-Update/default.aspx.

participation by the Kroger Co. corporate associates who voluntarily participated in Cincinnati's pride parade. It is undisputed that neither Plaintiff was ever forced to participate in any LGBTQ initiative or event. Kroger's SOF ¶29.

Plaintiffs argue that their beliefs must be rational because other employees at the store shared the same belief. EEOC's Resp., p. 14. However, the fact that other employees came to the same conclusion does not make the belief rational, especially considering that the employees only came to that conclusion after discussing their beliefs with each other and relying on rumors speculating about Kroger's intentions.

Regardless, Plaintiffs' belief that Kroger intended to use the Our Promise symbol to support the LGBTQ community was certainly not reasonable after Kroger management and human resources repeatedly explained the meaning of the Our Promise symbol to Plaintiffs, including assuring them that Kroger did not use the symbol to promote LGBTQ rights. Kroger's SOF ¶124. Kroger also provided the meaning of the Our Promise symbol on the uniform apron and the dress code, neither of which mention or reference LGBTQ initiatives. Kroger's SOF ¶¶34, 38, 45, 52. Undeniably, Kroger would have the most accurate information about Kroger's intention when it created the symbol. Accordingly, it was unreasonable for Plaintiffs to continue to refute Kroger's intention after Kroger repeatedly explained its own intention.

Critically, a company's support of LGBTQ initiatives does not transform an otherwise neutral corporate symbol or logo into an LGBTQ symbol. If it did, any right to a company's freedom of speech or control to their branding would be rendered meaningless.

**2)   Kroger Never Required Plaintiffs to Wear a Rainbow Heart.**

The EEOC claims that Kroger refused to consider any accommodation for Lawson or Rickerd, but this is not true. The only accommodation that Lawson requested was to wear a

nametag over the "rainbow heart logo," and the only accommodation that Rickerd requested was not to wear the Kroger uniform apron, which she described as having a "rainbow symbol." Kroger's SOF ¶¶98, 100. Plaintiffs never proposed any alternative accommodation. Per Kroger policy, Store Manager Sean Maxwell and HR Leader Sheryl Riddley escalated Plaintiffs' request to Delta Division Human Resource Leader Kevin Lindsey and Total Reward and Associate Relations Manager Andrea Wilson to consider.

As explained above, the Our Promise symbol was not a rainbow symbol or heart, and Plaintiffs were not able to explain why they otherwise believed it was an LGBTQ symbol. As such, after consulting with legal counsel, Lindsey and Wilson determined there was no conflict and Kroger never required them to wear a rainbow symbol. Kroger's SOF ¶133, 136-138. There is no evidence that Kroger was hostile to religious accommodations. In fact, Kevin Lindsey had granted other religious accommodations in the past when employees had expressed an actual conflict. Kroger's SOF ¶140.

### 3) **Kroger Disciplined and Discharged Plaintiffs.**

Kroger does not deny that it disciplined and discharged Plaintiffs. However, Kroger would like to clarify again for the Court that Plaintiffs were disciplined and discharged for refusal to wear the uniform, after being asked to do so by management multiple times.

### 4) **The Court Should not Bar Kroger from Asserting an Undue Hardship Defense**

The EEOC has known about Kroger's use of the undue hardship defense from the onset of the case and there is no justification for excluding the defense. The EEOC does not cite to any precedential case law finding that undue hardship is an affirmative defense or that failure to plead undue hardship should result in waiver. To the contrary, several courts have found that undue hardship is not an affirmative defense. *See e.g. Gorbea v. Verizon N.Y., Inc.*, No. 11-CV-3758

(KAM)(LB), 2014 U.S. Dist. LEXIS 87295, at *13 (E.D.N.Y. June 25, 2014) (undue hardship need not be plead as in the Answer as an affirmative defense) (collecting cases); *Chou v. Potter*, No. CV 06-5683 GAF (RCx), 2009 U.S. Dist. LEXIS 149604, at *5 (C.D. Cal. June 12, 2009) ("Accordingly, the claim of "undue hardship" is not a true affirmative defense that is waived if not pled.")

Kroger plead in its affirmative defenses that "each action taken by Kroger with regard to Plaintiff was based on legitimate, non-discriminatory and non-retaliatory reasons," which indicates that Kroger intended to defend its decision-making process and rationale for refusal to accommodate. Sec. Amend. Compl. ¶60. Additionally, Kroger asserted that it had the "right to assert additional defenses in the event discovery indicated they would be appropriate." Sec. Amend. Answer ¶65.

Nevertheless, even if it was an affirmative defense, the Court should not bar Kroger from asserting an undue hardship defense. "The Supreme Court has indicated that the Rule 8(c) pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it." *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007). Thus, the Eighth Circuit has refrained from applying a literal interpretation of 8(c) "that places form over substance, and instead have held that when an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise . . . technical failure to comply with Rule 8(c) is not fatal." *Id.* (internal quotations omitted) (citing *Thomas v. St. Luke's Health Sys., Inc.*, 61 F.3d 908 (8th Cir. 1995); *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014*).

When the defense is raised in enough time to give Plaintiffs notice of the defense, the Eighth Circuit has found the Defendant's assertion of the defense as constructively amending its

pleadings. *Id.* (citing *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443-44 (10th Cir. 1992) (describing the 10th Circuit's common law rule stating that inadequately plead affirmative defenses may still be proven at trial if notice of intent to raise the defense was provided at least three months prior to trial)).

Here, Kroger raised in its Interrogatory Responses, dated April 30, 2021, that granting the accommodations would have caused an undue hardship.

> **INTERROGATORY No. 8:** Please describe with specificity the reason(s) Defendant refused to grant Lawson's requests to cover the heart emblem on the apron and the reason Defendant refused to grant Rickerd's request to wear a different apron. **OBJECTION & RESPONSE: . . . Kroger states that it did not grant Plaintiffs' requests to violate the dress code policy because it did not find that Plaintiffs articulated a bona fide religious belief that conflicted with an employment requirement, and granting the request would have created an undue burden.**

ECF No. 47-1. In sum, the EEOC was aware that Kroger was asserting the affirmative defense for over seven (7) months prior to the close of discovery, and suffered no surprise or prejudice. For these reasons, the Court should not find that Kroger waived the undue hardship defense. In the alternative, Kroger seeks leave to file an amended answer to expressly assert the undue hardship defense.

### 5) <u>Kroger has Established that the Requested Accommodation Caused Kroger to Suffer an Undue Hardship.</u>

Kroger has shown as a matter of law that the proposed accommodation would cause Kroger to suffer an undue hardship. First, the proposed accommodation would cause Kroger to lose control over its public image and branding. The EEOC fails to explain why *Cloutier* is inapplicable to this case. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 137–38 (1st Cir. 2004). Like in *Cloutier*, the only accommodation that Plaintiffs would accept was an exemption to the Kroger uniform requirement to wear the uniform apron and display the Our Promise symbol. *Id.* While the *Cloutier* Court did discuss that Costco offered some alternative accommodations, the *Cloutier* Court's

decision examined the Plaintiffs' proposed accommodation, exemption from the dress code, and determined that Costco could not grant the accommodation without incurring an undue hardship by loss of control over its public image. *Id.*

Like Costco, Kroger made a legitimate business determination to require store associates to wear a standard uniform apron to ensure an attractive, consistent, and professional business image, while permitting employees to express themselves and be more comfortable wearing their own clothing, as the best way to represent its brand while balancing employee preferences. *Id.* ("such a business determination is within [a company's] discretion"); Kroger's SOF ¶¶31, 36-37. Because Kroger's dress code permits employees to wear their own clothing, the only standard uniform item to display a consistent business image and brand is the uniform apron. *Id.*

Rickerd was requesting to wear a non-uniform apron, which would have removed the only branded uniform item that Rickerd was required to wear, essentially allowing her to wear whatever she wanted. Lawson wanted to cover the Our Promise symbol, which was a piece of Kroger branding and part of the consistent uniform and Kroger's outward display of its public promise to customer service. Kroger's SOF ¶¶94, 100. Without that consistent apron, Kroger determined that its public image and branding would be undermined. Like in *Cloutier*, loss of control of its public image constituted an undue hardship. *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 137–38 (1st Cir. 2004).

While the EEOC argues that Kroger was not committed to its public image because other types of Kroger employees were not required to wear the apron, the argument is inopposite as Plaintiffs were undeniably required to wear the uniform apron under the policy. Kroger considered and selected the uniform for each type of employee based on business needs, customer preferences,

contractual agreements, and branding strategy.[13] Kroger's SOF ¶¶36, 39-40.  Kroger has already explained that Murray's Cheese Shop and Starbucks employees did not wear the branded Kroger apron due to branding agreements with those companies, which required employees to wear brand-specific uniforms. Kroger's SOF ¶39. Likewise, Kroger explained that pharmacists do not wear the apron because they wear medical scrubs and/or pharmacy coats, which is typical in the industry for medical professionals. Kroger's SOF ¶40; Lindsey Decl. ¶26.

The EEOC may not second-guess the legitimate business decision of the company in setting specific uniform requirements. *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729-30 (8th Cir. 2002) (restating longstanding principle that courts are not to sit as superpersonnel departments and noting that whether employer's "expectations constituted a good business practice is not for [courts] to decide"). Employers regularly set different uniform requirements for different types of employees.

To the extent that the EEOC alleges that Kroger was inconsistent in enforcing the uniform policy, as will be discussed at length below, Kroger did not allow or permit other employees to opt-out of the uniform apron or alter the uniform apron. However, there is ample evidence that Kroger addressed other employees' non-compliance when management became aware and that other employees always agreed to comply.

As the *Cloutier* Court also acknowledged:

[T]here is an important distinction between an employee who displays facial jewelry unnoticed in violation of the dress code and one who does so under an exemption from the

---

[13] Meat department, bakery, and front-end supervisors are all required wear the Kroger apron with the Our Promise symbol. Lindsey Decl. ¶¶27-29. However, meat department and bakery employees were permitted to wear white coats while behind the counter and handling food to protect the employees from stains and to signal that Kroger's bakers and butchers have the same level of professionalism and expertise that you'd find in a private bakery or butcher ship. *Id*. Also, the Front-end Supervisor was required to wear a visibility vest <u>while acting as the supervisor</u>, so as to be easy to identify if customers require immediate assistance. *Id.*

dress code. In the first scenario, [the employer] can instruct an employee to remove facial jewelry as soon as it becomes aware of a violation. In the second scenario, [the employer] forfeits its ability to mandate compliance and thus loses control over its public image. That loss, as we have discussed, would constitute an undue hardship.

*Id.* Like in this case, Plaintiffs' requested accommodation caused Kroger to lose control over its public image. For other non-compliant employees, Kroger could (and Kroger did) instruct the other employees to comply with the policy when a violation was noticed.

The EEOC also makes the bizarre argument that Kroger would not have incurred any financial cost, despite the clear CBA provision requiring Kroger to purchase the employee's uniform apron, because '[a]n apron without the multicolored heart emblem would not be a "uniform apron."' EEOC's Resp., p. 22. So long as Kroger was requiring the apron as part of the dress code, it would have been considered a "uniform apron." Thus, unless Kroger was willing to permit Plaintiffs to wear whatever they wanted, Kroger was required to incur the cost of providing an alternative apron.

In this case, the undue hardship would have been compounded because, after Plaintiffs requested an accommodation, seven other employees came forward requesting accommodations as well based on their mistaken belief that the Our Promise symbol was an LGBTQ symbol. Kroger's SOF ¶132. If Kroger would have granted the requested accommodation, Kroger would have lost its right to control the meaning of its branding and given credence to Plaintiffs' false assertion that Kroger intended the Our Promise symbol to promote LGBTQ rights, and it is highly likely that additional employees would have come forward at that store and in other stores.

Contrary to the EEOC's assertion, this case is obviously distinguishable from other cases, which do not require the employer to endorse the legitimacy of the religious belief, because Plaintiffs were specifically asserting it was Kroger's intention to promote LGBTQ rights. Unlike a Muslim employee asking to wear a head covering or a Seventh Day Adventist asking to take

Saturdays off, which do not require the employer to endorse the religious belief, Plaintiffs were objecting to Kroger's policy based on their misperception of Kroger's beliefs and intentions.[14]

Notably, the EEOC fails to rebut or even address Kroger's argument that Plaintiffs' proposed accommodations would have caused an undue hardship because: (i) the apron made employees easily recognizable to customers; (ii) the proposed accommodation undermined Kroger's commitment to customer service and the Our Promise values; (iii) the apron promotes Kroger's brand and acts as free advertising to the company; (iv) the apron encourages teamwork and reminds employees to work as a team; (v) the apron reminds employees of Kroger's values and promises to customers; (vi) the apron company pride and serves as a public relations tool; and (vii) it improves security for employee-only areas.

Finally, the EEOC fails to create an issue of material fact to undermine the clear evidence that Plaintiffs' accommodation requests caused a substantial disruption in operations and subjected Kroger to potential liability. While the EEOC may "object" to Kroger's characterization of employees' testimony as "pretty divisive" or causing a "split," that is an accurate characterization of the testimony and the EEOC provides no evidence to refute the witnesses' characterization.

The evidence clearly shows that:

1) After Plaintiffs refused to wear the dress code, "other associates started to test the limits of the dress code and stopped complying with the policy, which distracted management from other duties, as they had to devote extra time to enforcing the dress code and mediating disputes." Maxwell Decl. ¶ 54.
2) Harper colored in the Our Promise symbol with a red marker, and, in response, other PickUp associates began wearing rainbow-colored duct tape. Maxwell Decl. ¶ 55.
3) Employees complained to customers about the Plaintiffs' beliefs, which created confusion about the Our Promise symbol and created customer relations issues. Maxwell Decl. ¶57; Goodnight Decl. ¶14.

---

[14] For example, if Plaintiffs had asserted that their religion does not permit employees to wear heart symbols or the color red, that would have articulated a religious conflict with the Our Promise symbol.

4) After Plaintiffs told other associates that they felt LGBTQ was a sin and refused to wear the uniform, it "caused a significant controversy," "it was a big deal," and it "became very disruptive." Goodnight Decl. ¶ 11.

5) Employees complained to management about the controversy, including claiming that "it was creating unnecessary division in the workplace, hurting relationships with their co-workers, and hurting employee morale." Goodnight Decl. ¶ 12.

6) Employees complained to management that they were upset that Plaintiffs were essentially condemning employees, who identified as LGBTQ, as sinners in the workplace. *Id.*

7) The issue "caused a lot of drama" and that "a significant number of employees became more concerned about the drama and proving a point about the issue, than completing their tasks." Goodnight Decl. ¶ 13.

8) An employee filed a hotline complaint alleging that anti-LGBTQ employees were discriminating against LGBTQ employees and creating a hostile work environment. Kroger's SOF ¶146.

9) Harper reported to Riddley that employees were going "berserk," that it was impacting her relationship with her co-workers, and that PickUp was not able to get its work done. Riddley Decl. ¶16.

10) Brockman also testified that the issue created "an uproar" in the store. Kroger's SOF ¶143.

11) Judy also reported to the EEOC that the issue caused a split in the store. Kroger's SOF ¶143.

Contrary to Plaintiff Interveners' assertion, it was not Kroger's actions that caused these problems; there is no evidence that Kroger ever brought these issues to the store employees' attention or that Kroger ever said or implied that the Our Promise symbol was related to LGBTQ. Pl. Interven. Resp., p. 3. It was Plaintiffs' decision to spread their belief that homosexuality was a sin throughout the store and tell other employees that they were refusing to wear the apron because they believed Kroger was trying to promote LGBTQ rights. Kroger's SOF ¶141.  Kroger explained the meaning of the Our Promise symbol to the employees, directed all employees that they needed to follow the policy, and directed all employees to be respectful to one another. Maxwell Decl. ¶¶53, 55

In light of the significant evidence, there is no material dispute of fact that the issue caused a significant disruption to Kroger operations and subjected Kroger to potential liability from

harassment suits. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004) (finding it was an undue hardship to permit an employee to share beliefs condemning homosexuality because they demeaned and harassed his co-workers). Contrary to the EEOC's assertion, the harm was not speculative at all – it was very real and already occurring. In fact, it only would have increased had Kroger been forced to grant accommodations allowing Plaintiffs and the seven other associates (in addition to others who would have raised objections) to protest LGBTQ diversity and inclusion initiatives by covering up Kroger's neutral symbol.

The EEOC provides no legal evidence to support the argument that a jury must hear whether there was a substantial disruption. To the contrary, in *Wilson*, the Eighth Circuit found that the employee's requested accommodation created a substantial disruption at the workplace as a matter of law. *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1339 (8th Cir. 1995) (finding permitting an employee to wear a pro-life button was an undue burden when it created strong objections from her co-workers and resulted in complaints); *see also Cook v. Chrysler Corp.*, 779 F. Supp. 1016, 1023 (E.D. Mo. 1991) ("Granting Cook a preference in the seniority structure … would create very hard feelings among Cook's fellow employees…. The Court can only imagine the degree of animosity and hostility such a move would create."), aff'd, 981 F.2d 336 (8th Cir. 1992). As such, Kroger has established that the proposed accommodation created an undue hardship as a matter of law.

### 6)  __The EEOC Still Fails to Identify any Oppositional Activity Other than Plaintiffs' Request for Accommodation.__

The EEOC's retaliation argument is entirely circular and merely regurgitates a failure to accommodate claim. As the EEOC admits, under Eighth Circuit law, requesting an accommodation is not a protected activity. *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1101–04 (8th Cir. 2018). To *oppose* a practice, the employee must *communicate* a belief that the

employer has done something discriminatory. *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1101 (8th Cir. 2018) (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009)).

The EEOC clearly stated that the theory for its retaliation claim was that Plaintiffs were allegedly retaliated against for requesting an accommodation. *See* EEOC's Resp. to IROG No. 13; Amend. Compl. ¶¶25, 30. Now, despite Plaintiffs' admission that they never actually complained about discrimination prior to their termination, the EEOC attempts to frame Plaintiffs' refusal to follow the Kroger dress code as an oppositional activity.

Despite the EEOC's mischaracterization of the evidence to imply that Plaintiffs actually complained about discrimination, the EEOC only cites to the following activities as "complaining" about discrimination: (1) Plaintiffs orally explained to Maxwell that she could not wear the apron with the Our Promise symbol because it violated her religious beliefs; and (2) Plaintiffs' requests for accommodation stated that they were requesting a religious accommodation. *See* Pl.'s Response, p. 26-27; Pl.'s Resp. to Kroger's SOF ¶98, 100, 111, 121-124. Yet, both of these activities are clearly requests for accommodation of a religious belief, not complaints about discrimination.[15] Moreover, simply violating the dress code was not an oppositional activity.

The EEOC is merely trying to avoid the applicable Eighth Circuit case law by attempting to reframe a request for accommodation as an oppositional activity. *N. Mem'l Health Care*, 908 F.3d at 1103 ("If a legitimate accommodation request is not met, the employee might bring a

---

[15] The EEOC repeatedly tries to frame Plaintiffs' requests for accommodation as "complaints about discrimination." *See* EEOC's Resp. to Kroger's SOF ¶¶120, 121, 122. However, a request for accommodation is not a complaint of discrimination. *EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1101–04 (8th Cir. 2018). Likewise, the EEOC tries to re-characterize Plaintiff's requests for accommodation and objections to the uniform as complaints of discrimination, despite the Plaintiffs clear and unambiguous testimony that they did not complain about discrimination until after their termination. SOF ¶¶121-122.

disparate treatment claim—but not a retaliation claim.") If the EEOC's argument is followed to its logical conclusion, then every employee whose request for accommodation is lawfully denied must be exempted from their failure to comply with employers' policies and insubordination.

      7)  <u>**There is no Causation to Support a Finding of Retaliation.**</u>

For the same reasons as explained above, the EEOC fails to establish that Plaintiffs engaged in any oppositional activity until after they were terminated. At best, the pages cited simply establish that Plaintiffs indicated to Store Leader Maxwell that they did not want to wear the uniform, not that the uniform conflicted with a religious belief or that they believed it was discriminatory. Regardless, the evidence shows that by that time, Maxwell had already warned Plaintiffs that they would be subject to discipline for failure to wear the uniform. It wasn't until after the Plaintiffs had already started the progressive disciplinary process that they submitted requests for accommodation.

      8)  <u>**Kroger had a Legitimate Non-Discriminatory Reason for Termination and There is no Evidence of Pretext.**</u>

The EEOC admits that failure to follow the dress code is a legitimate, non-discriminatory reason for terminating Plaintiffs. Pl.'s Br., p. 29. The Eighth Circuit has also repeatedly recognized that insubordination is a legitimate, non-discriminatory reason for termination. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 796 (8th Cir. 2011); *see also e.g., Hill v. Walker*, 918 F. Supp. 2d 819, 834 (E.D. Ark. 2013). To establish pretext in a retaliation case, a plaintiff must <u>both</u> discredit defendant's asserted reasons for termination and show circumstances that permit drawing a reasonable inference that the real reason for the termination was retaliation. *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 506 (8th Cir. 2021).  Here, it is undisputed that Plaintiffs were terminated for repeatedly refusing to follow the dress code after being directed to do so by management on multiple occasions. SOF ¶ 103; SOF ¶ 126.

Additionally, there is no evidence of pretext because Kroger provided Plaintiffs numerous opportunities to avoid discipline, and even offered to reinstate Plaintiffs. SOF ¶ ¶ 105-106, 119.

The EEOC wrongfully asserts that Kroger did not discipline other employees for violating the dress code. There is substantial evidence in the record that Kroger maintains a progressive disciplinary policy, and that the first step of the disciplinary policy is oral counseling and providing the employee the opportunity to voluntarily comply with the policy. If the employee agrees to comply with the policy, Kroger does not escalate to written discipline. There is also undisputed evidence that Kroger management followed the progressive disciplinary policy by orally counseling other employees who violated the dress code.

Both Maxwell and Goodnight testified that they verbally counseled employees any time that they noticed an employee was out of uniform and that no other employee refused to comply with the policy. Kroger's SOF ¶¶ 128-129. For example, Maxwell testified that he counseled numerous employees who: (i) forgot to wear their apron or nametag; (ii) wore their nametag or apron improperly; (iii) wore leggings or tights, instead of pants; (iv) wore non-authorized headwear; or (v) wore white butcher coats on the sales floor. Maxwell Decl. ¶51. Likewise, Goodnight testified that when she noticed employees committing dress code violations, she addressed it with the employees, including verbally counseling other employees who were not wearing the apron or who wore leggings. Goodnight Decl. ¶15. Even the EEOC admits that Maxwell had numerous conversations with Noah Judy about dress code violations and that Judy always agreed to comply with the policy.

Next, the EEOC points to Paula Uekman, who claimed that she did not wear the uniform. But, Uekman clearly testified that on at least four occasions, Maxwell orally counseled her to put the apron on, she complied, and she later removed the apron only after Maxwell had left. Uekman

admits that Maxwell did not have knowledge that she later took the apron off and that she purposefully waited until he was out of sight before resuming her non-compliance. Uekman Dep. 31-32.

> Q: What did you tell Rebecca Harper about your concerns?
> A: … I believe that I told her that – I think Maxwell asked me four time[s]. I can count on my fingers how many times he asked me to put it on was four. And I complied with putting it on. And then, as soon as he went out the door, I took them back off.
> Q: So, essentially, he'd say can you put the apron on, you'd put it on; as soon as he walked far enough away, you'd take it back off?
> A: Correct.
> Q: So he thought you put it on, essentially, but then - -
> A: Essentially. Correct.

Uekman Dep. 31-32.

Similarly, Jeanetta Brockman admitted that she was verbally counseled on more than one occasion to wear the apron. Judy, Uekman, and Brockman all admitted that they agreed to comply once counseled by management and put on the apron. There is no evidence of a single incident where Kroger management knew that Judy, Uekman, and Brockman were not complying with the uniform and failed to act following counseling.

Finally, the EEOC points to Jeanetta Brockman's allegation that another employee, Julicia Addison did not wear her apron on some occasions and that Brockman allegedly pointed it out to a manager. However, there is no evidence that management failed to verbally counsel Addison or that she refused to comply with the policy when directed to do so by management. As such, even assuming Brockman's allegations are true, Addison is not a proper comparator. Plaintiffs were the only employees who defiantly refused to comply with the policy after being asked to comply by management.

The EEOC claims that Kroger failed to adequately enforce the dress code policy with other employees because "complying at the time of a request, then immediately not complying with the

request once the manager walks away is hardly compliance in the true sense of the word." However, as noted in *Cloutier*, "constant monitoring is impossible in a facility with several hundred employees." *Id.* at 137. Employers can only be expected to equally enforce policies for violations of which it was aware.

Regardless, Brockman, Judy, and Uekman are not proper comparators because they engaged in the same "activities" that Plaintiffs engaged in, including initially refusing to wear the apron, requesting religious accommodations, and repeatedly asserting objections to the dress code based on their mistaken belief that the Our Promise symbol was an LGBTQ symbol. Kroger's SOF ¶129. *Evans v. Wal-Mart Stores E., L.P.*, No. 2:08-CV-2110, 2009 U.S. Dist. LEXIS 80511, at *13 (W.D. Ark. Sep. 4, 2009) (holding a showing of differential treatment requires preferential treatment by someone outside a protected class, not similar treatment by someone within the same class). Thus, they are not outside the alleged "protected class." Kroger did not issue written discipline to these employees for non-compliance because they wore the uniform apron when asked. Kroger's SOF ¶¶127-128.

As such, there is no evidence to support that Kroger's legitimate, non-discriminatory reason for termination is pretextual. For the reasons stated above, Plaintiffs' claim fails as a matter of law.

III.   **<u>CONCLUSION</u>**

For the reasons explained above, Plaintiffs' claims are without merit and fail as a matter of law. Accordingly, Kroger respectfully requests that the Court grant Defendant's Motion for Summary Judgment and dismiss all claims with prejudice.

Respectfully submitted,

Faith C. Whittaker, Admitted Pro Hac Vice

Hayley L. Geiler, Admitted Pro Hac Vice
Attorneys For Defendant
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
T:  (513) 977-8200
F: (513) 977-8141
Faith.whittaker@dinsmore.com
Hayley.geiler@dinsmore.com

Cynthia W. Kolb, AB#2000156
Cross, Gunter, Witherspoon & Galchus,
P.C.
Attorneys For Defendant
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
T: (501) 371-9999
F:  (501)371-0035
Ckolb@cgwg.com