IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

EQUAL EMPLOYMENT                                           PLAINTIFF
OPPORTUNITY COMMISSION

BRENDA LAWSON and TRUDY RICKERD               PLAINTIFF-INTERVENORS


v.                          Case No.: 4:20-cv-1099-LPR

KROGER LIMITED PARTNERSHIP I
d/b/a KROGER STORE NO. 625                                 DEFENDANT

<u>ORDER</u>

This case arises from Kroger's termination of two employees.  The Equal Employment

Opportunity Commission alleges that these terminations amount to religious discrimination and

retaliation in violation of Title VII of the Civil Rights Act of 1964.  Kroger disagrees.

The two employees at issue—Brenda Lawson and Trudy Rickerd—worked at a Kroger

store in Conway, Arkansas.  They were fired after refusing to follow the new employee dress code

established by Kroger.  That new dress code required most store employees to wear an apron that

prominently featured a multi-colored heart symbol.  Lawson and Rickerd felt that the multi-colored

heart symbol supported and promoted the LGBTQ community.  That was a problem for Lawson

and Rickerd because they both have sincerely held religious beliefs that homosexuality is a sin and

that they cannot support or promote it.

After being reprimanded for their refusal to follow the dress code, but before termination,

Lawson and Rickerd each requested a religious accommodation from Kroger.  Lawson requested

that she be allowed to place her nametag over the multi-colored heart.  Rickerd requested that she

be allowed to purchase an apron without the multi-colored heart on it.  They both told Kroger that

the failure to allow such accommodations (and continued discipline regarding this dress-code issue) would be religious discrimination.

Kroger neither granted the requested accommodations nor suggested any other potential accommodations.  Instead, Kroger attempted (on multiple occasions) to explain to Lawson and Rickerd that the multi-colored heart symbol had no relation to the LGBTQ community whatsoever. Lawson and Rickerd were unpersuaded and continued to refuse to display the symbol.  After multiple rounds of discussions and discipline, Kroger fired both women for refusing to comply with the dress code.  After Lawson and Rickerd complained to the EEOC, the EEOC brought suit against Kroger.

Pending before the Court are cross-motions for summary judgment.  For the reasons stated below, Kroger's Motion is GRANTED in part and DENIED in part, and the EEOC's Motion is DENIED in its entirety.  The retaliation claim cannot survive summary judgment.  But the record would support a jury finding for either party on the religious discrimination claim, so that claim moves forward to trial.

## BACKGROUND

Because the Court is resolving cross-motions for summary judgment, this factual background section is limited to facts that are not subject to genuine dispute.  There is consensus among the parties regarding most of the historical facts in this record.

## I. Development of the Multi-Colored Heart Symbol and Apron

In 2004, Kroger initiated a "Customer First campaign that was dedicated to holding customers in the highest regard, and providing exceptional service."[1]  By 2012 and 2013, that

---

[1] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 6; *see also* Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 8:22–23, 9:5.

strategy required refreshing.   Kroger began to work with Boston Consulting Group and Brighthouse, who helped Kroger discover that the company "really didn't have a strong emotional connection with [its] shoppers."[2]  This market research led Kroger to start a campaign called "Feed the Human Spirit."[3]  The campaign "explained that Kroger's purpose is to Feed the Human Spirit by uplifting its associates, customers, and communities."[4]

In early 2016, in conjunction with the Feed the Human Spirit campaign, Kroger internally launched the symbol pictured below to company employees.[5]  This symbol was a blue heart containing the words "Feed the Human Spirit" in white text.[6]



Throughout 2016, and in subsequent years, Kroger continued to work with Boston Consulting Group and Brighthouse to regularly review and refresh its branding.[7]  In 2016, Kroger also brought in the Disney Company to "assist[] Kroger in creating a new, clear, and easy to embrace service

---

[2] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 9:9–22; *see also* Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 7.

[3] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶¶ 8–9.

[4] *Id.* ¶ 8.  Kroger generally uses the term "associates" to identify people who work for the company.  Throughout the record, "employees" and "associates" are used interchangeably.

[5] *Id.* ¶ 9.

[6] *Id.*; Ex. 4 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) at 9.

[7] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 12:9–19.

framework that simplified Kroger's various company initiatives into an understandable message."[8] This work ultimately resulted in what is now known as Kroger's "Our Promise" campaign, which Kroger launched in June of 2018.[9]

Kroger's Our Promise campaign "represents Kroger's four service-based commitments: (1) everyone friendly and caring; (2) everything fresh; (3) uplift every way; and (4) improve every day."[10]  The Our Promise campaign is symbolized by the Our Promise symbol.  The Our Promise symbol (pictured below) is a series of four concentric hearts.[11]



The innermost heart is navy blue, which hearkens back to the Feed the Human Spirit campaign branding.  This navy blue heart is surrounded by a yellow heart, then a red heart, and then finally

---

[8] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 11; *see also* Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 11:5–10.

[9] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶¶ 12, 23; *see also* Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 11:5–10.

[10] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 16; *see also* Ex. 3 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 25.

[11] Ex. 4 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) at 74.

a light blue heart.[12]   Kroger intended the four colors to represent the four service-based commitments that make up the Our Promise campaign.[13]

While Kroger was developing and launching its Our Promise campaign and Our Promise symbol, Kroger also began reconsidering its employee uniform policy.[14]   In the middle of 2018, Kroger announced a new uniform.[15]   The centerpiece of Kroger's new uniform was an apron that employees would wear over their own clothes.[16]   The front of the apron (pictured below) is blue, has Kroger's company logo in white letters in the center of it, and has the Our Promise symbol prominently displayed.[17]



There is a fair amount of record evidence concerning Kroger's internal messaging with respect to the Our Promise symbol.   Kroger developed "an internal communication campaign" to

---

[12] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 17.

[13] *Id.*; Ex. 4 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) at 88–93.

[14] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 27; *see also* Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 28:1–30:9.

[15] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 29:21–30.

[16] *Id.* at 29:11–25, 35:21–25.

[17] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 54.   From the employee's perspective, the Our Promise symbol is on the upper left side of the apron.   On the upper right side of the apron, there are "two eyelets for securing the employee's nametag . . . ."   Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 32.

let employees know about the new apron and the Our Promise symbol.[18]  This internal, employee-focused campaign included a video and a card from various corporate officers "that actually explained the apron, our purpose, [O]ur [P]romise, and what the different layers of the heart meant."[19]  Additionally, on the back side of the apron, Kroger stitched the following explanation (pictured below) of the Our Promise campaign: "Because Our Purpose is to Feed the Human Spirit, We Promise Everyone Friendly & Caring[,] Everything Fresh[,] Uplift Every Way[, and] Improve Every Day."[20]  Kroger stitched this explanation onto the back side of the apron because Kroger "wanted to make sure that associates . . . see it when they put [the apron] over their head[s] every day."[21]



There is no record evidence of a similar Our Promise communications campaign targeting customers.  There is no suggestion of store signage or any other in-store communication that explained the Our Promise symbol to customers.  There is no suggestion of print, electronic, or

---

[18] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 35:17–37:1.

[19] *Id.* at 36:9–23.

[20] *See* Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 55.

[21] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 32:21–25.

television advertising that explained the Our Promise symbol to customers.  Indeed, to Kroger, it was "not important for [Kroger's] customers to know what Our Promise is."[22]  Instead, Kroger wanted "customers to actually observe the [employees'] behaviors and to feel differently."[23]  To achieve its indirect goals of enhancing the customer experience and fostering an emotional connection with customers, Kroger used the Our Promise symbol, the internal employee communication campaign, and the explanatory inscription on the back of the apron to tell Kroger's employees "what to be."[24]

## II.  The Apron's Adoption in Conway, Arkansas

Although the new Our Promise symbol and apron were officially launched in 2018, they were not immediately used at every Kroger location across the country.  That is because Kroger's retail locations are grouped into different divisions, and "[t]he decision to accept the new uniform was left to each Kroger Co. division, who set[s] [its] own uniform policy, and set[s] [its] own schedule for rollout."[25]  The Conway, Arkansas, store at the center of this lawsuit is part of Kroger's Delta Division.[26]  The Delta Division did not adopt the new Our Promise apron as the employee uniform until April of 2019.[27]  Along with adopting the new apron, the Delta Division implemented a new employee dress code that specified who had to wear the apron, when the apron was to be worn, and how the apron was to be worn.[28]  Under the new dress code, the apron was "to be worn at all times while associates [were] on the clock," and employees were instructed to

---

[22] *Id.* at 33:1–3.

[23] *Id.*

[24] *Id.* at 33:8–9.

[25] Ex. 4 (Karl Niemann Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-4) ¶ 35.

[26] Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶ 1.

[27] *Id.* ¶ 3.

[28] *See* Ex. 1 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-1) at 15–17.

wear their name badges on the upper right side of the apron.[29]  (As explained in footnote 17, the Our Promise symbol was located on the upper left side of the apron.)

Some Kroger employees were not required to wear the apron at all.  Kroger employees who worked in the Starbucks, Murray's Cheese Shop, and Pharmacy areas of the store did not have to wear an Our Promise apron.[30]  The employees in the Starbucks and Murray's Cheese Shop areas of the store were exempted from wearing the apron because Kroger had agreements with those companies that required these employees to wear Starbucks and Murray's Cheese Shop uniforms.[31]  Pharmacy employees were "permitted to wear scrubs and/or traditional pharmacy coats" instead of the Our Promise apron because "Kroger believed that permitting pharmacy associates to wear the traditional apparel of healthcare professionals would encourage public trust."[32]

Some Kroger employees, while required to wear the new apron, had additional pieces to their uniforms that went over the apron and rendered the Our Promise symbol invisible.  "Baggers, Fuel Clerks, and PickUp associates were required to wear reflective safety vests over their apron[s] at all times they were working in the store parking lot or fuel center."[33]  "[F]ront-end supervisors [wore] a red vest over their apron[s]," and "Kroger permit[ted] Meat Clerks to wear the traditional white butcher coats over their uniforms while in the Meat Department."[34]  Store Leader Sean Maxwell estimated that out of 80-100 employees at the store on any given day, 15-18 of those employees did not have a visible Our Promise symbol on their person—either because they didn't

---

[29] *Id.* at 15.

[30] *Id.* at 16; Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶¶ 6–8.

[31] Ex. 1 (Kevin Lindsey Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-1) ¶ 25.

[32] *Id.* ¶ 26.

[33] *Id.* ¶ 27.

[34] *Id.* ¶¶ 28–29.

have to wear the apron at all or because they had to wear an additional piece of attire that covered the symbol.[35]

### III. Employee Reaction to the Our Promise Apron

Sometime in late April of 2019, supervisors at the Conway store began to distribute the new Our Promise aprons.[36]  Almost immediately, several employees expressed disapproval (to management and to one another) of the new aprons.[37]  The most common complaint was that the Our Promise symbol (the multi-colored heart) supported or promoted the LGBTQ community.[38] Conflation of the Our Promise symbol and support for or promotion of the LGBTQ community appears to have primarily stemmed from a press release issued by the Kroger Company in March of 2019.  In that press release, Kroger announced that it had been named "One of the best Places to Work for LGBTQ Equality by the Human Rights Campaign Foundation . . . ."[39]  The fact that Kroger's announcement of the award came so close in time to the Delta Division's adoption of the

---

[35] Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 24:17–23, 52:9–12.

[36] Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶ 3.  Full-time employees received two aprons; part-time employees received one.  Ex. 1 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-1) at 16.  Maxwell testified that store supervisors started to distribute the aprons as soon as they arrived at the store.  Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 45:2–20.  Any employees who were not working on the day the aprons were rolled out would receive their apron(s) during their next work shift.  *See id.* at 52:13–23, 55:18–56:11.

[37] *See* Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 18.  The exact number of employees who disapproved of the apron is unclear.  It appears to be at least ten and, based on some of the testimony, could be approximately twenty.  *See* Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 53 (naming nine employees who objected to the apron); EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 147 (discussing another employee's disapproval of the apron); Ex. 11 (Jeanetta Brockman Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-11) at 31:9–34:13 (naming an additional four employees); Ex. 14 (Paula Uekman Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-14) at 35:20–36:23 (naming an additional two employees); Ex. 15 (Noah Judy Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-15) at 24:12–25 (naming one additional employee and testifying that there were at least "a couple" others).  There is also a reference in the record to employees at another Kroger store (in a completely different part of the state) taking issue with the Our Promise symbol.  *See* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 33:12–34:1; Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 30.  It is not clear whether these employees' objections were similar to the objections raised by the employees at the Conway store.  Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 43:3–6.

[38] *See* Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 18.

[39] Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶ 16.

Our Promise apron led some employees in the Conway store to believe that Kroger's Our Promise symbol was related to Kroger's support for the LGBTQ community.[40]

Employees at the Conway store expressed their disapproval of the new aprons in several ways.  Lawson wore the apron, but she covered the Our Promise symbol with her nametag so that the multi-colored heart was no longer visible to customers or other employees.[41]  Rickerd refused to wear the apron at all.[42]  Other employees testified that they would only wear the apron when a supervisor was around and then would take the apron off as soon as the supervisor had walked away.[43]

One day in late April or early May (shortly after the new aprons were distributed), an employee named Rebecca Harper "protested the Our Promise symbol by coloring in the symbol with a red marker."[44]  In response, other employees placed rainbow tape on their aprons to show their support for the LGBTQ community.[45]  Ultimately, on that same day, store supervisors "instructed the . . . employees to remove the tape from their uniform," and "instructed Harper that she could not alter the uniform apron and needed to obtain a new apron."[46]

The record evidence regarding the level of disruption caused by the apron issues is in conflict.  On one hand, Maxwell seems to testify to very minimal disruption.  When asked if "[t]he

---

[40] *See* Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶¶ 10, 18; Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 14:19–16:2, 85:24–86:3; Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 68:12–19, 70:20–22; Ex. 14 (Paula Uekman Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-14) at 15:23–16:17, 19:20–23, 20:23–21:13.

[41] Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 36:1–12.

[42] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 95; *see also* Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 76:22–77:4.

[43] Ex. 14 (Paula Uekman Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-14) at 31:22–32:8; Ex. 15 (Noah Judy Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-15) at 22:3–20.

[44] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 147; Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 95:22–96:7.

[45] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 148.

[46] *Id.* ¶¶ 147–48.

issues with Rickerd and Lawson not wanting to wear the apron . . . cause[d] a division within the store," Maxwell acknowledged that the two employees "did have some support from other associates," but explained that he "would not call it 'a division.'"[47]  Maxwell also explained that all employees at the Conway store (except for Lawson and Rickerd) wore the apron in accordance with the dress code when told to do so.[48]

On the other hand, there was an anonymous employee complaint submitted to Kroger's corporate ethics hotline that complained of "a culture of bigotry and hate among the older religious associates at this store."[49]  This anonymous complaint specifically mentioned that "the aprons are viewed as Kroger's way of promoting the LGBTQ agenda even though it has nothing to do with that."[50]  Additionally, Harper (the employee who colored the heart with a red marker) told a Kroger executive that "employees were going 'berserk,' that it was impacting [Harper's] relationship with her co-workers, and that [the employees in Harper's department] were not able to get [their] work done."[51]  (Harper also said that things had "calmed down since [Harper] started wearing the apron."[52])

---

[47] Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 95:17–21.

[48] *Id.* at 65:3–69:19; *see also* Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 50.

[49] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 78.

[50] *Id.*  This anonymous complaint identified "Trudy" as "the person(s) engaged in this behavior."  *Id.*  Kroger was never able to "validate that this [complaint] was true."  Ex. 7 (Sherryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 37:9–11.  Kroger was also never able to officially determine whether the "Trudy" in the anonymous complaint was Rickerd.  *Id.* at 38:18–24.  However, Rickerd testified that she believed that the anonymous complaint was referring to her.  Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 153:2–4.

[51] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 149.

[52] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 35–36; Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 65:12–66:6.

## IV. Lawson and Rickerd

Lawson and Rickerd were steadfastly opposed to wearing the Our Promise apron from the start.  Lawson first made her objections known when she received the Our Promise apron from Maxwell.[53]  By that time, Lawson was familiar with the award Kroger had won (and publicized) for being a top LGBTQ workplace.[54]  When Lawson saw the Our Promise apron, she immediately associated the Our Promise symbol with Kroger's support of the LGBTQ community.[55]  Lawson explained to Maxwell that she would not wear the apron because of her religious belief that homosexuality is a sin.[56]  Ultimately, however, Lawson took and wore an apron, but covered the Our Promise symbol with her nametag.[57]

Rickerd testified that, before the aprons were actually given to the employees, God spoke to her and told her: "Be not conformed to this world, be ye separate."[58]  It was shortly after receiving this divine message that Rickerd learned about (1) the new apron with the multi-colored heart, and (2) Kroger's activities supporting the LGBTQ community.[59]  This timing led Rickerd to draw her "own conclusion that [the Our Promise symbol was] what God was talking about."[60]  Rickerd told Maxwell that she would not wear the apron because doing so would be "advertising that [Kroger] support[s] LGBTQ."[61]

---

[53] Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 35:20–36:12.

[54] *Id.* at 14:19–16:2, 85:24–86:3.

[55] *Id.* at 14:23–15:4, 35:20–36:12.

[56] *Id.* at 35:20–36:12.

[57] *Id.* at 36:9–12.

[58] Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 70:12–14.

[59] *See id.* at 25:5–15, 64:1–21.

[60] *Id.* at 70:17–20.

[61] *Id.* at 38:21–39:6.

Shortly after these initial interactions, Maxwell let both women know that they would be subject to discipline if they did not comply with the dress code. Kroger's discipline policy consisted of two levels of written warnings. The first level is called a Significant Incident Reminder ("SIR").[62] The second level is called a Constructive Advice Record ("CAR").[63] Once an employee has received an SIR and a CAR, she could be subject to suspension.[64] If non-compliance continues after she returns from suspension, then she could be terminated.[65]

Lawson and Rickerd began to receive written discipline in May of 2019. On May 1, Rickerd received an SIR for "[f]ailure to follow dress code."[66] Rickerd had not yet formally requested a religious accommodation to be exempted from wearing an apron that had the Our Promise symbol on it.[67] Two days later, on May 3, Rickerd received a CAR from Assistant Store Leader Kaleb Dickey because she "refused to follow the dress code."[68] The CAR notified Rickerd that "[f]urther instances will result in progressive discipline up to and including discharge."[69]

When Dickey gave Rickerd this CAR, she gave him a handwritten letter that sought a religious accommodation:

---

[62] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 43. Employees begin to receive written discipline if they continue to engage in misconduct after informal verbal discussions with supervisors. *Id.* Kroger's Statement of Material Facts says "Serious Incident Reminder," but everywhere else in the record (including Maxwell's declaration, which Kroger cites in its Statement of Material Facts) says "Significant Incident Reminder." *See, e.g.*, Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 16; Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 45, 47.

[63] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 43.

[64] *Id.*

[65] *Id.*

[66] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 63.

[67] Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 48:23–49:1.

[68] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 64; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 97.

[69] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 64; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 97.

> I have a sincerely held religious belief that I cannot wear a symbol that promotes or endorses something that is a violation of my religious faith.  I am requesting a religious accommodation to have a uniform apron that does not have a rainbow symbol.  I respect others who have a different opinion and am happy to work alongside others who desire to wear the symbol.  I am happy to buy another apron to ensure there is no financial hardship on Kroger.[70]

Maxwell later emailed a copy of the May 3 CAR and Rickerd's handwritten accommodation request to Human Resources Leader Sheryl Riddley.[71]  In this email, Maxwell told Riddley that (1) he had already "had several conversations with [Rickerd] and [had] let her know the meaning of the heart," and (2) the "next step" would "be a suspension."[72]

On May 4, Maxwell's attention turned to Lawson.  He issued Lawson an SIR because she "refuse[d] to follow the dress code."[73]  In response to the SIR, Lawson gave Maxwell a handwritten request for a religious accommodation:

> I am requesting reasonable accommodation of the dress code, with regard to any religious belief causing me great discomfort and . . . anguish if I am required to wear the rainbow heart logo.  I respect others['] beliefs and I expect the same.  This is confirmation of previous notice which I have given to management.[74]

That same day, Maxwell received a letter from local attorney David Hogue.  This letter was written on behalf of nine employees in the Conway store:

> Mr. Maxwell:
>
> This will advise you that I have been contacted by several of your employees regarding recent violations of the rights granted to them by Title VII of the Civil Rights Act of 1964.  Please accept this correspondence as the respectful request of

---

[70] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 70.  Rickerd testified that Dickey did not say anything in response to the handwritten request.  Ex.10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 52:15–24.

[71] Ex. 9 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-9) at 13–15.

[72] *Id.* at 13.

[73] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 45; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 99.

[74] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 51; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 99–100.

the employees named below, for Kroger to immediately cease actions to require them to wear items that violate their religious beliefs.

According to these individuals, Kroger is requiring employees to wear a blue apron with a multi-colored heart shape on the top front corner. This heart strongly resembles an LGBTQ symbol which stands for something these employees neither agree with nor support. I understand that the management position is that they wear this where it can be seen by customers, or face discipline, and that some are already facing unlawful discipline.

While I understand that Kroger's position is that this is not an LGBTQ symbol, the subject employees recognize it as such, and it is likely to be seen likewise by the public. Regardless, wearing it is objectionable to these employees, and because of that, under Title VII, they have a federally granted right not to wear it unless the company can show such a strong interest in forcing it that the company's interest over-rides the employees' religious liberty.

The employees desire to keep their jobs and continue to work peacefully delivering the quality of groceries and service in which they take pride. Please do not make the costly mistake of forcing them to endorse someone else's "pride." This embroidery is no more acceptable under the law than making someone wear a cross and telling them it is not meant to be religious.

On behalf of Jared [Noah] Judy, in the meat department, Cynthia Bailey, in utility, Trudy Rickerd, in file maintenance, Brenda Lawson and Carol Maxwell, in the deli, Jeanetta Brockman, in apparel, Paula Uekman, in the fuel center, Wesley Boyce, in receiving, and Steve Brewer, and any other employees that take issue with the apron, I am requesting you to immediately rescind the requirement to wear the objectionable apron. Just as you have given your employees 24 hours to comply, I will give you 24 hours to stop violating the religious rights of your employees.

Finally, be aware that any action of Kroger against the employees because of this letter or what is expressed herein will be taken as unlawful retaliation against them, again in violation of Title VII.[75]

Maxwell emailed a copy of this letter to Riddley and told her that "all of the associates mentioned in this letter have been following the dress code except for Brenda Lawson and Trudy Rickerd."[76]

Maxwell added that he had already "had several conversations with both of these individuals and

---

[75] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 53.

[76] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 31–32.

explained the meaning of the heart."[77]   The next day, May 5, Lawson received a CAR from

Assistant Store Leader Kaela Goodnight because Lawson "refused to follow the dress code."[78]

After Lawson's May 5 CAR, there was a significant gap of time before either she or Rickerd

received more discipline.  Maxwell testified that this gap of time occurred because Kroger was

considering Lawson's and Rickerd's accommodation requests.[79]

Eventually, Kroger management "determined that there was nothing to accommodate"

because the Our Promise symbol was not intended to have any connection to the LGBTQ

community.[80]  So, on May 21, Riddley (the Human Resources Leader) went to the Conway store

to meet with Lawson and Rickerd about their refusal to comply with the uniform policy.[81]

Maxwell and Noah Judy (a union steward) also attended these two meetings.[82]   Rickerd told

---

[77] *Id.* at 32.

[78] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 46; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 102.

[79] Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 74:14–75:2.

[80] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 138; *see also* Ex. 2 (Kevin Lindsey 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-2) at 31:7–33:10.

[81] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 104–06.  While Riddley was at the Conway store, she also spoke with Harper (the employee who colored in the Our Promise symbol with red marker) and Jeanetta Brockman.  Harper expressed her concern that the Our Promise symbol would make it look like "we are supporting [the LGBTQ] lifestyle."  Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 35–36; Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 65:12–66:6.  Harper also asked Riddley if it was "a coincidence that [the Our Promise apron] came out at the same time" as news of Kroger "paying for gender reassignment surgery."  Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 35–36; Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 65:12–66:6.

Brockman told Riddley that she was "[n]ot sure what [the Our Promise symbol] really means" but that her "reason [for being opposed to wearing the apron] is that [Kroger] did advertise that [Kroger] support[s] LGBTQ."  Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 39–40; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 66:22–67:5.  Brockman told Riddley that she would "do as [she] is told" because she did not want to lose her job, but that she did not understand why the apron was "so important to the extent [that] people [were] going to lose their jobs."  Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 39–40; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 66:22–67:5.

[82] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 43, 46; Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 51:18–53:6; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 104–05.

Riddley that she would "not wear the apron because of the agenda behind the rainbow heart."[83] Rickerd further explained that she believed that Kroger was "using the heart as an advertisement for LGBTQ [and] the Lord told [Rickerd] not to put [the apron] on."[84]  During the meeting with Rickerd,  Judy told Riddley that he also felt that the Our Promise symbol represented the LGBTQ community.[85]

Lawson was less talkative than Rickerd.  When Riddley asked Lawson why she would not wear the Our Promise apron, Lawson told Riddley that she would "rather not say anything."[86] Lawson did tell Riddley that the Our Promise symbol was "[a]gainst [Lawson's] religious beliefs, plain and simple."[87]  During the meeting with Lawson,  Judy told Riddley that the uniform policy "is affecting [employees'] religious beliefs" and that he had "never seen anything like this." [88]

At the end of each employee's meeting with Riddley, that employee was informed that her prior disciplinary write-ups were going to be revoked.[89]  Each woman was told, however, that discipline would restart if she continued to refuse to comply with the dress code.[90]  Lawson and Rickerd did not change their minds about the Our Promise symbol, and discipline began anew.

---

[83] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 43; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 70:15–71:5.

[84] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 43; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 70:15–71:5.

[85] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 44; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 71:8–12.

[86] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 46; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 72:4–9.

[87] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 46; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 72:4–9.

[88] Ex. 7 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 47; *see also* Ex. 7 (Sheryl Riddley Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-7) at 72:16–73:4.

[89] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 107.

[90] *See id.*

On May 22, Rickerd received an SIR for "[f]ailure to follow [d]ress code."[91]  The following day, Rickerd received a CAR when she "refused to follow the dress code."[92]  The CAR notified Rickerd that "[f]urther instances will result in progressive discipline up to and including discharge."[93]  On May 24, Lawson received an SIR for "[f]ailure to follow dress code."[94]  On May 27, both Lawson and Rickerd received CARs for failing to follow the dress code.[95]  The next day, they each received another CAR for failing to follow the dress code.[96]  Additionally, Lawson and Rickerd were each suspended from work for one day.[97]  On May 29, Kroger terminated Rickerd

---

[91] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 65; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 108.

[92] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 66; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 109.

[93] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 66; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 109.

[94] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 47; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 110.  In response to this SIR, Lawson gave Maxwell another handwritten request for a religious accommodation:

> I am requesting reasonable accommodation of this dress code, with regard to my religious belief causing me great discomfort and anguish, if I am required to wear it (the apron with the heart logo[]).

> I respect others['] beliefs and I expect the same.  This is confirmation of previous notice which I have given to management.  I am simply asking to wear my name badge over the heart logo.

Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 52; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 111.  Noah Judy signed Lawson's handwritten request as a witness.  Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 52.  Lawson testified that she does not remember what (if anything) Maxwell said in response to her request.  Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 60:23–61:1.

[95] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 48; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 67; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 112–13.

[96] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 49; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 68; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 114–15.

[97] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 49; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 68; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶¶ 114–15.

for her refusal to follow the dress code.[98]  On June 1, Kroger terminated Lawson for her refusal to follow the dress code.[99]

Lawson and Rickerd both filed grievances with their labor union.[100]  Both grievances requested immediate reinstatement, revocation of prior disciplinary write-ups, back pay, and to "otherwise make [Lawson and Rickerd] whole."[101]  Kroger denied both grievances because it "believe[d] that it [was] within its right to" terminate Lawson and Rickerd.[102]  But Kroger did offer both Lawson and Rickerd "reinstate[ment] with no back pay, and no loss of seniority" if they "agree[d] to wear the [Our Promise] apron . . .  [and] agree[d] to follow all policies regarding the [dress code] which includes nametag placement and the . . . wearing of the apron."[103]  Lawson and Rickerd both declined Kroger's offer.[104]

Lawson and Rickerd filed complaints with the Equal Employment Opportunity Commission (EEOC).[105]  On April 29, 2020, the EEOC issued Kroger "Letters of Determination finding reasonable cause to believe that [Kroger] violated Title VII and inviting [Kroger] to join

---

[98] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 69; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 116.

[99] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 50; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 117.  Maxwell asked Lawson to go home, think about things, and come back because he did not want to fire her.  *Id.*  Lawson did not change her mind.

[100] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 54; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 74.

[101] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 54; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 74.

[102] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 57; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 77.

[103] Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 57; Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 77.

[104] Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 70:3–17; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 119.

[105] EEOC's Am. Compl. (Doc. 18) ¶ 6; Kroger's Answer (Doc. 24) ¶ 6.

with the [EEOC] in informal methods of conciliation . . . ."[106]  Kroger and the EEOC were unable to reach an agreement.[107]  On July 21, 2020, the EEOC issued Kroger "Notices of Failure of Conciliation."[108]  On September 14, 2020, the EEOC filed this lawsuit against Kroger.[109]  On October 8, 2020, Lawson and Rickerd joined the suit as Plaintiff-Intervenors.[110]

## DISCUSSION

The EEOC brings two claims on behalf of Lawson and Rickerd.[111]  The principal claim is a religious discrimination claim.  The EEOC alleges that Kroger violated Title VII when it denied Lawson's and Rickerd's requests for religious accommodations and fired them for not complying with the dress code.[112]  This type of religious discrimination claim is known as a failure-to-accommodate claim.  The second claim is a retaliation claim.  The EEOC alleges that, by firing Lawson and Rickerd, Kroger unlawfully retaliated against them for complaining about the apron.[113]

---

[106] EEOC's Am. Compl. (Doc. 18) ¶ 7; Kroger's Answer (Doc. 24) ¶ 7.

[107] EEOC's Am. Compl. (Doc. 18) ¶ 9; Kroger's Answer (Doc. 24) ¶ 9.

[108] EEOC's Am. Compl. (Doc. 18) ¶ 10; Kroger's Answer (Doc. 24) ¶ 10.

[109] Compl. (Doc. 1).

[110] Intervenor Compl. (Doc. 8).  Lawson and Rickerd have adopted the EEOC's summary judgment arguments.  *See* Intervenors' Resp. to Mots. for Summ. J. (Doc. 46).

[111] The EEOC's Amended Complaint also raises a third claim on behalf of each woman for "discipline and discharge." EEOC's Am. Compl. (Doc. 18) ¶¶ 17–22, 34–39.  While each party's motion technically raises that claim, *see* EEOC's Mot. for Summ. J. (Doc. 31) at 1; Kroger's Mot. for Summ. J. (Doc. 34) at 1, neither party has actually argued that claim in the summary judgment briefing, *see* Apr. 25, 2022 Hr'g Tr. at 41:17–45:2, 57:9–20.  At most, Kroger could be said to have raised the issue in a footnote in its opening summary judgment brief.  *See* Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 11 n.5.  But until Kroger explained that footnote during a hearing on these Motions, it was far from clear that the footnote had anything to do with the EEOC's discipline-and-discharge claim.  *See* Apr. 25, 2022 Hr'g Tr. at 50:15–51:1.  The point of all this is to say that the discipline-and-discharge claim in the EEOC's Amended Complaint is not at issue on summary judgment.  It has not been sufficiently raised, briefed, or otherwise argued such that the Court can properly rule on that claim.

[112] EEOC's Am. Compl. (Doc. 18) ¶¶ 12–16, 29–33.

[113] *Id.* ¶¶ 23–28, 40–45.

The EEOC and Kroger have each moved for summary judgment on both claims.[114] Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[115] "A fact is 'material' if it may 'affect the outcome of the suit.'"[116] A fact is genuinely disputed when a rational juror could resolve the dispute in favor of either party.[117] "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact . . . ."[118] "[W]here conflicting inferences as to a material fact may reasonably be drawn from the materials before the court, the case is not appropriate for summary judgment."[119] Under this standard, neither side is entitled to summary judgment on the failure-to-accommodate claim. But Kroger is entitled to summary judgment on the retaliation claim. The Court will address each claim in turn.

## I. Failure to Accommodate

In 1964, Congress made it unlawful for employers to "discharge any individual . . . because of such individual's . . . religion . . . ."[120] In 1972, Congress added some meat to the bones of this prohibition on religious discrimination in the workplace. Specifically, Congress enacted a supplementary provision explaining that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he [or she] is unable to reasonably accommodate to an employee's or prospective employee's religious

---

[114] EEOC's Mot. for Summ. J. (Doc. 31); Kroger's Mot. for Summ. J. (Doc. 34).

[115] Fed. R. Civ. P. 56(a).

[116] *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[117] *Id.*

[118] *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).

[119] *Id.*

[120] 42 U.S.C. § 2000e-2(a)(1); Pub. L. No. 88-352, Title VII, § 703, 78 Stat. 241, 255 (1964).

observance or practice without undue hardship on the conduct of the employer's business."[121] Although this supplementary provision is structured somewhat awkwardly, its meaning and effect are clear.  The provision first provides an unquestionably broad statutory definition of the term "religion."[122]  The provision then goes on to create a defense to a failure-to-accommodate claim.

The Eighth Circuit (like its sister circuits across the country) uses a burden-shifting framework to determine if either party is entitled to summary judgment on a failure-to-accommodate claim.[123]  The specifics of the framework were derived from and roughly track the statutory language set out above.  A plaintiff must first establish a *prima facie* case, which is composed of three prongs.[124]  Those prongs are essentially a stand-in for the statutorily-required showing that the employer fired an employee "because of" any aspect of the employee's religious observance, practice, or belief.

For the first prong of the *prima facie* case, a plaintiff must establish that the employee's sincerely held religious belief conflicted with the employer's workplace rule.[125]  Of course, the word "belief" here is really a shorthand for religious observances and practices that are manifestations of the employee's religious belief.  Speaking metaphysically, a belief cannot

---

[121] 42 U.S.C. § 2000e(j);  Pub. L. No. 92-261, § 2, 86 Stat. 103, 103 (1972).

[122] It is hard to imagine a definition of religion that could be broader than "*all aspects* of religious *observance and practice, as well as belief*."  42 U.S.C. § 2000e(j) (emphasis added).

[123] *See, e.g.*, *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000); *Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013); *EEOC v. GEO Group, Inc.*, 616 F.3d 265, 271 (3d Cir. 2010); *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004); *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998).

[124] Because we are at the summary judgment stage, "establish" here means producing evidence from which a rational juror could conclude that a plaintiff proved the *prima facie* case by a preponderance of the evidence.

[125] The Eighth Circuit, over the years, has articulated two slightly different versions of the *prima facie* standard's first prong.  The more commonly used version is that a plaintiff must show "a bona fide religious belief that conflicts with an employment requirement." *Jones v. TEK Indus.*, 319 F.3d 355, 359 (8th Cir. 2003).  The less commonly used version is that a plaintiff must prove he or she "has a bona fide belief that compliance with an employment requirement is contrary to his [or her] religious faith." *Vetter v. Farmland Indus., Inc.*, 120 F.3d 749, 751 (8th Cir. 1997).  This slight difference in the articulation of the first prong seems to have played no role in the holding of any Eighth Circuit case.

conflict with a workplace rule.  Instead, it is the religious observance or practice—i.e., doing something or refraining from doing something based on a religious belief—that can conflict with a workplace rule.  For the second prong of the *prima facie* case, a plaintiff must establish that the employee informed the employer of the conflict.[126]  For the third and final prong of the *prima facie* case, a plaintiff must establish that the employee was disciplined for failing to comply with the conflicting workplace rule.[127]  If a plaintiff makes out a *prima facie* case, the burden of proof then shifts to the employer to show that accommodating the religious observance or practice would have created an "undue hardship on the conduct of the employer's business."[128]

In the cross-motions presented to the Court, there are only two live issues on the failure-to-accommodate claim.  Kroger argues that the EEOC has not provided any evidence to establish the first prong of the *prima facie* case.  Skipping over (and thus implicitly conceding) the other two prongs of the *prima facie* case, Kroger next argues that, based on the record before the Court, it is clear that accommodating Lawson and Rickerd would have caused undue hardship on the conduct of its business.  Kroger is wrong on both points.

### A.  The Conflict Prong of the *Prima Facie* Case

As briefly discussed above, the first prong of the *prima facie* test considers the evidence of the alleged conflict between Kroger's dress code and Lawson and Rickerd's religious beliefs, observances, and practices.  On the EEOC's telling, this is an easy task.  Kroger concedes that

---

[126] *Jones*, 319 F.3d at 359.  Subsequent to *Jones*, the United States Supreme Court lowered a plaintiff's burden on the second prong.  *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).  Instead of proving that an employee informed the employer of the need for an accommodation, it is sufficient to prove that the employer was in some way aware of the employee's need for an accommodation.  *See id.* at 773.  This lowering of the standard has no bearing on the case at bar, of course, because it is undisputed that Lawson and Rickerd told Kroger they needed a religious accommodation.

[127] *See, e.g.*, *Jones*, 319 F.3d at 359.

[128] 42 U.S.C. § 2000e(j); *see also Seaworth*, 203 F.3d at 1057.

Lawson and Rickerd sincerely believe that homosexuality is a sin and that they therefore cannot support or promote it.[129]  Kroger also concedes that Lawson and Rickerd sincerely believe that the Our Promise symbol communicates support for and promotion of the LGBTQ community.[130]  Those concessions, according to the EEOC, are the whole ball game when it comes to the first prong.

Kroger has a different view.  Kroger acknowledges that the Court can't sit in judgment of the objective reasonableness of a sincerely held religious belief.[131]  But Kroger maintains that there is an important distinction between (1) Lawson and Rickerd's religious beliefs themselves, and (2) Lawson and Rickerd's view that Kroger's dress code (specifically the Our Promise symbol) conflicts with their sincerely held religious beliefs.  Kroger argues that this latter view is not religious in nature, and thus should not be insulated from an objective-reasonableness review.  Kroger further argues that an objective-reasonableness review is necessary to determine whether there is a conflict between the dress code and Lawson and Rickerd's beliefs about homosexuality.  And, according to Kroger, all the record evidence points in one direction—that it is objectively unreasonable to believe that the Our Promise symbol supports and promotes the LGBTQ

---

[129] *See* Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶ 17; EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 134; Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 3; Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 5.

[130] Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶ 17.

[131] Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 5 ("Kroger also agrees that it is not the Court's place to challenge whether a religious belief is plausible or correct."); *see also Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) ("[W]hat is a 'religious' belief or practice . . . is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); *Love v. Reed*, 216 F.3d 682, 688 (8th Cir. 2000) ("[C]ourts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.") (quoting *Thomas*, 450 U.S. at 715).

community.  Thus, Kroger concludes, there is no conflict at all between Lawson and Rickerd's religious beliefs and Kroger's dress code.[132]

There is no controlling precedent that authoritatively approves of or rejects Kroger's theory of how to apply prong one of the *prima facie* case in a Title VII failure-to-accommodate action.[133] But there is some highly persuasive precedent lined up against Kroger.  Indeed, in very recent Free Exercise Clause and Religious Freedom Restoration Act (RFRA) cases, the United States Supreme Court has rejected arguments similar to those Kroger makes in the case at bar.  The teachings in those cases seem fairly applicable here.

In *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court had "little trouble concluding that" an agency regulation "'substantially burden[ed]' the exercise of religion" by requiring employers to "provid[e] health insurance that covers methods of birth control that . . . may result in the destruction of an embryo."[134]  The agency's position was that the regulation did not actually conflict with the plaintiffs' religion.  Specifically, the agency argued that "the connection between what the objecting parties must do . . . and the end that they find to be morally wrong . . . is simply

---

[132] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 12–20; Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 7–13; Kroger's Resp. to EEOC's Mot. for Summ. J. (Doc. 47) at 2–8.

[133] The few circuit and district courts that have addressed this issue (whether there is an objective-reasonableness component to the conflict question) are split.  The Fourth Circuit has taken a fully subjective approach, essentially merging the religious belief itself with the belief of a conflict.  *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017) (holding that "all that [was] required to establish the requisite conflict" was that a Christian employee "sincerely believed that [the employment requirement] 'was a showing of allegiance to the Antichrist,' inconsistent with his deepest religious convictions"); *see also Brennan v. Deluxe Corp.*, No. ELH-18-2119, 2021 WL 2155004, at *13–14 (D. Md. May 27, 2021).  Other courts have used an objective inquiry on the conflict issue.  *Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 842 (S.D. Ind. 2021); *Jackson v. NTN Driveshaft, Inc.*, No. 1:15-cv-01321, 2017 WL 1927694, at * 1 (S.D. Ind. May 10, 2017); *Summers v. Whitis*, No. 4:15-cv-00093, 2016 WL 7242483, at *5–7 (S.D. Ind. Dec. 15, 2016); *see also Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1089 (7th Cir. 1991).  As for the Eighth Circuit, it has not directly addressed the issue.  One could try to read tea leaves based off of the varying formulations of the first prong that the Eighth Circuit has endorsed over time.  *See supra* note 125.  However, because the slight differences in language have not played any role in the holding of any Eighth Circuit case, they have minimal (if any) relevance to whether this Court should use the subjective or objective approach.

[134] 573 U.S. 682, 719–20 (2014) (quoting 42 U.S.C. § 2000bb-1(a)).  The *Burwell* plaintiffs had "a sincere religious belief that life begins at conception," and "therefore object[ed] on religious grounds" to providing such health insurance coverage.  *Id.*

too attenuated" because "providing the coverage would not itself result in the destruction of an

embryo . . . ."[135]  The Supreme Court made it clear that such an argument misses the mark:

> This argument dodges the question that RFRA presents (whether the [agency] mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs) and instead addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable).  *The [plaintiffs] believe that providing the coverage demanded by the [agency's] regulations is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage. . . . [The agency] and the principal dissent in effect tell the plaintiffs that their beliefs are flawed.*  For good reason, we have repeatedly refused to take such a step.[136]

The Supreme Court doubled down on this point in *Fulton v. City of Philadelphia*.[137]  There,

the Court wasted little time shrugging off an argument much like the one Kroger is making:

> As an initial matter, it is plain that the City's actions have burdened [plaintiff's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.  The City disagrees.  In its view, certification reflects only that foster parents satisfy the statutory criteria, not that [plaintiff] endorses their relationships.  *But [plaintiff] believes that certification is tantamount to endorsement.  And religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.*  Our task is to decide whether the burden the City has placed on the religious exercise of [plaintiff] is constitutionally permissible.[138]

The upshot of both *Hobby Lobby* and *Fulton* is that Kroger slices things far too thin by isolating

the "religious belief" question from the "conflict" question.[139]  Both Supreme Court cases suggest

---

[135] *Id.* at 723.

[136] *Id.* at 724 (emphasis omitted and added).

[137] 141 S.Ct. 1868 (2021).

[138] *Id.* at 1876 (emphasis added) (internal citations and quotations omitted).

[139] The logic of *Hobby Lobby* and *Fulton* is important to the case at bar.  If something would burden a person's religious exercise for purposes of the First Amendment or RFRA, it follows that it would also amount to a "conflict" for purposes of a Title VII failure-to-accommodate *prima facie* case.  Indeed, the Eighth Circuit has held that the First Amendment's and Title VII's protections of "religious activity" are, at a minimum, coextensive.  *Brown v. Polk Cnty.*, 61 F.3d 650, 654 (1995) (en banc).

It is true that *Brown* indicated that the First Amendment may be more protective of religious activities than Title VII.  But that is because the statute's undue-hardship defense is a lower standard than those applied in Free Exercise Clause cases.  *Id.* at 654, 658.  In other words, it is possible that an employer may more easily avoid Title VII liability because

26

that those questions are too bound up with each other for Kroger's theory to be correct.  Subjecting the "conflict" question to an objective-reasonableness review would inevitably subject some aspect of the employee's religious beliefs, practices, or observances to the same standard.  And we know that isn't allowed.[140]  Kroger concedes that Lawson and Rickerd sincerely believe that wearing the Our Promise symbol violates their religion.  Following the general logic of *Hobby Lobby* and *Fulton*, that is enough.

In any event, even if Kroger was right that the conflict question included an objective-reasonableness component, there's evidence in the record that would allow (but not require) a rational juror to conclude that the EEOC has proven prong one.  That is, a rational juror could conclude that Lawson and Rickerd reasonably believed that wearing the multi-colored heart would communicate support for and promotion of the LGBTQ community.

Kroger notes that all the record evidence shows that Kroger's creation and use of the Our Promise symbol had nothing to do with the LGBTQ community.[141]  True, but not dispositive. Regardless of what Kroger intended for its Our Promise symbol to mean, Lawson and Rickerd object to *being seen as* supporting or promoting homosexuality.  So, the real question would be whether it was objectively reasonable for Lawson and Rickerd to believe that other people (i.e.,

---

[140] Kroger points to the Eighth Circuit's statement that Title VII does not protect an employee's "personal preferences." *See* Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 15 (citing *Vetter*, 120 F.3d at 751).  To Kroger, this means that the conflict question requires some level of objectivity.  But *Vetter* does not carry the water Kroger needs it to carry.  In *Vetter*, the Eighth Circuit was addressing whether the employer's asserted conflict was actually religious in nature.  120 F.3d at 752 (stating that the plaintiff "had to show . . . that his decision to live in Ames did not reflect a purely personal preference. . . . There was evidence that [the plaintiff] chose to live in Ames as a matter of personal preference, not because living [elsewhere] would have conflicted with an observance or practice of his religion").  There is no similar dispute in the case at bar.  Lawson and Rickerd refused to comply with the dress code because they thought doing so communicated support for or promotion of the LGBTQ community, and their objection to supporting or promoting the LGBTQ community flows directly from their religious belief that homosexuality is a sin.

[141] At oral argument on these Motions, the EEOC conceded as much.  *See* Apr. 25, 2022 Hr'g Tr. at 35–36 ("We have never put forth the argument that Kroger had a secret meaning to the rainbow heart.").

---

the statutory undue-hardship defense is easier to establish than the defenses available in constitutional cases. Thus, any differences between the First Amendment, RFRA, and Title VII become relevant only after it has been determined that a burden or conflict exists in the first place.

customers) would think that the multi-colored heart was a pro-LGBTQ symbol.  And a rational juror could go either way on that question.

At least ten (and possibly as many as twenty) other employees in the same store thought the Our Promise symbol communicated support for or promotion of the LGBTQ community.[142] Recall also that there was no campaign to explain the meaning of the multi-colored heart to customers or other non-employees.  Essentially, the meaning of the Our Promise symbol was left up to the imagination and interpretation of each particular customer who saw it.  Indeed, there is evidence of non-employees concluding that the multi-colored heart was a pro-LGBTQ symbol.[143]

The more people who saw the multi-colored heart the same way Lawson and Rickerd saw it, the harder it becomes to say that no rational juror could find Lawson and Rickerd's view to be reasonable.  Given the number of people in this case who came to the same conclusion as Lawson and Rickerd did, the Court would be reticent to declare this view unreasonable as a matter of law. Still, if the Our Promise symbol was sufficiently dissimilar to recognized pro-LGBTQ symbols (for example, if the Our Promise symbol were a red train), the Court could envision concluding that no rational juror could find Lawson and Rickerd's view to be objectively reasonable.  That is not the case at bar.  Whether or not the Court thinks the multi-colored heart could reasonably be confused with a pro-LGBTQ symbol, a rational juror could think so.[144]

---

[142] *See supra* note 37.

[143] Judy testified that one day he "stopped at the gas station on the way to work, and . . . a gas station employee there mentioned he had seen the apron and called [it] a gaypron."  Ex. 15 (Noah Judy Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-15) at 32:20–33:6.  Additionally, as Kroger points out, at least two customers also believed the multi-colored heart was related to the LGBTQ community.  *See*  Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) ¶ 57; Ex. 13 (Kaela Goodnight Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-13) ¶ 14.

[144] Kroger says this focus on customers' (or any other third party's) interpretations of the Our Promise symbol is inappropriate because that is not what this case is about.  Apr. 25, 2022 Hr'g Tr. at 10:21–23 (Kroger's counsel arguing that "this is . . . about the plaintiffs hav[ing] to have this actual conflict, not just other customers who might think" that the Our Promise symbol is an LGBTQ symbol); *see also id.* at 14:3–14.  Kroger is wrong.  The idea that other

## B. The Undue Hardship Defense

Relying on the statutory defense set forth in 42 U.S.C. § 2000e(j), Kroger says that accommodating Lawson and Rickerd would have caused an undue hardship on the conduct of Kroger's business. The Eighth Circuit has made clear that the existence of an undue hardship is a question of material fact that, when genuinely disputed, must be resolved by a jury.[145] So the issue here becomes whether the facts are so one-sided as to permit the Court to take this question away from a jury. As further explained below, because a rational juror could (on this record) answer the undue hardship question either way, summary judgment is not appropriate.

---

people would see the Our Promise symbol as support for or promotion of the LGBTQ community has been at issue since the aprons were introduced in the Conway store.

Maxwell said that, shortly after distributing the aprons, multiple employees objected to the apron because "they thought Kroger was trying to *promote* the LGBTQ community through the Our Promise symbol. . . ." Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 18 (emphasis added). Lawson testified that (at least part of) her objection to displaying the multi-colored heart was her belief that Kroger was "trying to get [her] to *promote*" the LGBTQ community. Ex. 6 (Brenda Lawson Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 40:8–13 (emphasis added); *see also id.* at 39:5–25 ("I don't approve of displaying or promoting it."); *id.* at 41:8–13 (Lawson testifying that she believes the multi-colored heart is "a subliminal" message of support for the LGBTQ community). Rickerd testified that she told Maxwell early on that she would "not *advertise* for Kroger," and that, to her, the Our Promise symbol was "*advertising* that they support LGBTQ." Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 38:21–39:6 (emphasis added); *see also id.* at 70:20–71:1 (stating "they want you to advertise for Kroger that they sponsor the LGBTQ. . . . I stand . . . on my word with God that it's wrong, and I was not going to . . . advertise and put that apron on"); *id.* at 95:19–22 (testifying that "I'm not going to advertise for Kroger. If they want to support the LGBTQ, that's fine with me, but just don't ask me to advertise for you"). The May 4 letter to Maxwell from Hogue emphasized that Kroger was requiring its employees to wear the multi-colored heart "where it can been seen by customers." Ex. 6 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-6) at 53. This was important to Hogue and the objecting employees because, in their view, "[t]his heart strongly resembles an LGBTQ symbol" and "it is likely to be *seen likewise by the public.*" *Id.* (emphasis added). Clearly, Lawson and Rickerd have always been concerned about what other people will think about them wearing the Our Promise symbol.

[145] Kroger argues that this isn't a jury question. As support for that proposition, Kroger points to *Wilson v. U.S. West Communications* and asserts that "the Eighth Circuit found that the employee's requested accommodation created a substantial disruption at the workplace as a matter of law." Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 22 (citing *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1339 (8th Cir. 1995)). Kroger's reliance on *Wilson* is misplaced: The *Wilson* Court expressly declined to reach the undue-hardship issue at all. 58 F.3d at 1342 ("[W]e need not consider Wilson's argument that her suggested accommodations would not cause undue hardship."). Undue hardship is a question of fact. *Mann v. Frank*, 7 F.3d 1365, 1369 (8th Cir. 1993) ("We upset the district court's fact finding of undue hardship and *de minimis* costs only if they are clearly erroneous."); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, No. 4:08-CV-1470, 2009 WL 3517584, at *4 (E.D. Mo. Oct. 26, 2009) (holding that the question of whether the employer "would have suffered more than a *de minimis* hardship . . . remains one for the jury").

29

What is an undue hardship on the conduct of an employer's business?  Title VII does not define undue hardship, so "the precise reach of the employer's obligation . . . must be determined on a case-by-case basis."[146]  Still, we are not entirely without guideposts.  In *Trans World Airlines, Inc. v. Hardison*, the Supreme Court laid down a rule that requiring an employer "to bear more than a *de minimis* cost . . . is an undue hardship" under Title VII.[147]  The Eighth Circuit has added that "*[d]e minimis* cost . . . 'entails not only monetary concerns, but also the employer's burden in conducting its business.'"[148]

Neither the Supreme Court nor the Eighth Circuit has defined *de minimis* for purposes of Title VII.  Merriam-Webster defines *de minimis* as "lacking significance or importance" and "so minor as to merit disregard."[149]  Black's Law Dictionary defines it as "trifling; negligible" or "so insignificant that a court may overlook it in deciding an issue or case."[150]  But while the *de minimis* standard imposed by the Supreme Court is certainly low, the Eighth Circuit has made clear that it is not as meaningless as the dictionaries might lead one to believe:

> Any hardship asserted, furthermore, must be real rather than speculative, merely conceivable, or hypothetical.  An employer stands on weak ground when advancing hypothetical hardships in a factual vacuum.  Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts.  Undue hardship requires more than proof of some fellow-worker's grumbling. . . . An employer . . . would

---

[146] *Brown*, 61 F.3d at 655 (quoting *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994)).

[147] 432 U.S. 63, 84 (1977) (italics added).  *Hardison*'s atextual interpretation of undue hardship has been greatly maligned since the day the case was decided.  *Id.* at 85–97 (Marshall, J., dissenting).  Justices and judges have expressed concern that *Hardison*'s unpersuasive and unmoored definition of "undue hardship" as anything more than a *de minimis* burden has all but neutered Congress' attempt to protect American workers from religious discrimination.  *See Small v. Memphis Light, Gas, & Water*, 141 S. Ct. 1227 (2021) (Gorsuch, J., dissenting from denial of cert.); *Patterson v. Walgreen Co.*, 140 S.Ct. 685 (2020) (Alito, J., concurring in denial of cert.); *Small v. Memphis Light, Gas, & Water*, 952 F.3d 821, 826 (Thapar, J., concurring).  Obviously, this Court is bound by *Hardison* unless and until it is overturned by the Supreme Court.

[148] *Brown*, 61 F.3d at 655 (quoting *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995)).

[149] *De minimis*, *Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/de%20minimis (last accessed June 21, 2022).

[150] *De minimis*, *Black's Law Dictionary* (11th ed. 2019).

have to show . . . actual imposition on co-workers or disruption of the work routine.[151]

Kroger has asserted several different hardships.[152]  The Court will address them more specifically below.  The take-home point, however, is that none of the asserted hardships (alone or in combination) warrants summary judgment.  Although there is certainly evidence in the record from which a rational juror could conclude that one or more of the asserted hardships meets the requisite standard, the evidence is not so lopsided as to demand that conclusion.  A rational juror could also look at this record and conclude that the asserted hardships (both alone and in combination) are *de minimis* as that term is used in this context.  Because a rational juror could go either way, summary judgment is inappropriate.  The undue-hardship question is one for the jury.

### 1.  Alleged Harm to Kroger's Branding and Business Image

Kroger argues that accommodating Lawson and Rickerd (and potentially other employees) would have had a more than *de minimis* impact on Kroger's branding, business image, and customer relations.   Kroger says that granting the requested accommodations would have "undermined the real meaning of the Our Promise symbol" by "giving credence to [the employees'] false assertion that Kroger intended the Our Promise symbol to promote LGBTQ

---

[151] *Brown*, 61 F.3d at 655 (ellipses in original) (internal citations and quotations omitted).

[152] The EEOC argues that Kroger has forfeited the undue-hardship defense.  EEOC's Resp. to Kroger's Mot. for Summ. J. (Doc. 49) at 18–20.  The Court disagrees.  It is true that Kroger did not raise the undue-hardship defense in its operative Answer.  However, that is not a *per se* forfeiture of the defense.  The Eighth Circuit has held that such a failure "'is not fatal' when the defense 'is raised in the trial court in a manner that does not result in unfair surprise.'" *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014) (quoting *First Union Nat'l Bank v. Pictet Overseas Tr. Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007)).  Kroger raised the undue-hardship issue over a year ago in its April 30, 2021 Interrogatory Responses. Ex. 1 to Kroger's Resp. to EEOC's Mot. for Summ. J. (Doc. 47-1) at 9.  That was sufficient notice to avoid any unfair surprise.

rights"[153] and "endors[ing] the religious belief."[154]  Kroger also says that accommodating Lawson and Rickerd would have "undermine[d] Kroger's commitment to customer relations and deprive[d] Kroger of free branding."[155]

On the record in this case, a rational juror could find that accommodating Lawson and Rickerd (and potentially other employees) would have had no effect or next-to-no effect on Kroger's branding or business image.  Take Kroger's asserted concern that granting the accommodations would have given credence to or endorsed Lawson and Rickerd's interpretation of the Our Promise symbol.  Kroger is essentially saying that, if it had granted the requested accommodation(s), other people (customers, press, employees, etc.) would think that Lawson and Rickerd's view of the Our Promise symbol as a pro-LGBTQ symbol was correct.  On Kroger's telling, this would mean that granting the accommodations would have been tantamount to transforming the meaning of the Our Promise symbol into a pro-LGBTQ symbol.

This argument has a serious weakness.  Providing a religious accommodation to an employee does not signal an employer's agreement with the employee's beliefs that created the need for the accommodation.  Still, it is theoretically possible that someone could mistakenly consider Kroger's accommodation of Lawson and Rickerd to be the company's acknowledgement that its Our Promise symbol was related to the LGBTQ community.  But that theoretical possibility

---

[153] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 23–24; Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 19.  In passing, Kroger also invokes the First Amendment and says that requiring it to accommodate Lawson and Rickerd would "completely undermine [Kroger's] right to free speech . . . ."  Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 24.  Kroger did not elaborate on this in its brief.  Kroger also did not raise the First Amendment as an affirmative defense in its operative Answer.  During a hearing on these Motions, Kroger expressly acknowledged that Kroger was not raising a First Amendment defense.  *See* Apr. 25, 2022 Hr'g Tr. at 50:1–14.  The defense Kroger is asserting—the undue hardship defense—is focused solely on impacts to "the conduct of the employer's business," and Kroger hasn't shown a sufficient link between its speech (i.e., the Our Promise symbol) and the conduct of its business.  42 U.S.C. § 2000e(j).

[154] Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 20.

[155] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 23; *see also* Kroger's Resp. to EEOC's Mot. for Summ. J. (Doc. 47) at 8–9; Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 16–18.

is speculative.  And it is even more speculative that enough people would share this view—and change their behavior because of it—to result in any hardship to the conduct of Kroger's business.[156]

As to Kroger's concern about its "commitment to customer relations" being "undermine[d]," a rational juror could conclude on this record that the requested accommodations would have had no impact on the company's commitment or its employees' commitment to customer relations.[157]   One of Kroger's corporate representatives testified that it was "not important for [Kroger's] customers to know what Our Promise is."[158]   Instead, the Our Promise symbol was used to remind *employees* of Kroger's customer-service philosophy.[159]   Moreover, the multi-colored heart symbol was not the only way Kroger instilled customer-service values in its employees.  There was the inscription on the back of the apron that Kroger made sure employees would see "when they put [the apron] over their head every day."[160]   And Maxwell posted signs in the employee break room that explained the Our Promise campaign, symbol, and Kroger's commitment to customer service.[161]

Recall that Kroger did not require its divisions to adopt the Our Promise symbol.  If the Our Promise symbol was important to the conduct of Kroger's business, one would expect the company to require its use.  Recall as well that not every employee had to wear an apron with the multi-colored heart as part of their uniform.  Kroger's reasons for some employees not being

---

[156] Even if the transformed-meaning theory came to pass, it could be mitigated by a single email explaining the legal requirements and effects of such accommodations.  There is no suggestion in the caselaw that the time spent composing a single email is more than a *de minimis* hardship.

[157] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 23.

[158] Ex. 3 (Karl Niemann 30(b)(6) Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-3) at 33:1–3.

[159] *Id.* at 33:1–9.

[160] *Id.* at 32:21–25.

[161] *See* Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 18.

required to wear the Our Promise apron or display the Our Promise symbol (i.e., contractual agreements with third-party vendors, safety, and the appearance of medical professionalism) are certainly understandable.  Still, the fact that approximately twenty percent of employees in the store on any given day did not display the Our Promise symbol is relevant.  This evidence, in concert with the other evidence just discussed, would allow a rational juror to conclude that letting Lawson and Rickerd (and perhaps other employees) forego displaying the Our Promise symbol would have at most caused a *de minimis* impact on the employee-focused Our Promise campaign. This is especially so given that Kroger has not provided any evidence of an increase in employee commitment, customer satisfaction, store traffic, or profits associated with the use of the Our Promise symbol.

Kroger's final argument in this category—that the requested accommodations would "deprive[] Kroger of free branding"—fares no better.[162]  The Our Promise symbol does not bear Kroger's name or any other similar company-identifying logo.  The Our Promise symbol has not been marketed to customers.  Kroger has not put forth any evidence to show that it receives any value at all from the "free branding" associated with the Our Promise symbol.  For example, Kroger has not provided evidence of an increase in market share, customer loyalty, or store traffic since the implementation of the Our Promise symbol.  On the current record, a rational juror has

---

[162] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 23; *see also* Kroger's Resp. to EEOC's Mot. for Summ. J. (Doc. 47) at 8–9; Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 16–18.  Kroger says that the free-branding issue is especially important with respect to Rickerd because she "was requesting to wear a non-uniform apron, which would have removed the *only branded uniform item* that Rickerd was required to wear . . . ."  Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 17 (emphasis added).  The record doesn't support Kroger's statement. Rickerd's request was to buy (with her own money) an apron without the multi-colored heart.  Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 70.  She testified that she had no objection to wearing the Kroger logo (which is also prominently displayed on the uniform apron).  Ex. 10 (Trudy Rickerd Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 14:12–14.  Thus, the "non-uniform apron" that Rickerd wanted to purchase could have included Kroger's logo.

no way of knowing whether the amount of lost free-branding value (if any) is more than *de minimis*. A rational juror could find that the lost free-branding value is zero or very close to zero.[163]

## 2. Alleged Financial Costs

Kroger also contends that it would have incurred additional financial costs because it "would have had to purchase new aprons for the associates who refused to wear the Our Promise symbol."[164] But Lawson did not ask for a new apron at all. Lawson asked only that she be allowed to cover the multi-colored heart with her nametag. And Rickerd specifically offered "to buy another apron to ensure there is no financial hardship on Kroger."[165] So, it certainly doesn't appear that Kroger would have incurred *any* additional financial costs had it granted the religious accommodations.

Kroger offers no response with respect to Lawson. Kroger's response with respect to Rickerd is that the "collective bargaining agreement requires that Kroger bear the cost in providing employees the uniform apron . . . ."[166] Kroger's point appears to be that, under the collective bargaining agreement ("CBA"), it would have had to pay for Rickerd's new apron regardless of Rickerd's offer to pay. Kroger's argument has two shortcomings. First, Kroger did not produce

---

[163] With respect to both employee commitment and branding concerns, a rational juror could also consider a real-world experiment that appears to have occurred through happenstance. Sometime between the introduction of the Our Promise apron to the Conway store in late April of 2019 and September or October of 2020, the Conway store was unable to receive aprons with the multi-colored heart due to supply chain issues. Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 18:22–19:2, 40:22–41:13. During that time, employees were simply given "plain blue aprons." *Id.* at 41:9–10. That is, employees were using aprons without the Our Promise symbol. Yet there is zero evidence that employee commitment to customer relations, the Conway store's profits, or any other measure of success suffered during this period. If any of Kroger's hypothesized hardships had legs, one would expect there to be actual evidence of such harms to the business occurring during this period. *Cf. Brown v. Gen. Motors Corp.*, 601 F.2d 956, 960 (8th Cir. 1979) ("If an employer stands on weak ground when advancing hypothetical hardships in a factual vacuum, then surely his footing is even more precarious when the proposed accommodation has been tried and the postulated hardship did not arise.").

[164] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 25.

[165] Ex. 10 to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-10) at 70.

[166] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 25.

the CBA.  So, the Court is unable to say what the CBA actually required of Kroger.  The EEOC argues that "[a]n apron without the [Our Promise symbol] would not be a 'uniform apron;' therefore, Kroger would not have violated the CBA, thereby mooting Kroger's financial hardship argument."[167]  In any event, whatever the CBA allows or disallows, Kroger has a bigger problem.  Kroger did not produce any evidence about the cost of the accommodation apron that it would have had to purchase for Rickerd.  Using common sense, a rational juror could conclude that the cost would be *de minimis* under current precedent.[168]

Kroger does raise the specter of having to purchase additional accommodation aprons for other employees who object to displaying the heart.[169]  But, even assuming the potential need to accommodate employees aside from Lawson and Rickerd is a proper consideration, there is no evidence that other employees would be unsatisfied with the (cost-free) approach Lawson took— wearing the original apron with the Kroger nametag covering the Our Promise symbol.

---

[167] EEOC's Resp. to Kroger's Mot. for Summ. J. (Doc. 49) at 22.

[168] *See Hardison*, 432 U.S. at 92 n.6 (Marshall, J., dissenting) (stating that the accommodation that the majority considered to be an undue hardship would have cost the employer $150).  It is worth noting that, although not dispositive one way or the other in the case at bar, *Hardison* was decided in June of 1977.  Adjusting for inflation, *Hardison* could be said to stand for the rule that any accommodation which costs more than $722 is an undue hardship. *See* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.  A rational juror, relying on his or her common sense, could easily conclude that the cost of one accommodation apron would be far less than $150.

[169] *See* Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 25.  Lawson and Rickerd were not the only employees who objected to wearing an apron with the multi-colored heart.  Seven other employees were named in Hogue's May 4 letter demanding that Kroger cease enforcement of the new dress code, and an eighth employee expressed her disapproval of the Our Promise symbol by coloring it in with a red marker.  Kroger's argument is that if it had "granted the accommodation request[s] from [Lawson and Rickerd], . . . [then] Kroger would have had to accommodate the eight other employees . . . ."  Kroger's Resp. to EEOC's Mot. for Summ. J. (Doc. 47) at 12.  Although a rational juror could accept this argument, such a juror could also conclude that it is too speculative.  As Kroger points out in other contexts, Lawson and Rickerd were the only two employees who outright refused to display the Our Promise symbol after discussions with store supervisors as to the real meaning of the symbol.  A rational juror could thus conclude that at least some of the eight other employees no longer cared enough about the Our Promise symbol to request an accommodation.

### 3.  Alleged Workplace Disruption

Kroger argues that the requested accommodations would have "caused a substantial disruption in Kroger's workplace and created potential liability for Kroger against harassment suits from LGBTQ employees."[170]  This is, in the Court's view, Kroger's strongest hardship argument. It may well be a winning argument in front of a jury.  However, while it presents a closer call for the Court than the other hardship arguments, the Court ultimately concludes that a rational juror could find that the potential disruption caused by the requested accommodations would have had only a *de minimis* effect on the conduct of Kroger's business.

Kroger certainly has provided evidence from which a rational juror could conclude that granting the requested accommodations would have led to disruption in the workplace.  Primarily, that evidence consists of the disruption that did occur at the store around the time of the distribution of the aprons.  Essentially, Kroger's read of the record is that something akin to a civil war broke out in the Conway store.  Kroger says that Lawson, Rickerd, and the other objecting employees had "discussions with their co-workers [that] led to most employees in the store knowing that [they] refused to wear the uniform because they regarded homosexuality and participation in the LGBTQ community as a sin."[171]  According to Kroger, this offended "members of the LGBTQ community and their allies" and "led to polarization within the workplace, which witnesses described as 'pretty divisive' and 'causing some controversy,' 'a major issue,' 'an uproar,' 'a split,' and impacting employee comfort."[172]  Peace only came, according to Kroger, once it was clear that Kroger would strictly enforce its dress code.

---

[170] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 26.

[171] *Id.*

[172] *Id.*

The problem for Kroger—at the summary judgment stage—is that its reading of the record is not the only plausible one.  A rational juror could conclude that the extent and duration of the workplace disruption was significantly less intense.  Maxwell (the Store Leader) testified that, while Lawson and Rickerd "did have some support from other associates," he "wasn't aware of any" "division" in the Conway store.[173]  Judy (on whom Kroger partially relies for its workplace-disruption argument[174]) testified that he did not think it fair "to say this issue split the store."[175]  Indeed, if all reasonable inferences are drawn in favor of the EEOC, the only specific instance of a disruption in the workplace that Kroger points to—the red-marker-and-rainbow-tape incident—could be viewed as being entirely resolved in as little time as an hour or two.[176]  There is no evidence of a meaningful reduction in employee productivity.[177]  There is no evidence of a meaningful increase in employee absenteeism.  There is no evidence that workplace disruption impacted Kroger's profits in any way.  A rational juror could see all of this as normal workplace friction that was easily resolved by management with no real impact to the business.  Further, a

---

[173] Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 95:17–21.

[174] *See* Kroger's Statement of Material Facts (Doc. 35) ¶¶ 143–44; Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 26.

[175] Ex. 15 (Noah Judy Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-15) at 26:11–18, 31:12–32:13.

[176] Maxwell (the Store Leader) was not at the store that day, but his description of the incident does not paint the picture of a major disruption or a workplace grinding to a halt:

> I believe I was off [that] day and this was . . . early on in the process.  And the way it was explained to me, it was [that] an employee in the pick-up department had colored their [Our Promise symbol] in just all red. . . . And then, I think, what was explained to me was there were some other employees . . . [whose] response to it was to put rainbow tape on their uniform. . .

> I believe I had gotten a phone call or text message from one of my assistant managers when I was at home that day, and I let them know that they needed to make sure that that wasn't part of the uniform and they can't put tape or anything extra on the uniform, and that the other associate needed [to] get a new apron and that they couldn't have it colored in or covered up, or [have] tape, or anything on it.

Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 95:22–96:15.

[177] *But see supra* notes 51–52 and accompanying text.

rational juror could conclude that granting the requested accommodations would not have caused any additional impacts, even if the workplace friction was marginally prolonged.

Indeed, even if the workplace disruption was as bad as Kroger makes it out to be, Kroger would still not be entitled to summary judgment.  As the EEOC emphasizes in its briefing, "it is the accommodation that must cause the disruption when asserting undue hardship."[178]  A rational juror could conclude that the workplace disruption had little (or nothing) to do with Lawson and Rickerd at all, much less with their requests to cover the multi-colored heart or buy a new apron without the multi-colored heart.  Put differently, the record does not require a juror to agree with Kroger that the "Our Promise symbol . . . was transformed into a battle ground" "*as a result* of [Lawson's and Rickerd's] objections."[179]  Rather, a rational juror could conclude that (1) the disruption that took place would have occurred whether or not Kroger allowed the requested accommodations, and (2) allowing the requested accommodations would not have prolonged or reignited the disruption.

It is easy to conclude that the disruption would have taken place in the absence of Kroger accommodating Lawson and Rickerd.  That's because the disruption did occur in the absence of the accommodations.  As to whether granting the accommodations would have prolonged or reignited the disruption, there's little evidence one way or the other.  So, a rational juror could find the prolonged-or-reignited-disruption thesis to be speculative.

Kroger's disruption argument extends beyond employee conflict.  Kroger says customers learned about the employees' views of the Our Promise symbol and began to complain about the

---

[178] Reply in Supp. of EEOC's Mot. for Summ. J. (Doc. 51) at 8. Kroger's best shot at linking the accommodations to the alleged workplace disruption is its theory that the disruptions "only would have increased had Kroger been forced to grant [the] accommodations . . . ."  Reply in Supp. of Kroger's Mot. for Summ. J. (Doc. 52) at 22.  But a rational juror could find this to be speculation unsupported by the record.  *See Brown*, 61 F.3d at 655.

[179] Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36) at 27 (emphasis added).

symbol themselves.  The only evidence of customer complaints comes from the declarations of

Maxwell and Assistant Store Leader Kaela Goodnight.  Maxwell tells about a single interaction he

had with a customer:

> [W]e began to see a customer-relations concern due to the controversy.  For example, after an employee told a customer that the Our Promise symbol was an LGBTQ symbol, the customer approached me and complained that Kroger was promoting LGBTQ on its uniform.  I then had to explain to the customer the meaning of the Our Promise symbol and that it had no connection to LGBTQ.[180]

Goodnight's declaration is essentially the same, with the exception that she speaks of "multiple"

interactions:

> Employees also began to speak to customers about the drama, which created confusion about the Our Promise symbol and customer relations issues.  I had multiple customers come in and complain about what they believed Kroger and its employees were doing.[181]

---

[180] Ex. 5 (Sean Maxwell Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-5) ¶ 57.

[181] Ex. 13 (Kaela Goodnight Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-13) ¶ 14.  The EEOC has moved to strike Goodnight's declaration from the summary judgment record (and prohibit her testimony at trial) because Kroger "violated Federal Rules of Civil Procedure 26(a)(1)(A)(i) and 26(e)(1)(A) by failing to disclose [Goodnight] in its Initial Disclosures and by failing to disclose [her] by Supplemental Disclosures."  Br. in Supp. of EEOC's Mot. to Strike (Doc. 42) at 1.  If Kroger violated Rule 26, then Kroger cannot use Goodnight's declaration on summary judgment (or her testimony at trial) "unless the failure [to comply with Rule 26] was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Kroger argues that its failure to affirmatively disclose Goodnight as a witness is not a violation of Rule 26 at all because Goodnight's identity and relevance to the case had "otherwise been made known to the [EEOC] during the discovery process . . . ."  Kroger's Resp. to EEOC's Mot. to Strike (Doc. 45) at 2 (quoting Fed. R. Civ. P. 26(e)); *id.* at 3 (arguing that the EEOC knew of Goodnight before litigation ever commenced).  Alternatively, Kroger argues that any violation of Rule 26 was harmless and therefore Rule 37(c) does not bar Goodnight's declaration (and testimony at trial).  *Id.* at 6.  Kroger is right.  The EEOC knew of Goodnight's identity and at least some of her role in the case before and during litigation.  Moreover, Kroger's late disclosure is harmless because Goodnight's declaration has had no impact on the Court's summary-judgment rulings.  That is, the Court's analysis would not change in an outcome-determinative way regardless of its use or avoidance of the contested declaration.

However, in its discretion and for good cause shown, the Court grants the EEOC's request that it be allowed to depose Goodnight.  EEOC's Mot. to Strike (Doc. 41) ¶ 10.  While Goodnight's evidence was not a complete surprise, neither was it entirely clear that she was going to be a principal witness for Kroger.  Had it been clearer, the EEOC would have deposed her.  Fairness dictates allowing such a deposition before trial.  That deposition must take place within sixty (60) days of the date of this Order.  The Court denies the EEOC's request that it be allowed to re-depose Maxwell.  *Id.*  The Court likewise denies the EEOC's request that Kroger "incur the costs of [the] deposition[] as well as the witness and mileage fees."  *Id.*

A rational juror could conclude that the burden on Kroger from these interactions was *de minimis*.  Neither Maxwell's nor Goodnight's statements (nor any other piece of evidence) proves that Kroger lost any of the complaining customers' business.  Neither statement (nor any other piece of evidence) proves that Maxwell or Goodnight spent a significant amount of time explaining the Our Promise symbol to these customers such that non-*de minimis* inefficiencies occurred.[182] Instead, a rational juror could conclude that (1) more than one customer complained about the multi-colored heart, (2) Maxwell or Goodnight took a brief moment each time to explain what the Our Promise symbol means, and (3) nothing further occurred.  If a rational juror reaches that conclusion, then a rational juror could conclude that there was only a *de minimis* hardship on the conduct of Kroger's business.[183]

Kroger's last remaining argument is that accommodating Lawson and Rickerd would have exposed Kroger to legal liability for fostering a hostile work environment or allowing Lawson and Rickerd to harass other employees.  That's a non-starter.  All the accommodations would have done was allow Lawson and Rickerd to forego wearing the Our Promise symbol.  That is not the

---

[182] And it would not be sufficient to simply say that a significant amount of time was spent.  For instance, in another context, Goodnight says that she lost "a significant amount of time that [she] should have spent on other duties" because "other employees began to test the limits of the dress code" and "[i]t became a battle to enforce the dress code."  Ex. 13 (Kaela Goodnight Decl.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-13) ¶ 15.

But whether something is "significant" is a determination for the jury to make, and a rational juror could conclude that what Goodnight describes as a "significant" amount of time was in fact *de minimis*.  It is undisputed that Lawson and Rickerd were the only employees to receive written discipline, so Goodnight never had to spend any time writing SIRs or CARs for these other employees.  Instead, Goodnight merely "verbally counseled other employees who were not wearing the apron . . . ."  *Id.*  While Goodnight has not been deposed, Maxwell's testimony indicates that verbal counseling sessions about the dress code were a normal part of the job and quite brief:

> We would have people show up in the wrong pants, and we had extra pants that we would let them change into, or we might even verbally tell them, 'Hey, you can't wear those pants.  You've got to wear something different next time.'  So, they usually always complied after we had a conversation.

Ex. 8 (Sean Maxwell Dep.) to Br. in Supp. of Kroger's Mot. for Summ. J. (Doc. 36-8) at 69:2–8.

[183] Moreover, Maxwell's and Goodnight's statements do not involve Lawson or Rickerd.  The statements certainly do nothing to show that Lawson's or Rickerd's requested accommodations are what upset the (at most) handful of customers.  Nor do they show that granting the requested accommodations would have had any effect on the existence or number of customer complaints.

stuff of harassment or hostile work environment claims.  This is so even though other people know why Lawson and Rickerd wanted an accommodation—i.e., that they don't want to endorse homosexuality.  Whether such a view is good or bad, right or wrong, it does not constitute harassment or create a hostile work environment.  Other concerns Kroger might have—such as the potential for intolerant discussions of LGBTQ issues among workers—are not directly related to the accommodation itself and can be addressed if or when they occur.

## II. Retaliation

Title VII prohibits employers from retaliating against an employee because that employee has opposed the employer's unlawful employment practice.[184]  In the Eighth Circuit, the EEOC must show that (1) Lawson and Rickerd "engaged in a protected activity," (2) they "suffered an adverse employment action," and (3) "the adverse action occurred because [they were] engaged in the protected activity."[185]  If the EEOC makes out a *prima facie* case, Kroger must "produce a nondiscriminatory reason for the adverse employment action."[186]  "Then, the burden shifts back to [the EEOC] to show that [Kroger's] proffered reason was pretextual."[187]

The EEOC's briefing articulates two (slightly) different versions of its retaliation claim. Neither version makes it past the *prima facie* stage. The first version of the EEOC's retaliation claim is that Lawson's and Rickerd's continued refusal to comply with the dress code was the protected (or oppositional) activity.[188]  This claim is dead on arrival.  When an employee's request

---

[184] 42 U.S.C. § 2000e-3(a).

[185] *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002).

[186] *Id.*

[187] *Id.*

[188] EEOC's Resp. to Kroger's Mot. for Summ. J. (Doc. 49) at 26 ("Kroger retaliated against Lawson and Rickerd because of their continued opposition to conforming to Kroger's dress code—which they believed was in conflict with their sincerely held religious beliefs.").

for a religious accommodation is denied, and the employee is fired because he or she did not comply with the conflicting employment requirement, that employee can bring a failure-to-accommodate claim.[189]   But simply refusing to comply with the conflicting employment requirement is not "oppos[ing]" an unlawful "practice."[190]

The second, and far less fanciful, version of EEOC's retaliation argument focuses on Lawson's and Rickerd's specific requests for accommodation and the letter from Hogue.  The EEOC says that these requests "communicat[ed] to [Kroger] a belief that [it had] engaged in . . . a form of employment discrimination."[191]  Such communication "virtually always constitutes . . . opposition to the activity."[192]

That gets the EEOC past prong one of the *prima facie* test.  Prong two is not at issue.  But prong three is.  For the EEOC's retaliation claim to get past prong three, there must be evidence from which a rational juror could conclude that Kroger fired Lawson and Rickerd because they told Kroger of their belief that enforcement of the dress code was a discriminatory employment practice.  Put another way, the EEOC needs evidence that Kroger fired Lawson and Rickerd because of their *whistleblowing*.  But it is undisputed that Kroger's reason for terminating Lawson and Rickerd was their noncompliance with the dress code.[193]  Moreover, subsequent to the requests

---

[189] *See EEOC v. N. Mem'l Health Care*, 908 F.3d 1098 (8th Cir. 2018).

[190] 42 U.S.C. § 2000e-3(a).  In *N. Mem'l Health Care*, the Eighth Circuit described an argument that "in requesting accommodation . . . [plaintiff] necessarily was complaining that requiring her to work Friday shifts conflicted with her religious beliefs" as a "false equation" because the plaintiff "did not complain that [the employer] unlawfully *refused to accommodate*.  [Plaintiff] *requested* an accommodation, and it is undisputed on this record that [the employer's] *non-discriminatory* practice was to consider such requests on a case-by-case basis."  908 F.3d at 1102.  Likewise, in the case at bar, there is no evidence that Kroger's practice of addressing requests for religious accommodations on a case-by-case basis was in some way discriminatory.  Instead, the EEOC is challenging Kroger's decisions in this particular case.

[191] Br. in Supp. of EEOC's Mot. for Summ. J. (Doc. 33) at 19 (quoting *Crawford v. Metro Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 276 (2009)).

[192] *N. Mem'l Health Care*, 908 F.3d at 1101 (quoting *Crawford*, 555 U.S. at 276).

[193] EEOC's Resp. to Kroger's Statement of Material Facts (Doc. 50) ¶ 126; Kroger's Resp. to EEOC's Statement of Material Facts (Doc. 48) ¶¶ 20, 32, 43.

for accommodation, Kroger tried on multiple occasions to avoid firing Lawson and Rickerd.  After deciding that the requests for accommodation would not be granted, Kroger revoked all prior discipline to essentially give Lawson and Rickerd a fresh start.  Kroger also offered to reinstate them if they would agree to comply with the dress code.  Nothing suggests that these offers were anything but genuine.  On this record, no rational juror could conclude that the protected activity (i.e., the requests) caused Lawson and Rickerd to be terminated.  So, the EEOC's retaliation claim fails.

**CONCLUSION**

For the reasons stated above, the Court (1) GRANTS in part and DENIES in part Kroger's Motion for Summary Judgment, (2) DENIES the EEOC's Motion for Summary Judgment in its entirety, and (3) GRANTS in part and DENIES in part the EEOC's Motion to Strike.  The EEOC's retaliation claim is out.  The EEOC's failure-to-accommodate claim will go to trial.  The EEOC may depose Goodnight but may not re-depose Maxwell or shift the costs of Goodnight's deposition to Kroger.

IT IS SO ORDERED this 23rd day of June 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE